THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| KAELI GARNER, *et al.*, | Case No.: 2:21-cv-00750-RSL |
| Plaintiffs, | **MOTION TO DISMISS FIRST AMENDED CONSOLIDATED COMPLAINT** |
| v. | NOTE ON MOTION CALENDAR: January 28, 2022 |
| AMAZON.COM, INC., a Delaware Corporation, and AMAZON.COM SERVICES, LLC, a Delaware Limited Liability Company, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................1

BACKGROUND ....................................................................................3

    A.    The Alexa Service.........................................................3

    B.    How Alexa Works..........................................................4

    C.    Overview Of Alexa Registration And Consent Process ..............6

    D.    The Plaintiffs And Their Claims.........................................7

LEGAL STANDARD...............................................................................9

ARGUMENT .......................................................................................10

    I.    FOR REGISTERED USERS, WASHINGTON LAW GOVERNS AND ALL OTHER STATE LAW CLAIMS MUST BE DISMISSED. ........10

    A.    The COUs Bind All Registered Alexa Users.............................11

    B.    The Amazon COUs Require Application Of Washington Law................13

        1.    This Dispute Has A Substantial Relationship To Washington. ...................................................15

        2.    Washington Law Does Not Contradict Any Fundamental Policy Expressed By The Non-Washington States' Wiretapping Laws. ..........................................15

            a.    Washington And Every Alternative All-Party Consent State Proscribe Similar Activities in Similar Ways...............................................16

            b.    Mere Potential Differences In Outcome Or Remedies Are Not Different Fundamental Policies..........17

        3.    No State Has A Materially Greater Interest Than Washington. ...................................................20

    C.    The Choice-Of-Law Clause Applies To All Claims By Registered Users Relating To Their Alexa Devices. .........................21

    II.    REGISTERED USERS CONSENTED TO RECORDING TO PROVIDE, PERSONALIZE, AND IMPROVE THE ALEXA SERVICE. ...........22

MOTION TO DISMISS FACC        - i -        FENWICK & WEST LLP
CASE NO.: 2:21-CV-00750-RSL        1191 SECOND AVENUE, 10TH FLOOR
        SEATTLE, WASHINGTON 98101

**TABLE OF CONTENTS**
(continued)

Page

A.    Plaintiffs Expressly Consented To Recordings In The Registration Process. ...................................................................................23

B.    The Alexa Terms Disclose That Amazon Retains Recordings.................24

C.    All Plaintiffs Impliedly Consented To Recording Under Washington Law. ...................................................................27

III.    PLAINTIFFS STATE NO CLAIM UNDER THE WASHINGTON CONSUMER PROTECTION ACT. ....................................................31

    A.    The Amended Complaint Does Not Plead That Amazon Committed "Unfair or Deceptive Acts."........................................32

        1.    Rule 9(b) Requires That Plaintiffs Plead Misrepresentations With Specificity. ...........................................33

        2.    Plaintiffs Allege No Facts Demonstrating Any Actionable Misrepresentation Or Unfair Conduct. ...........................34

    B.    Plaintiffs Suffered No Injury To Their Business or Property, as Required By The WCPA. ...........................................37

IV.    PLAINTIFFS STATE NO CLAIM UNDER THE FEDERAL WIRETAP ACT.....................................................................41

V.    PLAINTIFFS STATE NO CLAIM UNDER THE FEDERAL STORED COMMUNICATIONS ACT. ......................................................43

    A.    Plaintiffs Have Failed To Allege That Alexa Is An Electronic Communication Service Under The SCA....................................43

    B.    Plaintiffs Fail To Allege That Alexa Recordings Are "In Electronic Storage."..................................................................45

    C.    Plaintiffs Make No Plausible Allegation That Any Alexa Recordings Were "Divulged" From Electronic Storage To A Third Party. ................................................................46

CONCLUSION................................................................................48

MOTION TO DISMISS FACC       - ii -       FENWICK & WEST LLP
CASE NO.: 2:21-CV-00750-RSL       1191 SECOND AVENUE, 10TH FLOOR
       SEATTLE, WASHINGTON 98101

# TABLE OF AUTHORITIES

CASES                                                                                     PAGE(S)

*ACD Distrib. LLC v. Wizards of the Coast LLC*,
    No. 20-35828, 2021 WL 4027805 (9th Cir. Sept. 3, 2021) .................................................14

*Alpert v. Nationstar Mortg., LLC*,
    No. C15-1164 RAJ, 2019 WL 1200541 (W.D. Wash. Mar. 14, 2019) ...........................32, 36

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................................9, 10

*Bass v. Facebook, Inc.*,
    394 F. Supp. 3d 1024 (N.D. Cal. 2019) ...............................................................40, 41

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).........................................................................................................9

*Benavidez v. Cty. of San Diego*,
    993 F.3d 1134 (9th Cir. 2021) ......................................................................................10

*Brazil v. Dell Inc.*,
    585 F. Supp. 2d 1158 (N.D. Cal. 2008) ..................................................................18, 20

*Brotherson v. Professional Basketball Club, L.L.C.*,
    604 F. Supp. 2d 1276 (W.D. Wash. 2009) .....................................................................38

*Carideo v. Dell, Inc.*,
    520 F. Supp. 2d 1241 (W.D. Wash. 2007).................................................................15, 21

*Carideo v. Dell, Inc.*,
    706 F. Supp. 2d 1122 (W.D. Wash. 2010) .....................................................................21

*Casillas v. Cypress Ins. Co.*,
    770 F. App'x 329 (9th Cir. 2019) ..................................................................................46

*Cousineau v. Microsoft Corp.*,
    992 F. Supp. 2d 1116 (W.D. Wash. 2012).....................................................................38

*Crowley v. CyberSource Corp.*,
    166 F. Supp. 2d 1263 (N.D. Cal. 2001) ..........................................................................44

*Dajani v. Dell Inc.*,
    No. C 08-5285, 2009 WL 815352 (N.D. Cal. Mar. 26, 2009)...............................................20

*Daniels-Hall v. Nat'l Educ. Ass'n*,
    629 F.3d 992 (9th Cir. 2012) ..........................................................................................37

*Davis v. HSBC Bank Nevada, N.A.*,
    691 F.3d 1152 (9th Cir. 2012) ..................................................................................32, 35, 36

*Del Vecchio v. Amazon.com, Inc.*,
    No. C11-366RSL, 2012 WL 1997697 (W.D. Wash. June 1, 2012) ...........................36, 37, 39

# TABLE OF AUTHORITIES
**(continued)**

CASES       PAGE(S)

*Dohrmann v. Intuit, Inc.*,
   823 F. App'x 482 (9th Cir. 2020) ........................................................................12

*Donohue v. Apple, Inc.*,
   871 F. Supp. 2d 913 (N.D. Cal. 2012) .................................................................34

*Ekin v. Amazon Servs., LLC*,
   84 F. Supp. 3d 1172-73 (W.D. Wash. 2014) .......................................................11

*Erie Ins. Exch. v. Heffernan*,
   925 A.2d 636 (Md. 2007) ..............................................................................18, 20

*Erwin v. Cotter Health Ctrs.*,
   161 Wn.2d 676, 167 P.3d 1112 (2007)..........................................................14, 21

*Facebook, Inc. v. Profile Tech., Ltd.*,
   No. 5:13–cv–0459–PSG, 2014 WL 492369 (N.D. Cal. Feb. 5, 2014) ..................20

*Fagerstrom v. Amazon.com, Inc.*,
   141 F. Supp. 3d 1051 (S.D. Cal. 2015)................................................................18

*Fid. Mortg. Corp. v. Seattle Times Co.*,
   213 F.R.D. 573 (W.D. Wash. 2003) ....................................................................33

*Gierke v. Allstate Prop. & Cas. Ins. Co.*,
   No. C19-0071JLR, 2019 WL 4849494 (W.D. Wash. Oct. 1, 2019)......................21

*Goodman v. HTC America, Inc.*,
   No. C11-1793MJP, 2012 WL 2412070 (W.D. Wash. June 26, 2012) .............34, 41

*Gragg v. Orange Cab Co., Inc.*,
   942 F. Supp. 2d 1111 (W.D. Wash. 2013)...........................................................38

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,
   105 Wn.2d 778, 719 P.2d 531 (1986)......................................................31, 32, 41

*Harbers v. Eddie Bauer, LLC*,
   No. C19-1012JLR, 2019 WL 6130822 (W.D. Wash. Nov. 19, 2019) ..................13

*Hoang v. Amazon.com, Inc.*,
   No. C11–1709MJP, 2012 WL 1088165 (W.D. Wash. Mar. 30, 2012) ..................31

*Hoefs v. Sig Sauer Inc.*,
   No. 3:20-cv-05173-RBL, 2020 WL 3488155 (W.D. Wash. June 26, 2020).........33

*Huynh v. Quora, Inc.*,
   No. 18-cv-07597-BLF, 2019 WL 11502875 (N.D. Cal. Dec. 19, 2019)...............39

*In re Facebook, Inc. Internet Tracking Litig.*,
   956 F.3d 589 (9th Cir. 2020) .................................................................40, 41, 45

MOTION TO DISMISS FACC    - iv -     **FENWICK & WEST LLP**
CASE NO.: 2:21-CV-00750-RSL     1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON 98101

1

**TABLE OF AUTHORITIES**
(continued)

2

CASES                                                                    PAGE(S)

3   *In re Google Assistant Priv. Litig.*,
       457 F. Supp. 3d 797 (N.D. Cal. May 6, 2020)..........................................................47

4

5   *In re Google Assistant Priv. Litig.*,
       No. 19-cv-04286-BLF, 2021 WL 2711747 (N.D. Cal. July 1, 2021).........................39, 40, 47

6   *In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
       806 F.3d 125 (3d Cir. 2015)............................................................................22, 42

7

8   *In re: JetBlue Airways Corp. Priv. Litig.*,
       379 F. Supp. 2d 299 (E.D.N.Y. 2005) ...................................................................44

9   *In re Marriage of Farr*,
       87 Wn. App. 177 (1997) ..............................................................................29, 30

10

11   *In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV
       Television Litig.*,
       758 F. Supp. 2d 1077 (S.D. Cal. 2010)...................................................................9

12

13   *In re Toys R Us, Inc., Priv. Litig.*,
       No. 00-cv-2746, 2001 WL 34517252 (N.D. Cal. Oct. 9, 2001) .............................................45

14   *In re Zynga Priv. Litig.*,
       No. C 10-04680 JW, 2011 WL 13240366 (N.D. Cal. Nov. 22, 2011) ..................................10

15

16   *Innovation Ventures, L.L.C. v. Custom Nutrition Labs., L.L.C.*,
       No. 12-13850, 2015 WL 5679879 (E.D. Mich. Sept. 28, 2015)............................................19

17   *Ins. Auto Auctions, Inc. v. Indian Harbor Ins. Co.*,
       No. C09-1522RAJ, 2010 WL 11688494 (W.D. Wash. Sept. 16, 2010)..........................15, 20

18

19   *Kearney v. Kearney*,
       95 Wn. App. 405, 974 P.2d 872 (1999) ................................................................31

20   *Keithly v. Intelius Inc.*,
       764 F. Supp. 2d 1257 (W.D. Wash. 2011) .............................................................44

21

22   *Keyes v. Bollinger*,
       31 Wn. App. 286, 640 P.2d 1077 (1982)...........................................................37, 38

23   *KSA Elecs., Inc. v. M/A-COM Tech. Sols., Inc.*,
       No. 15–10848–FDS, 2015 WL 4396477 (D. Mass. July 17, 2015) .......................................20

24

25   *Kwan v. SanMedica Int'l*,
       854 F.3d 1088 (9th Cir. 2017) ........................................................................10

26   *LaCourt v. Specific Media, Inc.*,
       No. SACV 10-1256-GW(JCGx), 2011 WL 1661532 (C.D. Cal. April 28,
       2011) ...................................................................................................40

27

28

**TABLE OF AUTHORITIES**
(continued)

CASES                                                                          PAGE(S)

*Lee v. Ticketmaster L.L.C.*,
   817 F. App'x 393 (9th Cir. 2020) ...................................................................12, 13

*Lessard v. Clarke*,
   736 A.2d 1226 (N.H. 1999) ...................................................................18

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
   350 F.3d 1018 (9th Cir. 2003) ...................................................................9

*Lopez v. Apple, Inc.*,
   519 F. Supp. 3d 672 (N.D. Cal. 2021) ...................................................................44

*Low v. LinkedIn Corp.*,
   No. 11-CV-01468-LHK, 2011 WL 5509848 (N.D. Cal. Nov. 11, 2011)...............................40

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
   519 F.3d 1025 (9th Cir. 2008) ...................................................................9

*Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*,
   761 So. 2d 306 (Fla. 2000)...................................................................19

*Mellon v. Regional Trustee Servs. Corp.*,
   182 Wn. App. 476, 334 P.3d 1120 (2014)...................................................................32

*Minnick v. Clearwire US, LLC*,
   683 F. Supp. 2d 1179 (W.D. Wash. 2010)...................................................................37

*Nemykina v. Old Navy, LLC*,
   461 F. Supp. 3d 1054 (W.D. Wash. 2020)...................................................................33

*Nguyen v. Barnes & Noble, Inc.*,
   763 F.3d 1171 (9th Cir. 2014) ...................................................................12

*Nguyen v. Doak Homes, Inc.*,
   140 Wn. App. 726, 167 P.3d 1162 (2007)...................................................................32

*Opperman v. Path, Inc.*,
   87 F. Supp. 3d 1018, 1056 (N.D. Cal. 2014) ...................................................................39

*Pulte Home Corp. v. TIG Ins. Co.*,
   794 F. App'x 587 (9th Cir. 2019) ...................................................................19

*Robinson v. Avis Rent A Car System, Inc.*,
   106 Wn. App. 104, 22 P.3d 818 (2001)...................................................................31

*Schnall v. AT & T Wireless Servs., Inc.*,
   171 Wn.2d 260, 259 P.3d 129 (2011)...................................................................14, 20

*Selden v. Airbnb, Inc.*,
   4 F.4th 148 (D.C. Cir. 2021)...................................................................13

# TABLE OF AUTHORITIES
**(continued)**

CASES                                                                    PAGE(S)

*Selden v. Airbnb, Inc.*,
   No. 16-cv-00933 (CRC), 2016 WL 6476934 (D.D.C. Nov. 1, 2016) .....................................13

*Short v. Hyundai Motor Co.*,
   No. C19-0318JLR, 2020 WL 6132214 (W.D. Wash. Oct. 19, 2020)....................................34

*Silver v. Stripe Inc.*,
   No. 4:20-cv-08196-YGR, 2021 WL 3191752 (N.D. Cal. July 28, 2021) ..............................26

*State v. Glant*,
   13 Wn. App. 3d 356, 465 P.3d 382 (2020)................................................................28, 29, 30

*State v. John Smith*,
   189 Wn.2d 655, 405 P.3d 997 (2017)..................................................................................27, 30

*State v. Racus*,
   7 Wn. App. 2d 287, 299-300, 433 P.3d 830 (2019).........................................................27, 29, 30

*State v. Roden*,
   179 Wn.2d 893, 321 P.3d 1183 (2014)......................................................................................17

*State v. Townsend*,
   147 Wn.2d 666, 57 P.3d 255 (2002)...................................................................... *passim*

*Stephens v. Omni Ins. Co.*,
   138 Wn. App. 151, 159 P.3d 10 (2007)...................................................................................32

*Surles v. Prudential Ins. Co. of Am.*,
   No. C 06-05807 WHA, 2007 WL 164548 (N.D. Cal. Jan. 19, 2007)...................................19

*Taylor v. E. Connection Operating, Inc.*,
   988 N.E.2d 408 (Mass. 2013).....................................................................................................18

*Theofel v. Farey-Jones*,
   359 F.3d 1066 (9th Cir. 2004) ........................................................................................45, 46

*Weimin Chen v. Sierra Trading Post, Inc.*,
   No. 2:18-cv-1581-RAJ, 2019 WL 3564659 (W.D. Wash. Aug. 6, 2019) .............................11

*Wesch v. Yodlee, Inc.*,
   No. 20-cv-05991-SK, 2021 WL 1399291 (N.D. Cal. Feb. 16, 2021)....................................45

*William Insulation Co. Inc. v. JH Kelly LLC*,
   No. C21-5083 BHS, 2021 WL 1894092 (W.D. Wash. May 11, 2021)..................................14

*Williams v. Facebook, Inc.*,
   384 F. Supp. 3d 1043 (N.D. Cal. 2018) .........................................................................15, 19

*Wiseley v. Amazon.com, Inc.*,
   709 F. App'x 862, 863-64 (9th Cir. 2017)...........................................................12, 15, 18, 26

**TABLE OF AUTHORITIES**
(continued)

CASES                                                                                                PAGE(S)

*Workhouse Media, Inc. v. Ventresca*,
   No. 75373-8-I, 2017 WL 959534 (Wash. App. Mar. 13, 2017) ...............................................15

*Yakima Cty. (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima*,
   122 Wn.2d 371, 858 P.2d 245 (1993).............................................................................................13

*Zamber v. Am. Airlines, Inc.*,
   No. 16-23901-CV, 2020 WL 1445479 (S.D. Fla. Feb. 11, 2020) ...........................................26

STATUTES AND RULES

42 Pa. Cons. Stat. Ann. § 5524(7)...................................................................................................17

18 Pa. Cons. Stat. § 5703 ..........................................................................................................16, 31

18 Pa. Cons. Stat. § 5725 ................................................................................................................16

18 U.S.C. § 2510.......................................................................................................................43, 45

18 U.S.C. § 2511 ................................................................................................................... *passim*

18 U.S.C. § 2702 ................................................................................................................... *passim*

18 U.S.C. § 2711(1) ........................................................................................................................43

Cal. Civ. Proc. Code § 340 .............................................................................................................17

Cal. Penal Code §§ 631-632 .....................................................................................................16, 17, 31

Cal. Penal Code § 637.2 ..................................................................................................................17

Federal Rules of Civil Procedure 8(a) ............................................................................................34

Federal Rules of Civil Procedure 9(b) ......................................................................................33, 34

Federal Rules of Civil Procedure 12 ..................................................................................... *passim*

Fla. Stat. Ann. § 934.03 ...........................................................................................................16, 17, 31

Fla. Stat. Ann. § 934.10(3)..............................................................................................................17

Ill. Comp. Stat. Ann. 5/13-202.......................................................................................................17

Ill. Comp. Stat. § 5/14-2..........................................................................................................16, 17, 31

Ill. Comp. Stat. § 5/14-6..................................................................................................................17

Mass. Gen. Laws Ann. ch. 260, § 2A ............................................................................................17

Mass. Gen. Laws ch. 272, § 99 ...............................................................................................16, 31

**TABLE OF AUTHORITIES**
(continued)

STATUTES AND RULES                                                                PAGE(S)

Md. Code Ann., Cts. & Jud. Proc. § 5-101 .................................................................17

Md. Code Ann., Cts. & Jud. Proc. § 10-402 ..............................................16, 17, 31

Mich. Comp. Laws § 750.539 ..........................................................................16, 17

Mich. Comp. Laws § 750.539c ...................................................................................31

N.H. Rev. Stat. § 508:4 .............................................................................................17

N.H. Rev. Stat. § 570-A:2 ..............................................................................16, 17, 31

RCW § 4.16.080(2) ...................................................................................................17

RCW § 19.86.20 ..............................................................................................passim

RCW § 19.86.90 ..............................................................................................passim

RCW § 9.73.030 ..............................................................................................passim

RCW § 9.73.060 ...................................................................................................17

OTHER AUTHORITIES

https://www.justia.com/50-state-surveys/recording-phone-calls-and-
   conversations/ ...................................................................................................16

Restatement (Second) Conflict of Laws Section 187 (1971).................................passim

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON 98101

**INTRODUCTION**

Plaintiffs did not oppose Amazon's Motion to Dismiss the Consolidated Complaint in this action.  Dkt. 48.  Instead, Plaintiffs filed a First Amended Consolidated Complaint ("Amended Complaint" or "FACC"), again alleging that Amazon's popular Alexa voice service records people's voices without their knowledge or consent.  Plaintiffs are wrong.  The Amended Complaint cannot remedy the deficiencies of their claims, and it should be dismissed.

Alexa is a transformative technology.  It allows users to access an essentially unlimited array of online services and information by using their voices instead of a keyboard, mouse, or touchscreen.  Hundreds of millions of people around the world use Alexa to make their lives more convenient, efficient, and entertaining.  At one level, while being able to talk to your computer is new, voice prompts are just another way of giving instructions to a computer.  At another level, it is revolutionary, just as it was revolutionary when PCs replaced a keystroke with a mouse-click, and when mobile phones replaced a mouse-click with a tap or swipe.  Today, voice assistants allow users to interact with computers and access the internet without using their hands at all.  Nevertheless, all of these methods are merely different ways to input commands to computers so that they can digitally record, process, and respond to those commands.

Plaintiffs claim that the inherent functionality of the Alexa service—*i.e.*, that it records a user's voice in order to process her commands—violates various state and federal laws.  But as explained in this Motion, Plaintiffs' claims fail as a matter of law because they are based on false premises.  The central conceit of Plaintiffs' Amended Complaint is that the Alexa service records "secretly," that Plaintiffs were genuinely surprised to learn about those recordings, and that they were harmed.  But nothing about Alexa's recording functionality is a secret:  Amazon clearly discloses how Alexa works and, from the day Alexa launched in 2014, the media reported the fact that the service records users' voices and stores those recordings until the user deletes them.  Alexa-enabled devices also use visual and audio cues to alert users when, after detecting the "wake word" (generally "Alexa"), the devices are activated and start sending audio to the cloud.

Nor should Plaintiffs have been surprised.  Alexa users purchase voice-activated devices, place them in their homes, connect them to the internet, and make voice requests to the Alexa

service, expecting and wanting the service to digitally record, process, and respond.  When users sign up and activate the Alexa service, the very first thing Amazon tells those users is that Alexa retains their audio inputs in the cloud to improve the service.  And users are notified of and consent to that recording, in multiple ways, through Amazon's service terms.

Further, Plaintiffs have not been harmed.  Nowhere in the Amended Complaint do Plaintiffs allege any injury to their money or property.  To the contrary, their households have evidently enjoyed the myriad benefits of the Alexa service for years to enrich their lives.  And if the prospect of having their voice recordings stored is troubling in some way, Plaintiffs have the power to opt out and delete their recordings, individually or *en masse*, with a click or a voice command.

All of Plaintiffs' claims should be dismissed for one or more reasons.  There are two categories of Plaintiffs:  those who signed up for the Alexa service and registered Alexa-enabled devices, and those who purportedly used the Alexa service without themselves registering.  There are also two general categories of recordings alleged:  recordings of intentional commands directed to the Alexa service, and recordings caused by purported "false wakes"—when the device activates after mistakenly detecting the wake word.  No claim has been pleaded as to any of these circumstances.

With respect to Plaintiffs who registered for the Alexa service, Washington law applies to this dispute because the parties agreed that it would.  Plaintiffs acknowledge that fact and, indeed, state at the outset of the Amended Complaint that "Washington's wiretapping law … applies nationwide to Plaintiffs and all members of the Class."  As such, Plaintiffs' claims under the laws of various other all-party-consent states must be dismissed.  In any event, no court in Washington or anywhere else has ever concluded that recording routine, intentional instructions to a computer constitutes actionable wiretapping.  If a typed command to the Alexa service would not violate the law, the exact same command transmitted orally does not either.  As explained below, Plaintiffs have alleged nothing that would support a claim under Washington's wiretap statute.  Plaintiffs' Washington Consumer Protection Act claim also fails because Plaintiffs have not alleged or suffered any injury to their business or property as the statute requires.  Nor have they identified

any misrepresentation by Amazon about Alexa recordings, much less any that a Plaintiff saw or relied on.  To the contrary, Plaintiffs identify Amazon privacy resources— including the webpage called "Alexa, Echo Devices, and Your Privacy" ("Your Privacy")—which provide helpful and accurate information about the Alexa service, the retention of recordings, and how to delete them.

Plaintiffs' Federal Wiretap Act claim fails as a matter of law because, as the intended recipient of users' commands to the Alexa service, Amazon cannot illegally "intercept" those communications.  Similarly, Plaintiffs' Federal Stored Communications Act claim fails because the statute does not apply to voice requests made to the Alexa service.  But even if it did, Amazon is the intended recipient of user commands and does not disclose them to any third party.

The Amended Complaint repeats the same failures that doomed the last one.  Plaintiffs cannot overcome their own allegations showing Amazon's extensive disclosure of Alexa recording practices and users' consent to those practices, both express and implied, as a prerequisite to registering and using the Alexa service.  Plaintiffs have thus pled no viable cause of action.  That is not surprising, because Plaintiffs are misapplying laws enacted in a different time to address a different problem.  Amazon is not wiretapping or secretly recording its customers.  As the unsuccessful amendment to the Complaint shows, allowing any further amendment would be futile.  Accordingly, under Fed. R. Civ. P. 12(b)(6), the Court should dismiss Plaintiffs' Amended Complaint with prejudice.

## BACKGROUND

### A.    The Alexa Service

Amazon's Alexa is a cloud-based voice service that allows users to access online resources and make commands and queries to computers by voice instead of using a keyboard, mouse, or touchscreen.  *See* FACC (Dkt. No. 59) ¶¶ 7, 44, 49; *see also* Consolidated Complaint (Dkt. No. 22) ("CC") ¶ 44.  Some Alexa-enabled devices are sold by Amazon, primarily its Echo line of "smart speaker" products; many other Alexa-enabled devices are made and sold by other companies like Sonos.  FACC ¶ 4.  With those devices, users can choose to listen to music or books, check the weather or news, control smart-home devices like thermostats or lights, create timers or lists, and access hundreds of other convenient and entertaining features.  *See* Amazon's

Request For Judicial Notice ("RJN") (filed concurrently with this Motion) Ex. A ("Alexa Frequently Asked Questions" or "FAQs") at 1, FAQ 1.

Alexa's voice interface is innovative, but at its simplest level, Alexa is a computer service: the user inputs a command, the cloud-based computer service receives and processes that command in a digital format, and some function is performed or a response is sent back to the user. FACC ¶ 7. As Plaintiffs acknowledge, "Alexa Devices are designed to record and respond to human commands in a simulated voice." *Id.*; *see also* CC ¶ 6. That the service captures voice commands to process them is both self-evident and fully known to Plaintiffs, who also admit that "[m]ost people believe that when they speak to an Alexa Device, their voice is temporarily processed so that Alexa can generate a response or carry out the user's command." FACC ¶ 5; CC ¶ 5. Indeed, in their Amended Complaint, Plaintiffs cite a "2019 survey of smart-home device users" that shows that the vast majority of users, some 89.6%, understand that audio inputs to Alexa are recorded. FACC ¶ 53 & n.26; RJN Ex. D at 255. The Alexa FAQs, which the FACC references and incorporates (at footnote 30), also explain that, "[w]hen you speak to Alexa, a recording of what you asked Alexa is sent to Amazon's cloud so we can process and respond to your request." *See* RJN Ex. A at 1, FAQ 1; CC at n.18.

Innumerable online services—from Google Search, to Lexis/Nexis, to Netflix—transmit inputs, commands, or requests via the internet to cloud-based computer servers where they are recorded and processed. With Alexa, these requests can be spoken rather than typed. But that does not change the fact that, like other internet commands, they must be recorded and processed on cloud-based computer servers. In fact, the Alexa service also has an "Alexa Type" function that allows users to type exactly the same command that they could alternatively transmit orally to an Alexa device. No court has held that a computer system's recording of commands directed to it—whether spoken, clicked, or typed—is wiretapping.

### B.    How Alexa Works

A typical Alexa-enabled Echo device consists of a speaker, microphone, light ring, and buttons (to control volume, an "action" button to activate Alexa manually without the wake word, and a microphone on/off button). FACC ¶¶ 111, 122; RJN Ex. A at 20-21, Alexa-Enabled Echo

Device FAQs, FAQ 2-3.  When an Echo device detects the "wake word" (typically, "Alexa"), the Echo flashes a blue light ring to alert the user and turns down the volume on any sound playing on the device (*e.g.*, music, news, audiobook, podcast).  FACC ¶ 111.  At the user's option, Echo devices also will produce an audible tone to indicate that the devices have been activated and are sending audio to the cloud.  RJN Ex. A at 2-3, FAQ 5; *id.* at 20-21, Alexa-Enabled Echo Device FAQs, FAQ 2-3.  Any user who does not want Alexa to listen for the wake word can turn the microphone off until they want to issue a request, and then turn on the microphone, or "push-to-talk," as she chooses.  *See* FACC ¶ 122 (noting that a user can prevent recording by muting the microphone or unplugging the device).  Some Alexa-enabled devices—such as certain Fire tablets—operate *only* by "push-to-talk," without functionality that listens for a wake word.  RJN Ex. A at 1, FAQ 1.

When the Alexa service detects a wake word or the action button on the device is pressed, the device starts streaming audio to the cloud.  FACC ¶¶ 7, 52.  As Amazon explains in one of the many privacy resources it publishes about Alexa, "[n]o audio is stored or sent to the cloud unless **the device detects** the wake word (or Alexa is activated by pressing a button)."  FACC ¶ 103 & n.56 (quoting Your Privacy webpage) (emphasis added); *see also generally* RJN Ex. C, Your Privacy.  These audio commands must be captured and translated into digital computer instructions so that cloud servers can process and respond to those commands.  *Id.*  As Amazon describes in the Alexa FAQs, and in its device registration materials (described below), these audio inputs are used to respond to the user's request and are retained to improve the Alexa service.  RJN Ex. A at 4-5, FAQ 9-10; FACC ¶ 52.

A so-called "false wake" is a phenomenon that can occasionally occur if the Alexa service mistakenly identifies a sound as the wake word.  FACC ¶¶ 57-58; RJN Ex. A at 2-3, FAQ 5.  For example, if someone says, "My neighbor just bought a Lexus," the Alexa service might incorrectly detect "a Lexus" as an acoustic pattern that matches the wake word "Alexa."  When that happens, with the device detecting what it perceives as the wake word, the Alexa-enabled device operates as it would if someone actually spoke the wake word: alerting users with the flashing blue light, optional tone, and (if the device is on and playing music or other content) reduced volume.  RJN

Ex. A at 1-2, FAQ 1-2.  In other words, "false wakes" are not hidden, because the device signals that it has been activated and has detected what was perceived as a wake word.  *Id.*

Moreover, false wakes are not a secret because Amazon publicly discloses and explains the phenomenon.  This is from the Alexa FAQs:

> In some cases, your Alexa-enabled device might interpret another word or sound as the wake word (for instance, the name "Alex" or someone saying "Alexa" on the radio or television).  When this happens, we call that a "false wake."  We have a team of world-class scientists and engineers dedicated to continually improving our wake word detection technology and preventing false wakes from happening, including through the cloud verification mechanism described in the FAQ "How does Alexa minimize the amount of data sent to the cloud?"

> Anytime your Echo device detects the wake word, a visual or audible indicator will signal it is recording audio to stream to the cloud, and you can review and delete the voice recordings associated with your account (including any audio resulting from a false wake) in your Voice History available in the Alexa app at **Settings > Alexa Privacy** or https://www.amazon.com/alexaprivacysettings.

RJN Ex. A at 2-3, FAQ 5.

Amazon makes false-wake recordings available to the user to review and provide feedback, and this data also helps Amazon reduce the likelihood of false wakes in the future.  FACC ¶ 60; *see also id.* ¶ 63 ("each named Plaintiff accessed their recordings, or the recordings of the registered user that they live with, through an Alexa App in a manner similar to" the screenshot at paragraph 60).  If users have questions about why an Alexa device activated, they can view transcripts of their recordings and play or delete them at any time by going to "History" in "Settings" in the Alexa app or website.  *Id.* ¶¶ 60, 65.  Customers also can adjust their settings to delete voice recordings automatically all at once or after a specific time period (*e.g.*, three months), or choose not to have their voice recordings stored at all.  RJN Ex. A at 3, FAQ 6.  A user can also delete recordings by voice, by stating, "Alexa, delete what I just said" or "Alexa, delete everything I said today."  *Id.*

## C.    Overview Of Alexa Registration And Consent Process

Plaintiffs acknowledge that in order to set up and register an Alexa device, a user must use the Alexa App, which shows various notices during the setup process.  FACC ¶¶ 95-100.  (Users can also register the device through a web browser and are shown similar notices.)  Those notices

include a "Welcome Screen" that explains at the top of the screen that "*Amazon processes and retains audio, interactions, and other data in the cloud to provide and improve our services*." *Id.* ¶ 100 (emphasis added). As discussed further below, users also accept the Alexa Terms of Use ("Alexa Terms"), when setting up Alexa devices. *See* FACC ¶ 52 & n.24 (citing Alexa Terms); CC ¶ 46 & n.16 (same); RJN Ex. B. The Alexa Terms are incorporated by reference through the Amazon Conditions Of Use ("COUs") (FACC ¶ 96; Ex. A at 1), and users are also required to accept the Alexa Terms in order to set up Alexa devices. FACC ¶ 100. The Terms make clear that Amazon "processes and *retains your Alexa Interactions, such as your voice inputs* … in the cloud," and they explain "how to *delete voice recordings* associated with your account," with links to information on how users can read transcripts of, listen to, and delete their recordings. RJN Ex. B at 2, Alexa Terms ¶ 1.3 (emphases added).

### D. The Plaintiffs And Their Claims

Before filing the Consolidated Complaint, Plaintiffs maintained seven separate putative class actions alleging substantially similar claims. On August 3, 2021, the Court granted the parties' stipulated motion to consolidate those cases. *See* Dkt. 21. The Plaintiffs in this consolidated action all now allege that they "live[] in a household with an Alexa Device." FACC ¶¶ 17-37. But they differ in whether they have personally registered that Alexa device with an Amazon account, as required for its activation, or if the device was "registered by someone else." Plaintiffs Mark Fladd, Jodi Brust, John Dannelly, Diane McNealy, Lisa Hovasse, Sandra Mirabile, Susan Lenehan, Jeffrey Hoyt, James Robinson, Eric Dlugoss, Selena Johnson, and Kelly Miller allege that they "set up the Alexa Device through the use of their Alexa App as outlined below." FACC ¶¶ 3 & n.1, 18, 20-22, 24, 25, 27, 28, 30, 32, 35, 37. Plaintiffs Kaeli Garner, Stephanie Fladd, Michael McNealy, Ricky Babani, Lorlie Tesoriero, Rosa Comacho, Julie Dlugoss, Ronald Johnson, and Caron Watkins allege that the Alexa device was registered "by someone else," without specifying who or on which account. *Id.* ¶¶ 17, 19, 23, 26, 29, 31, 33, 34, 36. The various Plaintiffs reside in Washington, Florida, New Hampshire, Massachusetts, California, Maryland, Pennsylvania, Illinois, and Michigan. Those states were selected by Plaintiffs' counsel because those states' statutes, like Washington's, require consent of all parties

1    to record private communications.  *See* FACC ¶ 2.

2         Plaintiffs filed their Consolidated Complaint on September 2, 2021.  Dkt. 22.  On October

3    18, 2021, Amazon moved to dismiss this entire action.  Dkt. 48.  In response, Plaintiffs amended

4    their Consolidated Complaint and filed the Amended Complaint on November 17, 2021.  Dkt. 59.

5    Like the initial Consolidated Complaint, the Amended Complaint asserts thirteen counts, for

6    violation of the Washington Privacy Act, which is Washington's wiretap statute ("WPA"); the

7    Washington Consumer Protection Act ("WCPA"); nine other states' wiretapping laws (two in

8    California); the Federal Wiretap Act (18 U.S.C. § 2511(1)(a)); and the Stored Communications

9    Act (18 U.S.C. § 2702) ("SCA").

10        The Amended Complaint does not materially change any of Plaintiffs' claims.  Plaintiffs

11   add allegations about their purported household Alexa use.  *See* FACC ¶¶ 60-84; *compare* CC

12   ¶¶ 52-57.  If anything, however, these new allegations show merely how easy it is for household

13   Alexa users to review, listen to, and, if they wish, delete recordings.  Whether or not they were

14   registered Alexa users, Plaintiffs admit that they each "accessed their recordings, or the recordings

15   of the registered user that they live with, through an Alexa App" without any obstacle.  FACC

16   ¶ 63.

17        The Amended Complaint also fails to overcome the fact that the terms Plaintiffs cite bar

18   their claims.  Plaintiffs now criticize Amazon for periodically updating its COUs and other terms.

19   FACC ¶ 93.  But Plaintiffs do not identify a single material difference in Amazon's terms and

20   disclosures as a result of any such updates.  And, while they vaguely suggest uncertainty as to what

21   terms were in place when Alexa was registered for each Plaintiff, the Amended Complaint contains

22   no allegation that the version of the COUs ***they attach as Exhibit A*** does not bind Plaintiffs.

23   Plaintiffs also make no changes to the fact allegations about the screenshots and disclosures that

24   Amazon presents to users during the Alexa sign-up and registration process.  *Compare* FACC

25   ¶¶ 94-100, *with* CC ¶¶ 63-69.

26        Plaintiffs make only cosmetic changes to their proposed class allegations.  In their

27   Consolidated Complaint, Plaintiffs primarily sought to represent two "Nationwide Classes

28   pursuant to Washington and federal law."  One such class was for "registered Alexa users", and

one was for "unregistered" users.  As the alternative to nationwide classes under Washington law, the Consolidated Complaint sought to represent sub-classes under the laws of each of their respective states.  CC ¶ 84.  With the Amended Complaint, however, Plaintiffs reverse the order of the proposed classes:  they now seek initially to represent a nationwide class of registered users and state classes for registered and unregistered users, and, in the alternative, nationwide classes of registered and unregistered users.  FACC ¶¶ 125-126.  Whatever the ordering of the class allegations, however, Plaintiffs still admit that "Washington's wiretapping law … applies nationwide to Plaintiffs and all members of the Class."  FACC ¶ 1; CC ¶ 1.  And, as the first two counts in their Amended Complaint, Plaintiffs assert Washington law claims, under the WPA and WCPA, on behalf of a "Nationwide Registered Class."  FACC ¶¶ 143-175.

## LEGAL STANDARD

The Rule 12 standards are well-known and well-established.  To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Pleading facts that are "'merely consistent with' a defendant's liability" is not enough. *Iqbal*, 556 U.S. at 678.  To represent a class, of course, Plaintiffs first must have viable claims of their own. *See, e.g.*, *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003) (if plaintiff has no claim "she cannot represent others who may have such a claim, and her bid to serve as a class representative must fail"); *In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*, 758 F. Supp. 2d 1077, 1100 (S.D. Cal. 2010) (in putative class action, named plaintiffs' complaint "must state the requirements for all named class members").

A claim is properly dismissed where, under applicable law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  Although the Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party," *Manzarek v. St. Paul Fire & Marine*

*Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted), "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Legal conclusions are insufficient and must be supported by factual allegations, *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017), and "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss," *Benavidez v. Cty. of San Diego*, 993 F.3d 1134, 1145 (9th Cir. 2021) (quoting *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004)).

Further, dismissal with prejudice is appropriate where a proposed amendment would be futile: "Courts may dismiss a case without leave to amend if the plaintiff is unable to cure the defect by amendment." *In re Zynga Priv. Litig.*, No. C 10-04680 JW, 2011 WL 13240366, at *2 (N.D. Cal. Nov. 22, 2011) (dismissing claims under the Wiretap Act and Stored Communications Act with prejudice because amendment was futile).

## ARGUMENT

### I. FOR REGISTERED USERS, WASHINGTON LAW GOVERNS AND ALL OTHER STATE LAW CLAIMS MUST BE DISMISSED.

The Amended Complaint acknowledges that registration of an Alexa device requires agreement to the Amazon COUs. FACC ¶¶ 95-97, Ex. A. The COUs include an "Applicable Law" clause that requires application of Washington law, stating: "the laws of the state of Washington, without regard to principles of conflict of laws, will govern these Conditions of Use and any dispute of any sort that might arise between you and Amazon." FACC, Ex. A at 8; CC ¶ 104. As explained below, registered users of the Alexa service are bound by this online agreement. And under Washington law, the Court must enforce this contractual choice at least for all Plaintiffs who registered an Alexa device. Plaintiffs apparently recognize that Washington law applies to all Plaintiffs: they allege that "Washington's wiretapping law … applies nationwide to Plaintiffs and all members of the Class," FACC ¶ 1, and their primary claims assert Washington causes of action on behalf of the putative Nationwide Class of registered users—not just Washingtonians. *Id.* ¶¶ 143-175. The parties' explicit choice of Washington law in the COUs compels dismissal of any claim under another state's law. Washington law governs here, and at

least the claims of registered users under all other state laws should be dismissed with prejudice.

### A.   The COUs Bind All Registered Alexa Users.

Plaintiffs concede that registered users of the Alexa service must complete registration through a sign-up process during which they repeatedly agree to the COUs.  FACC ¶¶ 94-100. Upon opening the Alexa App to set up an Alexa device, users are prompted with the sign-in screen. *Id.* ¶¶ 94-95.  Under the "SIGN-IN" button (for an existing Amazon account), and immediately above the button to "CREATE A NEW AMAZON ACCOUNT," Amazon explains that, "By continuing, you agree to Amazon's Conditions of Use and Privacy Notice." *Id.* ¶ 95.  The COUs and the Privacy Notice are hyperlinked in contrasting blue font, the color that consistently indicates hyperlinks throughout the registration process.  *Id.*  A user who clicks on the link is taken to the COUs, which display, among other terms, the choice-of-law provision under the all-caps, bold heading "**APPLICABLE LAW**." *Id.* ¶¶ 96-97, Ex. A at 8.  By continuing to sign in after receipt of this notice, the user agrees to the COUs, including the choice-of-law provision.

The Amended Complaint further acknowledges that a user who continues past the sign-in screen is directed through three more screens—the "Add mobile number" screen, "Welcome to Alexa" screen, and "Confirm your first and last name" screen. FACC ¶ 100.  Each of those screens again informs the user that "by continuing," or "by tapping 'Continue,'" "you agree to Amazon's Conditions of Use and Privacy Notice" with hyperlinks provided in contrasting blue font. *Id.*  And when setting up an Alexa-enabled device, the user is presented with yet another screen, stating that "by proceeding you agree to Amazon's Conditions of Use and Privacy Notice." *Id.*  Only by proceeding through all of these notices and disclosures, and agreeing to the Amazon COUs at least five times, may a user register a device. *Id.*

Washington courts consistently find precisely these sorts of online agreements—where consumers are informed that clicking a button or "signing in" constitutes assent to linked terms— to be enforceable. *See, e.g.*, *Weimin Chen v. Sierra Trading Post, Inc.*, No. 2:18-cv-1581-RAJ, 2019 WL 3564659, at *3 (W.D. Wash. Aug. 6, 2019) (applying Washington law and holding that plaintiff validly assented to the linked terms by clicking a "Place my order" button proximate to a notice that doing so constituted agreement); *Ekin v. Amazon Servs., LLC*, 84 F. Supp. 3d 1172-73,

1175 n.5 (W.D. Wash. 2014) (finding Amazon's Conditions of Use "completely enforceable" because the user "click[ed] a button next to text that says 'by placing your order, you agree to Amazon.com's privacy notice and conditions of use'").

Indeed, the Ninth Circuit has repeatedly found valid assent to online terms when a hyperlink to the terms is presented in close proximity to an action button, with a notice that selecting the action accepts the terms. In *Wiseley v. Amazon.com, Inc.*, the Ninth Circuit enforced Amazon's COUs because Amazon's checkout and account registration pages alerted the consumer that "clicking the corresponding action button constituted agreement to the hyperlinked COU, [which] were in sufficient proximity to give him a 'reasonable opportunity to understand' that he would be bound by additional terms." 709 F. App'x 862, 863-64 (9th Cir. 2017). The Ninth Circuit reiterated this principle in *Lee v. Ticketmaster L.L.C.*, 817 F. App'x 393 (9th Cir. 2020), and *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482 (9th Cir. 2020). In *Ticketmaster*, the court found that the consumer had assented to Ticketmaster's Terms of Use where, "each time he clicked the 'Sign In' button when signing into his Ticketmaster account, [] three lines below the button, the website displayed the phrase, 'By continuing past this page, you agree to our Terms of Use,'" and "Terms of Use" was displayed in a blue hyperlink. 817 F. App'x at 394-95. Likewise, in *Intuit*, the court found that the TurboTax terms of use were binding where the terms were provided in light blue hyperlinks underneath a "Sign In" button and directly above a notice stating, "By clicking Sign In, you agree to the Turbo Terms of Use." 823 F. App'x at 484.[1]

---

[1] The Alexa registration process is fundamentally distinguishable from the "browsewrap" agreement that the Ninth Circuit found insufficient in *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171 (9th Cir. 2014) (cited at FACC ¶ 92). The Barnes & Noble terms were provided via a hyperlink only on the bottom left-hand corner of the Barnes & Noble website, not proximate to a "call-to-action" button, and the site did not require any affirmative action that would demonstrate the user's assent to those terms. *Id.* at 1173. Consistent with its later decisions in *Wiseley*, *Ticketmaster*, and *Intuit*, the Ninth Circuit noted the difference between constructive assent based on a user's notice and affirmative action to agree, whereas Barnes & Noble's browsewrap agreement provided no similar opportunity for or notice of assent. *Id.* at 1176. That is not the case here, where the Alexa registration flow repeatedly hyperlinks the COUs in contrasting font immediately above or below the "Continue" button and informs users that by clicking "Continue" they agree to the referenced and linked terms.

In the modern online world, assent to hyperlinked terms is the predominant way that users agree to terms that are required to buy a product or enjoy a service; long gone are the days when the average, reasonable consumer can claim ignorance of how clickwrap and sign-up wrap works. As the court in *Selden v. Airbnb, Inc.*, No. 16-cv-00933 (CRC), 2016 WL 6476934, at *5 (D.D.C. Nov. 1, 2016), put it in a leading case:

> Any reasonably-active adult consumer will almost certainly appreciate that by signing up for a particular service, he or she is accepting the terms and conditions of the provider. Notifications to that effect—be they check boxes or hyperlinks—abound. To be sure, few people may take time to actually read the user agreements. But ignorance of the precise terms does not mean that consumers are unaware they are entering contracts by signing up for internet-based services.

*Id*. at *5. As the D.C. Circuit recently reiterated in affirming the *Selden* district court's order, "the screen provided reasonable notice to Selden that, by signing up, he was agreeing to Airbnb's Terms of Service. Whether Selden read those Terms is irrelevant because he was on inquiry notice." *Selden v. Airbnb, Inc.*, 4 F.4th 148, 157 (D.C. Cir. 2021).

Registered Alexa users cannot avoid the terms of a contract, even if they "failed to read it before signing … especially when [they] had a legitimate opportunity to review it." *Ticketmaster L.L.C.*, 817 F. App'x at 395; *see also Harbers v. Eddie Bauer, LLC*, No. C19-1012JLR, 2019 WL 6130822, at *7 (W.D. Wash. Nov. 19, 2019) (finding mutual assent under Washington law to Eddie Bauer's terms presented at checkout and rejecting the argument that the consumer failed to read them); *Yakima Cty. (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 388-89, 858 P.2d 245 (1993) (same). Thus, the twelve Plaintiffs who admit they registered for the Alexa service are bound by the COUs, including the applicable law provision, regardless of whether or not they chose to read it.[2]

## B. The Amazon COUs Require Application Of Washington Law.

The COUs' choice of Washington law to govern "any dispute of any sort … that may arise between you and Amazon" is fully enforceable and governs this action. Washington courts

---

[2]  The Plaintiffs who admit to registering for the Alexa service are Plaintiffs Mark Fladd, Jodi Brust, John Dannelly, Diane McNealy, Lisa Hovasse, Sandra Mirabile, Susan Lenehan, Jeffrey Hoyt, James Robinson, Eric Dlugoss, Selena Johnson, and Kelly Miller.

"interpret contract provisions to render them enforceable whenever possible." *Schnall v. AT & T Wireless Servs., Inc.*, 171 Wn.2d 260, 266, 259 P.3d 129 (2011) (enforcing choice-of-law clause in consumer contract). Washington has a strong policy in favor of enforcing choice-of-law agreements to protect the parties' justified expectations. "[L]etting the parties choose the law to govern the validity of the contract and the rights created thereby," ensures "certainty and predictability." *Erwin v. Cotter Health Ctrs.*, 161 Wn.2d 676, 700, 167 P.3d 1112 (2007) ("[T]he interests of the parties are best served by leaving them exactly where they placed themselves— litigating this dispute in Washington and under Washington law.") (quotations and citations omitted); *see also William Insulation Co. Inc. v. JH Kelly LLC*, No. C21-5083 BHS, 2021 WL 1894092, at *5 (W.D. Wash. May 11, 2021) (citing *Erwin* in enforcing a Washington choice-of-law clause, noting the strong "expectation interest of the parties"); *ACD Distrib. LLC v. Wizards of the Coast LLC*, No. 20-35828, 2021 WL 4027805 (9th Cir. Sept. 3, 2021) (same; applying Washington choice-of-law rules to enforce a Minnesota choice-of-law clause).

In deciding whether to enforce a contractual choice of law, Washington courts apply the test in Section 187 of the Restatement (Second) Conflict of Laws (1971). *Erwin*, 161 Wn.2d at 694-95. Under Section 187, the contractual choice may not be overridden unless:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be [i] ***contrary to a fundamental policy*** of a state which [ii] has a ***materially greater interest*** than the chosen state in the determination of the particular issue and which, [iii] under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Id.* (emphases added). If the chosen state has a substantial relationship to the parties or the dispute, that choice must control, unless all three elements of Section 187(2)(b)'s exception apply. *Erwin*, 161 Wn.2d at 694-95 ("Under the section 187(2)(b) exception 'three questions are posed,' all of which must be answered in the affirmative for the exception to apply.") (citing *O'Brien v. Shearson Hayden Stone, Inc.*, 90 Wn.2d 680, 685, 586 P.2d 830 (1978)). Under Section 187, "[t]he parties' power to choose the applicable law is subject to least restriction in situations where the significant contacts are so widely dispersed that determination of the state of the applicable law without regard

to the parties' choice would present real difficulties."  Restatement § 187, cmt. g.  That is exactly the case here, where Plaintiffs from nine different states seek to assert claims on behalf of a nationwide class.

### 1.   This Dispute Has A Substantial Relationship To Washington.

The first prong of Section 187 is easily satisfied.  When a party is domiciled in the state of the contractually chosen law, there is both a substantial relationship to the parties and a reasonable basis for the choice.  *See, e.g.*, *Carideo v. Dell, Inc.*, 520 F. Supp. 2d 1241, 1245 (W.D. Wash. 2007); *Workhouse Media, Inc. v. Ventresca*, No. 75373-8-I, 2017 WL 959534, at *4 (Wash. App. Mar. 13, 2017).  Here, Amazon is headquartered in and directs the operation of the Alexa service from Washington.  FACC ¶¶ 38-39.  Amazon specifies its home-state's law to govern its transactions with a nationwide customer-base uniformly and consistently.  Plaintiffs concede as much, admitting at the outset of their Amended Complaint that "Washington's wiretapping law … applies nationwide to Plaintiffs and all members of the Class."  FACC ¶ 1; *see also* CC ¶ 1. Thus, Amazon has satisfied the "substantial relationship or reasonable basis" prong of the Section 187(2) analysis.  The parties' choice of law must therefore be honored unless Plaintiffs can prove all three elements of the exception in Section 187(b)(2).  As discussed in the following subsection, Plaintiffs cannot do so:  there is no contradiction in fundamental public policies between Washington and any other state; and even if there were, no state has a materially greater interest in this dispute; therefore, the parties' choice—Washington law—governs here.  *See, e.g.*, *Wiseley*, 709 F. App'x at 863.

### 2.   Washington Law Does Not Contradict Any Fundamental Policy Expressed By The Non-Washington States' Wiretapping Laws.

To overcome the parties' contractual choice of law, Plaintiffs must demonstrate that Washington law is "contrary to" the fundamental policy expressed by another state.  *See* Section 187(b)(i).  "[M]erely showing that the laws of two states differ does not establish that one state's laws violate the other state's public policy."  *Ins. Auto Auctions, Inc. v. Indian Harbor Ins. Co.*, No. C09-1522RAJ, 2010 WL 11688494, at *6 (W.D. Wash. Sept. 16, 2010); *see also Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043, 1056 (N.D. Cal. 2018) ("[d]ifferences in the particulars of

the consumer statutes are not enough … and do not represent a fundamentally different policy"). Rather, Plaintiffs must show that Washington law actually *contradicts* the fundamental policy of another state.  That is a very high bar that they cannot meet.

### a.   Washington And Every Alternative All-Party Consent State Proscribe Similar Activities in Similar Ways.

The wiretap laws of Washington and the eight other states that Plaintiffs invoke are fundamentally consistent and proscribe similar activities in similar ways.  As Plaintiffs concede, all of these states require "all-party consent" to record a private or confidential communication—indeed, that is precisely why Plaintiffs selected them.  FACC ¶¶ 1, 144, 191, 210, 230, 254, 274, 291, 300, 315.  This critical requirement differentiates these states' wiretap laws from the other 41 states' regimes, all of which require only one-party consent to record, as does the Federal Wiretap Act.    *See* https://www.justia.com/50-state-surveys/recording-phone-calls-and-conversations/ (collecting statutes); 18 U.S.C. § 2511(2)(d).  Every state statute that Plaintiffs invoke serves the same fundamental policy: prohibiting the recording of private or confidential conversations without the consent of all parties.  Each of these nine statutes afford (1) a private right of action (2) to recover all actual damages suffered (3) from the interception or recording of a private conversation or communication (4) without the consent of all participants.[3]

---

[3]    *Compare* RCW § 9.73.030 (prohibiting interception or recording of any private communications between two or more individuals without prior consent of all parties) *with* Fla. Stat. Ann. §§ 934.03(1)(a)-(b), (3)(d) and 934.10 (prohibiting the intentional interception, use, and disclosure of wire, oral, or electronic communications without consent of all parties and providing for private cause of action); N.H. Rev. Stat. §§ 570-A:2(I)(a)-(d), 570-A:11 (prohibiting the willful interception, use, and disclosure of telecommunication or oral communication without consent of all parties and providing for private cause of action); Mass. Gen. Laws ch. 272, § 99(C), (Q) (prohibiting the willful interception, disclosure, or use of any wire or oral communication without consent of all parties and providing for private cause of action); Cal. Penal Code §§ 631-632, 637.2(a)  (prohibiting the intentional wiretapping and the intentional eavesdropping and recording of confidential communications without consent of all parties and providing for private cause of action); Md. Code Ann., Cts. & Jud. Proc. §§ 10-402, 10-410 (2016) (prohibiting the willful interception, disclosure, and use of wire, oral, or electronic communication without consent of all parties and providing for private cause of action); 18 Pa. Cons. Stat. §§ 5703, 5725 (prohibiting intentional interception, disclosure, and use of any wire, electronic or oral communication without consent of all parties, and providing for private cause of action); 720 Ill. Comp. Stat. §§ 5/14-2, 5/14-6 (prohibiting knowing and intentional eavesdropping, interception, and use of private communications without consent of all parties, and providing for private cause of action); Mich. Comp. Laws §§ 750.539c, 750.539h (prohibiting willful eavesdropping on conversations without

If anything, Washington law is *more* protective than most states' laws. The WPA is "one of the most restrictive electronic surveillance laws ever promulgated." *State v. Roden*, 179 Wn.2d 893, 898, 321 P.3d 1183 (2014). Washington does not require Plaintiffs to prove culpable intent, which is a requirement in other states. *Compare* RCW § 9.73.030 (no intent requirement), *with* Fla. Stat. Ann. § 934.03(1) (requiring intentional conduct), Cal. Penal Code §§ 631-632 (same), 720 Ill. Comp. Stat. § 5/14-2 (requiring *intentional or knowing* conduct) *and* N.H. Rev. Stat. § 570-A:2(I), Md. Code Ann., Cts. & Jud. Proc. § 10-402, Mich. Comp. Laws § 750.539c (all requiring willful conduct). Washington allows recovery of "reasonable attorney's fee[s] and other costs of litigation," which are unavailable in Illinois, Michigan, or California. *Compare* RCW § 9.73.060 *with* 720 Ill. Comp. Stat. § 5/14-6; Mich. Comp. Laws § 750.539h; *and* Cal. Penal Code § 637.2. Moreover, Washington provides a three-year statute of limitations (RCW § 4.16.080(2)), similar to that in Maryland, Massachusetts, Michigan, and New Hampshire (Md. Code Ann., Cts. & Jud. Proc. § 5-101; Mass. Gen. Laws Ann. ch. 260, § 2A; N.H. Rev. Stat. § 508:4), whereas Florida, Illinois, and Pennsylvania provide for only two years (Fla. Stat. Ann. § 934.10(3); 735 Ill. Comp. Stat. Ann. 5/13-202; 42 Pa. Cons. Stat. Ann. § 5524(7)), and California only one year (Cal. Civ. Proc. Code § 340).

Thus, nothing in the Washington statute contradicts any fundamental policy of any of those other states. To the contrary, Plaintiffs contend that Alexa violates both Washington law *and* all the alternatively asserted states' statutes. FACC ¶¶ 2, 125-126. At the same time, nowhere do Plaintiffs complain of any conduct that allegedly violates the law of one of the alternative states but *not* Washington law. This alone forecloses Plaintiffs' claim that the policies these laws embody are contradictory.

> **b.** **Mere Potential Differences In Outcome Or Remedies Are Not Different Fundamental Policies.**

Even if there were potential differences in outcomes under these similar statutes, the Ninth Circuit, applying the Restatement Section 187 test, has made clear that differences in outcome or result alone are insufficient to establish that one state's policy is "contrary to the fundamental

consent of all parties, and providing for private cause of action).

policy" of another.  *See Fagerstrom v. Amazon.com, Inc.,* 141 F. Supp. 3d 1051, 1061-62 (S.D. Cal. 2015) (enforcing Amazon's choice-of-law provision, holding "[t]he forum will not refrain from applying the chosen law merely because this would lead to a different result than would be obtained under the local law of the [forum]."), *aff'd sub nom. Wiseley v. Amazon.com.*  In *Wiseley*, the Ninth Circuit enforced Amazon's Washington choice-of-law clause in the COUs against a consumer class action asserting California state law claims for false advertising and unfair business practices.  709 F. App'x at 863.  The Circuit noted that both states' laws were "substantially similar" and that, while California law "might hypothetically invalidate some contracts that would be upheld under Washington's [law], the reverse is also true." *Id.* (citations omitted).  The same applies here, where all Plaintiffs admit the primacy of Washington law in the first paragraph in the Amended Complaint, FACC ¶ 1, and assert Washington claims on behalf of a putative nationwide class of registered users, *id.* ¶¶ 143-175.

Other courts applying Section 187, including those in the other states Plaintiffs invoke, consistently hold that potential differences in protection or remedies do not render one state's law contrary to the fundamental policy of another.  *See, e.g.*, *Brazil v. Dell Inc.*, 585 F. Supp. 2d 1158, 1166 (N.D. Cal. 2008) ("The mere fact that the chosen law provides greater or lesser protection than California law, or that in a particular application the chosen law would not provide protection while California law would, are not reasons for applying California law. … [T]he standard is whether the chosen law is so offensive to California public policy as to be 'prejudicial to recognized standards of morality and to the general interest of the citizens.'") (enforcing Texas choice-of-law provision in contract as governing consumer contract claims); *Taylor v. E. Connection Operating, Inc.*, 988 N.E.2d 408, 412-13 (Mass. 2013) (enforcing Massachusetts choice-of-law clause as to New York plaintiffs where the fundamental policies of the two states are "roughly equivalent" and "New York simply uses a different mechanism to effectuate this aim than does Massachusetts"); *Erie Ins. Exch. v. Heffernan*, 925 A.2d 636, 657 (Md. 2007) (enforcing the contractually chosen law of Delaware because it is "merely a situation in which the law of Maryland and Delaware are different"); *Lessard v. Clarke*, 736 A.2d 1226, 1228 (N.H. 1999) (where tort damages under New Hampshire law were greater but plaintiffs failed to identify a

"strong policy concern," applying contract's Ontario choice of law); *Innovation Ventures, L.L.C. v. Custom Nutrition Labs., L.L.C.*, No. 12-13850, 2015 WL 5679879 (E.D. Mich. Sept. 28, 2015) (enforcing Texas choice-of-law clause even where Michigan's successor liability law was broader than that in Texas), *rev'd on other grounds by Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 912 F.3d 316 (6th Cir. 2018); *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 311-12 (Fla. 2000) (holding that courts should use "extreme caution" when finding a conflict with a fundamental state policy, and should limit it only to situations where there is "great prejudice to the dominant public interest sufficient to overthrow the fundamental policy of the right to freedom of contract").

Nor is there any conflict—much less one that abrogates a fundamental state policy—based solely on the *amount* of statutory damages that might be available in a particular case.[4]  While Washington and other states provide some different statutory and punitive damage remedies, such differences do not reflect a conflict with a fundamental policy as required to override the parties' contractual choice.  As the Ninth Circuit stated in enforcing a Georgia choice-of-law provision restricting punitive damages that would have been available in California, "even assuming that California has a fundamental interest in regulating contracts such as the policies here, the standard is not whether this case implicates a fundamental interest of California, but whether Georgia law *contradicts* a fundamental policy of California." *Pulte Home Corp. v. TIG Ins. Co.*, 794 F. App'x 587, 589 (9th Cir. 2019) (applying Section 187).  Other courts applying Section 187 have reached the same conclusion.  *See Williams*, 384 F. Supp. 3d at 1056 (enforcing California choice-of-law clause after finding that, despite the absence of statutory damages under California law that were available under New York law, there was no conflict with any fundamental New York policy); *Surles v. Prudential Ins. Co. of Am.*, No. C 06-05807 WHA, 2007 WL 164548, at *6 (N.D. Cal. Jan. 19, 2007) ("[N]o significant interest of the state of California is impaired by the application

---

[4]  Washington provides statutory damages of $100 per violation with a maximum of $1,000, while some of the other states provide $100 per violation with no maximum, and California provides $5,000 per violation.  Some states other than Washington also authorize punitive damages.  But under every state's regime, a wronged party is entitled to recover full compensatory damages for any actual injury suffered.

of Illinois law" where the available damages are lower in Illinois); *KSA Elecs., Inc. v. M/A-COM Tech. Sols., Inc.*, No. 15–10848–FDS, 2015 WL 4396477, at *4 (D. Mass. July 17, 2015) (although California law imposed mandatory treble damages and Massachusetts merely allowed it, enforcing Massachusetts choice-of-law clause where the states had "similar, if not precisely identical" protections); *Erie Ins. Exch.*, 925 A.2d at 657 (rejecting proposition that Maryland's limit on remedies for personal injuries reflects a fundamental policy sufficient to overcome the contractually chosen Delaware law, which had no such limit).  Under Washington law, if Plaintiffs could establish a claim, they would be made more than whole by recovering any actual damages they suffered, statutory damages, and potentially attorneys' fees.  Nothing about that remedy scheme is "contrary to" the fundamental policy of the other states invoked.

Where, as here, the relevant statutes reflect the same policy objectives and proscribe similar conduct, there is no fundamental conflict due merely to differences in statutory damages.  As the Washington Supreme Court has held, "to effectively void a choice of law provision, a court must find that the chosen state has no substantial relationship to the parties *or* that the application of the chosen law would be contrary to a fundamental policy" of the non-chosen state.  *Schnall*, 171 Wn.2d at 267.  The absence of a contradictory fundamental policy ends the Section 187 inquiry.

And because this issue presents a pure question of law, the Court can and should dismiss all non-Washington claims by the registrant-Plaintiffs with prejudice.  *See, e.g.*, *Ins. Auto Auctions*, 2010 WL 11688494, at *6  (enforcing the parties' New York choice-of-law clause, and dismissing Washington law claims under Rule 12(b)(6)); *Brazil*, 585 F. Supp. 2d at 1166 (enforcing Texas choice-of-law clause in Dell's Terms and Conditions and dismissing consumer claims under California law); *Dajani v. Dell Inc.*, No. C 08-5285, 2009 WL 815352, at *4 (N.D. Cal. Mar. 26, 2009) (same); *Facebook, Inc. v. Profile Tech., Ltd.*, No. 5:13–cv–0459–PSG, 2014 WL 492369, at *2 (N.D. Cal. Feb. 5, 2014) (applying Delaware law, as required by Facebook's Terms of Service, and dismissing California claims).

### 3.    No State Has A Materially Greater Interest Than Washington.

While the lack of a fundamental conflict is alone dispositive, Plaintiffs fail also to show why any asserted state other than Washington could conceivably have a materially greater interest

in this dispute.  To the contrary, the fact that Plaintiffs in the Amended Complaint seek to certify a nationwide class under Washington's wiretap and consumer protection statutes (FACC ¶¶ 1, 143-175) conclusively establishes the primacy of Washington's interest here.  And Plaintiffs cannot avoid Washington's strong interest in protecting privacy through balanced, predictable remedial laws for its businesses.  *See Erwin*, 161 Wn.2d at 700 ("certainty and predictability of result[s] are most likely to be secured" in multistate interactions by allowing contracting parties to choose the governing law) (quoting Restatement § 187, cmt. e).

Thus, even if Plaintiffs could establish a conflict between Washington law and some fundamental public policy of another state, which they cannot, no other state has a *materially greater* interest in the resolution of this dispute than Washington, which independently defeats the Section 187(b) exception to the contractual choice of law.

### C.    The Choice-Of-Law Clause Applies To All Claims By Registered Users Relating To Their Alexa Devices.

The broad scope of the COUs' choice-of-law provision unquestionably encompasses this dispute.  Washington law provides that the scope of a choice-of-law clause turns on the parties' objective manifestations through the terms of their agreement—that is, "the actual words used"—which will encompass tort or statutory claims if drafted broadly.  *See Carideo v. Dell, Inc.*, 706 F. Supp. 2d 1122, 1128 (W.D. Wash. 2010);[5] *see also Gierke v. Allstate Prop. & Cas. Ins. Co.*, No. C19-0071JLR, 2019 WL 4849494, at *1 (W.D. Wash. Oct. 1, 2019) (clause governing "any and all claims or disputes in any way related to this policy" included tort and statutory claims).  Here, the governing law clause could not be more simple, clear, or broad:  it applies Washington law to "***any dispute of any sort*** that might arise between you and Amazon."  *See* FACC, Ex. A at 8, Applicable Law (emphasis added).  Further, the COUs make clear that use of Amazon services is

---

[5] In *Carideo*, the court recognized that torts and claims under consumer statutes can be covered by a contractual choice-of-law provision, but it held that Dell's choice-of-law clause in that case—which was narrowly drawn and governed only "THIS AGREEMENT AND ANY SALES THEREUNDER"—did not encompass the plaintiffs' tort and WCPA claims.  706 F. Supp. 2d at 1127-28.  But the court contrasted that clause with more "expansive" terms in other Dell contracts previously addressed by other courts, which covered "any claim, dispute or controversy," and which therefore did cover tort and statutory claims.  *Id.* at 1127 (citing *Brazil*, 585 F. Supp. 2d 1158, and *Dajani*, 2009 WL 815352).

governed by additional "Services Terms."  *See* FACC ¶ 52 & n.24; Ex. A at 1 ("When you use an Amazon Service (for example, Your Profile, Gift Cards, Amazon Video, Your Media Library, Amazon devices, or Amazon applications) you also will be subject to the guidelines, terms and agreements applicable to that Amazon Service ('Service Terms').").  Relevant to this dispute, these include the Alexa Terms, which reiterate that the COUs' selection of Washington law specifically governs any dispute "relating to … Alexa."  RJN Ex. B at 5, Alexa Terms ¶ 4.6, Disputes.  Plaintiffs' claims undeniably are disputes with Amazon that relate to Alexa; as such, they fall squarely within the Washington choice-of-law clause.

Accordingly, the Washington governing law clause applies to all claims asserted by those who, in signing up for the Alexa service and registering Alexa devices, agreed to the COUs, and any claims under other state laws should be dismissed.[6]

## II.   REGISTERED USERS CONSENTED TO RECORDING TO PROVIDE, PERSONALIZE, AND IMPROVE THE ALEXA SERVICE.

The fact that registered users provide consent, through their participation in the Alexa activation process and agreement to the terms governing Alexa, independently defeats their claims.  Lack of consent is an element of Plaintiffs' proof.  RCW § 9.73.030(1)(a)-(b); *see State v. Townsend*, 147 Wn.2d 666, 675-76, 57 P.3d 255 (2002) (describing consent element); *see also* Footnote 3 above (consent is a defense to state wiretapping claims); *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 140, 146 (3d Cir. 2015) (consent provides a defense to Federal Wiretapping Act and Stored Communications Act).  Consent may be express or implied.  Here, as set forth in the Amended Complaint, when users first set up an Alexa device, they must review the Alexa "Welcome Screen" that notifies them that Amazon processes and retains audio to improve the service.  FACC ¶ 100.  Use of the Alexa service is also subject to the Alexa Terms and the Amazon Privacy Notice (FACC, Ex. B), which both make clear that Amazon retains Alexa voice recordings (until the user chooses, at any time, to delete them).  By continuing

---

[6]  While not the subject of this motion, the COUs' choice-of-law provision may also apply to people who did not themselves perform the registration process, either because they separately agreed to the COUs, or under principles of agency, equitable estoppel, relationship to the registrant, and other contract principles.

1  to use the Alexa service, which was conditioned on those terms, Plaintiffs consented to recordings

2  and Amazon's retention of them.

3       **A.      Plaintiffs Expressly Consented To Recordings In The Registration Process.**

4       During the registration process, Plaintiffs were presented with a "Welcome to Alexa!"

5  screen that highlighted the fact that Amazon retains audio, interactions, and other data in the cloud

6  to improve the Alexa service.  FACC ¶ 100.  Below is an image of such a welcome screen, also

7  shown at page 30 of the Amended Complaint:

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON 98101

Notably, the Welcome Screen does not merely refer users to other terms but itself clearly states in the second line that "***Amazon processes and retains audio, interactions, and other data in the cloud to provide and improve our services***."  FACC ¶ 100 (emphasis added).  That screen also has a "Learn more" hyperlink to the Alexa FAQs, which describe in detail how Alexa works, how false wakes can happen, and how users can review and delete voice recordings.  RJN Ex. A at 1-3, FAQ 1-6.  To proceed with the registration process, Plaintiffs had to tap the "Continue" button from the Welcome Screen.  FACC ¶ 100.  They did so after being informed that their audio inputs would be retained to improve Alexa.  And the same screen states that "By tapping 'Continue,' you agree to Amazon's Conditions of Use and all the terms found here."  *Id.*  Clicking the link to "all the terms found here" takes the user to a page of terms and conditions, including the Alexa Terms, which, as next discussed, provided additional notice.

### B.  The Alexa Terms Disclose That Amazon Retains Recordings.

As Plaintiffs acknowledge (FACC ¶ 52 & n.24), the Alexa Terms, which are incorporated into the COUs, make clear that Amazon retains voice recordings and also link to additional information about how users can access and delete their voice recordings:

> **Alexa Interactions**.  You control Alexa with your voice. Alexa records and sends audio to the cloud when you interact with Alexa. Amazon processes and retains your Alexa Interactions, such as your voice inputs, music playlists, and your Alexa to-do and shopping lists, in the cloud to provide, personalize, and improve our services. Learn more about Alexa, including how to delete voice recordings associated with your account and manage our use of those voice recordings.

RJN Ex. B at 2, Alexa Terms at ¶ 1.3.  The words "Learn more" contain a hyperlink to the Alexa FAQs, which explain: "Alexa uses your voice recordings and other information, including from third-party services, to answer your questions, fulfill your requests, and improve your experience and our services."  RJN Ex. A at 4, FAQ 9.  The FAQs disclose that recordings are used "to train our speech recognition and natural language understanding systems using machine learning" and that "this training relies in part on supervised machine learning, an industry-standard practice where humans review an extremely small sample of requests to help Alexa understand the correct interpretation of a request and provide the appropriate response in the future."  *Id.* at 4-5, FAQ 10. The FAQs also explain how Alexa users are notified with a "visual or audible indicator" when the

device detects the wake word and starts streaming audio to the cloud.  *Id*. at 2-3, FAQ 5.  The FAQs also explain how to delete Alexa voice recordings:

**6. Can I review and delete my voice recordings?**

Yes. You can review voice recordings associated with your account and delete the voice recordings one by one, by date range, by Alexa-enabled device, or all at once by visiting **Settings > Alexa Privacy** in the Alexa app or https://www.amazon.com/alexaprivacysettings. From either page, you can also choose to have your voice recordings older than 3 or 18 months deleted automatically, or you can choose to not save any voice recordings. If you choose not to save any voice recordings, we will automatically delete your voice recordings after we process your requests and automatically delete all of the voice recordings currently in your Voice History as well. And you can delete all those voice recordings associated with your account all at once for each of your Alexa-enabled devices and apps by visiting Manage Your Content and Devices.

You can also enable the ability to delete your recordings by voice. If enabled, you can delete the voice recording of your last request by saying "Alexa, delete what I just said," delete the voice recordings associated with your account for the day by saying "Alexa, delete everything I said today," or all the voice recordings associated with your account by saying, "Alexa, delete everything I said." Deletion by voice is automatically enabled if any member of your household has created an Alexa voice profile and their voice is recognized when requesting to delete recordings by voice. If you or your household members have not created an Alexa voice profile, you can enable deletion by voice at **Settings > Alexa Privacy > Manage Your Alexa Data** in the Alexa app or https://www.amazon.com/alexaprivacysettings. When enabled via your Privacy Settings, anyone with access to your Alexa-enabled devices can ask Alexa to delete voice recordings associated with your account.

Deleting voice recordings may degrade your Alexa experience. If you choose not to save any voice recordings, voice profiles may not work.

If you have changed your default marketplace while using an Alexa-enabled product, you will need to delete all voice recordings associated with your account separately for each marketplace. To learn how to transfer your Amazon account to another marketplace, go here.

*Id*. at 3, FAQ 6; *see also id.*, FAQ 7 (answering **"What happens when I delete my voice recordings?"**).  The Alexa Terms are clear: "If you do not accept the terms of this Agreement, then you may not use Alexa."  RJN Ex. B at 1, Alexa Terms; *cf. Townsend*, 147 Wn.2d at 678 (where a "privacy policy advised users such as Townsend that if they did not wish to be subjected to the risks of recording, they should not use the software," the user's "familiarity with [the policy] may reasonably be inferred").

The Alexa Terms also incorporate the Amazon Privacy Notice, which is incorporated into the COUs as well.  *See* FACC ¶ 98; Ex. A at 1.  The Alexa registration process repeatedly provides links to and requires users to accept the Privacy Notice, advising that "By continuing, you agree to Amazon's Conditions of Use and Privacy Notice."  FACC ¶¶ 95, 100.  The Privacy Notice explains that Amazon receives and stores any information users provide during their use of Alexa services: "We receive and store any information you provide in relation to Amazon Services." FACC, Ex. B at 2.  The Privacy Notice further states that: "When you use our voice, image and camera services, we use your voice input, images, videos, and other personal information to respond to your requests, provide the requested service to you, and improve our services."  *Id.* at 3.  The notice lists examples of the information that Amazon collects, specifically informing users that "[y]ou provide information to us when you … talk to or otherwise interact with our Alexa Voice service" and also telling them that "[a]s a result of those actions, you might supply us with such information as … voice recordings when you speak to Alexa …."  *Id.* at 10-12.  The Privacy Notice also makes clear that Amazon personnel help perform functions on Amazon's behalf, including "analyzing data," and that those personnel sometimes have access to "personal information needed to perform their functions."  *Id.* at 4-5.  It provides that Amazon receives "information about internet-connected devices and services linked with Alexa."  *Id.* at 13.  In addition, it links to further privacy resources about Alexa's recording capability: "For more information about Alexa voice services, click here."[7]  *Id.* at 3.

"Courts consistently hold that terms of service and privacy policies … can establish consent to the alleged conduct challenged under various states wiretapping statutes and related claims." *Silver v. Stripe Inc.*, No. 4:20-cv-08196-YGR, 2021 WL 3191752, at *4 (N.D. Cal. July 28, 2021) (applying Washington law).  Plaintiffs admit that Alexa registrants must follow the set-up process to activate an Alexa device.  FACC ¶¶ 47-48.  As discussed above, that process plainly establishes a binding contract to the terms presented.  *See*, *e.g.*, *Wiseley*, 709 F. App'x at 863-64; *see also Zamber v. Am. Airlines, Inc.*, No. 16-23901-CV, 2020 WL 1445479, at *3 (S.D. Fla. Feb. 11, 2020)

---

[7]   Unlike the reformatted reproduction of the Privacy Notice Plaintiffs attach to their Complaint, the version that Amazon provides on its website includes a highlighted blue-colored link to the privacy resources.

1    (enforcing a "hybrid clickwrap-browsewrap agreement" where terms and conditions were

2    presented in link above log-in button, user was advised that clicking button accepted terms, and

3    accepted terms included link to "usage policy" with forum selection clause) (citations omitted).

4    Accordingly, the registered Plaintiffs legally consented to voice recordings when setting up and

5    registering Alexa devices.

6            **C.      All Plaintiffs Impliedly Consented To Recording Under Washington Law.**

7            In addition to registrants receiving express notice and providing express consent, all of the

8    Plaintiffs (registrants and non-registrants alike) also impliedly consented to voice recordings under

9    Washington law.  "[A] person may *impliedly* consent to the recording within the meaning of the

10   privacy act in multiple ways."  *State v. John Smith*, 189 Wn.2d 655, 665, 405 P.3d 997 (2017)

11   (emphasis in original).  The Washington Supreme Court has confirmed at least two means of

12   implied consent: (1) when another party has disclosed in "any reasonably effective manner" that

13   the communication would be recorded; or (2) when recording is an inherent function of the

14   technology used.  *See Townsend*, 147 Wn.2d at 676; *see also* RCW § 9.73.030(3).  Both of those

15   independent bases to find implied consent apply here.

16           *First,* Amazon has repeatedly announced how Alexa works, including in the Welcome

17   Screen, Alexa Terms, Privacy Notice, FAQs, and elsewhere, placing users on reasonable notice of

18   the fact that the Alexa service makes recordings.  In *Townsend*, the Washington Supreme Court

19   found that a party impliedly consented to the permanent recording of his online instant messages

20   as a result of the applicable privacy policy, notwithstanding that "no evidence was presented at

21   trial establishing that Townsend had acquainted himself with the [applicable] privacy policy."  *See*

22   *Townsend,* 147 Wn.2d at 678.  The court reasoned that the privacy policy for the instant messaging

23   software warned about the possibility of permanent recording.  *Id.*  The user consented to recording

24   by sending instant messages, even in the absence of evidence that the user actually read this policy,

25   because familiarity with the policy "***may reasonably be inferred***," thereby creating the "***risk that***

26   ***his messages might be recorded by the recipient***."  *Id.* at 678 (emphasis added).  *See also State v.*

27   *Racus*, 7 Wn. App. 2d 287, 299-300, 433 P.3d 830 (2019) (party impliedly consented to recording

28

1  e-mail and text conversations); *State v. Glant*, 13 Wn. App. 2d 356, 364-66, 465 P.3d 382 (2020)

2  (party impliedly consented to recording of digital messages).

3      As explained above, the Alexa Terms, the Amazon Privacy Notice, and the Alexa FAQs

4  all advise that voice recordings will be made and retained by the Alexa service.  Beyond these

5  disclosures, since Alexa launched in 2014 *tens of thousands of articles* in national mainstream

6  media have discussed that Alexa devices send users' voice commands to the cloud for processing,

7  where they are recorded.  The Amended Complaint itself references instances of that coverage:

8        On May 6, 2019, the Washington Post reported that "Alexa keeps a record of what

9        it hears every time an Echo speaker activates" and that "you can manually delete
      past recordings."

10       On February 25, 2020, USA Today reported that "accessing your Amazon

11       recordings is fairly simple. You can delete anything there and opt out of having
      your audio recording reviewed by people."

12
      On May 28, 2021, Reader's Digest reported that Amazon "Alexa only begins

13       recording your conversation upon hearing the device's wake word."

14 *See* FACC ¶ 7 & n.6, ¶ 57 & n.35, ¶ 49 & n.22.  The Amended Complaint also cites a "2019 survey

15 of smart-home device users" that revealed that the vast majority of participants understood that

16 their audio was being recorded and stored for some period of time; indeed, Plaintiffs admit that

17 ***nearly half of survey participants believed that their audio recordings are stored permanently***

18 ***by default***, with most others also knowing that recordings were being made. *Id.* ¶ 53 & n.26; RJN

19 Ex. D at 255.  This underscores an obvious point:  there has never been anything "secret" about

20 the fact that Alexa interactions are recorded.  Indeed, it is arguably the Alexa feature that has

21 garnered the most public attention over many years.  And, as Plaintiffs' numerous allegations about

22 retrieving their audio recordings amply demonstrate (FACC ¶¶ 60-84), Amazon does not hide its

23 users' recordings, it makes them available for review at any time.

24     Nor is there anything secret about the false-wake phenomenon.[8]  Amazon publicly explains

25

26     [8]  Plaintiffs make repeated references to an Amazon patent for "Pre-wake word speech
processing" as purportedly suggesting that Amazon "may record and process all conversations

27 prior to any use of a wake word."  *See* FACC ¶ 8 & n.7, ¶ 45 & n.16, ¶ 50 & n.23, ¶ 87 & n.43,
and ¶ 45 & n.105 (all citing U.S. Patent No. 10,192,546).  That suggestion has no plausible basis.

28 Not only is Plaintiffs' suggestion based on a total misconstruction of the patent, but Plaintiffs also
fail to allege that Amazon practices the patent.  A patent describes an invention, not what the

MOTION TO DISMISS FACC          - 28 -          FENWICK & WEST LLP
CASE NO.: 2:21-CV-00750-RSL              1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON 98101

how false wakes can occur, and how users can tell if the device inadvertently has been activated. RJN Ex. A at 2-3, FAQ 5-6.  The media has also widely reported on the fact that activations can sometimes occur by mistake.  The Amended Complaint references some of that coverage, too:

> In 2020, media outlets reported on false wakes, noting "'In some cases, your Alexa-enabled device might interpret another word or sound as the wake word. When this happens, we call that a 'false wake.'"

*See* FACC at ¶ 49 & n.22, ¶ 10 & n.8.  Because Amazon explicitly and publicly announced how Alexa works, because the media widely reported those announcements, and because Plaintiffs in all events would have been alerted by their Alexa devices if false wakes had occurred, consent is impliedly established, in addition to being expressly given during activation.  Indeed, Plaintiffs here received substantially more notice than the defendant in *Townsend*, whose familiarity with a privacy policy was merely inferred from his use of the underlying technology, such that he knowingly "took a risk" of recording as a matter of law.  *Townsend*, 147 Wn.2d at 678.  No inference is required here because Plaintiffs received express notice in multiple ways.[9]

---

inventor does in business.  Nor do Plaintiffs allege that the patent describes anything that, even if reduced to practice, would be inconsistent with Amazon's statements about the Alexa service or customer expectations.  Processing speech captured before a wake word is spoken would be completely consistent with the need to listen for the wake word to detect when to begin processing a command.

[9] Plaintiffs suggest that the only way to obtain user consent is by a recorded pre-announcement under the safe harbor provided in RCW § 9.73.030(3).  FACC ¶ 101 (referencing n.44).  Not so. Washington courts consistently recognize that consent may be provided either expressly or by implication, such as when a party proceeds to use a technology knowing or on notice that recording might occur.  *See, e.g.*, *Townsend*, 147 Wn.2d at 675 (finding implied consent to recorded emails because "*[i]n addition*" to § 9.73.030(3), "a communicating party will be deemed to have consented to having his or her communication recorded when the party knows that the messages will be recorded.") (emphasis added); *State v. Glant*, 13 Wn. App. 3d 356, 365, *review denied*, 196 Wn.2d 1021 (2020) (finding implied consent to recorded emails and text messages even in the absence of a § 9.73.030(3) pre-recording announcement because "[a] person *also* consents by choosing to communicate through a device in which the person knows the information will be recorded.") (emphasis added); *see also State v. Racus*, 7 Wn. App. 2d 287, 300, *review denied*, 193 Wn.2d 1014 (2019) (finding implied consent, even in the absence of a pre-recording announcement, because user "had to understand that computers are message recording devices and that his text messages … would be preserved and recorded on a computer"); *In re Marriage of Farr*, 87 Wn. App. 177, 184 (1997) (finding implied consent to recorded messages on an answering machine, even in the absence of a pre-recording announcement, because reasonable people must know that an answering machine's only function is to record).

*Second,* Plaintiffs also impliedly consented to recording because recording is an inherent part of Alexa's function. In *Townsend*, the Washington Supreme Court found that the user impliedly consented to recording because "in order for e-mail to be useful it must be recorded by the receiving computer," and "saving of messages is inherent in e-mail and [instant] messaging." 147 Wn.2d at 676. Washington courts have repeatedly confirmed this rule. *See John Smith*, 189 Wn.2d at 665 (finding implied consent where party took the risk that her call would trigger a recording function); *Racus*, 7 Wn. App. 2d at 299-300 (finding implied consent where a party "had to understand that computers are message recording devices and that her text messages … would be preserved and recorded"); *Glant*, 13 Wn. App. 2d at 364-66 (finding implied consent because "Glant had to understand that computers and phones are message recording devices and that her e-mails and text messages … would be preserved"); *In re Marriage of Farr*, 87 Wn. App. 177, 184, 940 P.2d 679 (1997) (finding consent under the wiretap statute when a party left a message on an answering machine because the device's "function is to record messages").

It is obvious that words spoken into the air must be captured in order to convert that audio into digital commands that a computer can read and process in order to respond. Plaintiffs admit that recording in some form is essential for the computers that provide the Alexa service to interpret and process an audible command. They allege that "Alexa devices are designed to record and respond to human commands in a simulated voice." FACC ¶ 7. They acknowledge transmittal of "the recording to Amazon's servers where algorithms in the server … analyze the speech pattern and try to detect and identify the words to generate a response." *Id.* ¶ 49.

Plaintiffs complain that the recording is not "temporarily processed," but rather "permanently store[d]." *Id.* ¶ 5.[10] But nothing in any wiretap statute makes the *preservation* of a

---

[10]   Plaintiffs assert also that Amazon *could* have designed a service to make only a local recording on the Alexa device rather than transmitting audio to the cloud to be recorded, or that Amazon *could* overwrite recordings after uploading to short-term memory. FACC ¶ 54. But even if true, the fact that the Alexa service could have been designed differently is irrelevant to the question of wiretapping liability. Nor would a hypothetical alternative design negate that a computer command using any medium (text, swipe, voice) must be recorded in some form simply to be processed, which even Plaintiffs acknowledge. FACC ¶ 49; *see also id.* at n.7 (an Alexa patent that explains, "natural language understanding (NLU) is a field of computer science, artificial intelligence, and linguistics concerned with enabling computers to derive meaning from

MOTION TO DISMISS FACC
CASE NO.: 2:21-CV-00750-RSL

- 30 -

recording unlawful when the recording was made lawfully.  As explained above, because Alexa users consent, either expressly or impliedly, to voice recordings, the recordings are lawful in the first instance.  Again, and importantly, most state wiretap statutes (including Washington's) apply *only* to the act of *recording* itself, not to what is subsequently done with that recording.[11]  The WPA "prohibits only recording or intercepting private phone conversations without the consent of the other party; ***it does not prohibit disseminating such conversations to others***."  *Kearney v. Kearney*, 95 Wn. App. 405, 412, 974 P.2d 872 (1999) (emphases added); *see also Hoang v. Amazon.com, Inc.*, No. C11–1709MJP, 2012 WL 1088165, at *5 (W.D. Wash. Mar. 30, 2012) (no violation of WPA "regardless of what [defendants] did with [plaintiff's] information").  In other words, the WPA either is violated or not at the moment of the recording, independent of whether that recording is immediately deleted, stored or published to the public or third parties.  Consequently, all of Plaintiffs' allegations regarding Amazon's retention of Alexa voice recordings, and what Amazon allegedly does with those recordings, are irrelevant.  Since Plaintiffs consented to the recording in the first instance, no wiretapping claim exists.

## III.  PLAINTIFFS STATE NO CLAIM UNDER THE WASHINGTON CONSUMER PROTECTION ACT.

The Amended Complaint fails to plead a violation of the WCPA because Plaintiffs have not alleged either an injury to "business or property" or an "unfair or deceptive practice."  *See* RCW §§ 19.86.20, 19.86.90.  To state a claim under the WCPA, Plaintiffs must establish (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) public interest impact, (4) injury to Plaintiffs' business or property, and (5) causation.  *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986).  "If any element is not satisfied, there can be no successful CPA claim."  *Robinson v. Avis Rent A Car System, Inc.*, 106

---

text input containing natural language").

[11]   Some states provide remedies for subsequent use or disclosure of an unlawful recording, but those remedies exist *only* if the recording was unlawful in the first instance.  *See, e.g.*, Fla. Stat. Ann. § 934.03; N.H. Rev. Stat. § 570-A:2; Mass. Gen. Laws ch. 272, § 99(C), (Q); Cal. Penal Code §§ 631-632; Md. Code Ann., Cts. & Jud. Proc. § 10-402; 18 Pa. Cons. Stat. § 5703; 720 Ill. Comp. Stat. § 5/14-2; Mich. Comp. Laws § 750.539c.

Wn. App. 104, 114, 22 P.3d 818 (2001); *see also Nguyen v. Doak Homes, Inc.*, 140 Wn. App. 726, 733, 167 P.3d 1162 (2007).  Plaintiffs do not adequately plead the first or fourth element.

### A.   The Amended Complaint Does Not Plead That Amazon Committed "Unfair or Deceptive Acts."

The Amended Complaint pleads only legal conclusions of "unfair" and "deceptive" practices (FACC ¶¶ 166-67), but Plaintiffs have not alleged any unfair or deceptive acts or practices by Amazon.  Although the WCPA does not define a "deceptive" act, "implicit in that term 'is the understanding that the actor *misrepresented* something of material importance.'" *Stephens v. Omni Ins. Co.*, 138 Wn. App. 151, 166, 159 P.3d 10 (2007) (internal quotations omitted) (emphasis in original).  In determining whether an act or practice is unfair, Washington courts look to federal law, which suggests that "a practice is unfair [if it] causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits [to consumers or to competition]." *Alpert v. Nationstar Mortg., LLC*, No. C15-1164 RAJ, 2019 WL 1200541, at *6 (W.D. Wash. Mar. 14, 2019) (quoting 15 U.S.C. § 45(n), brackets in *Alpert*).[12]  "An injury is reasonably avoidable if consumers 'have reason to anticipate the impending harm and the means to avoid it.'" *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168-69 (9th Cir. 2012) (finding that there was no "unfair" practice for purposes of the UCL where defendant disclosed their annual credit card fee in their terms and conditions).  The Amended Complaint alleges no deceptive or unfair acts, and,

---

[12]   A practice can also be unfair "per se" if it "violates a statute that declares the conduct at issue to be unfair or deceptive." *Id.* (citing *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn. 2d 778, 780, 719 P.2d 531, 533 (1986)).  Here, as discussed above, there is no per se unfairness because there has been no violation of the Washington wiretapping statute. *See* Part II, *supra*.  Independently, the wiretapping statute could not give rise to a per se violation because the statute does not declare the conduct it prohibits to be unfair or deceptive. *Hangman Ridge*, 105 Wn. 2d at 787 ("the Legislature, not this court, is the appropriate body to establish that [illegal conduct is a violation of the WCPA] by declaring a statutory violation to be a per se unfair trade practice" within the statute itself.); *Mellon v. Regional Trustee Servs. Corp.*, 182 Wn. App. 476, 488, 334 P.3d 1120, 1126 (2014) (holding that a statute to which the Legislature added a declaration that a violation constituted a per se unfair trade practice could *not* support a per se claim for violation that occurred prior to amendment adding that declaration).

in fact, the screenshots and disclosures that Plaintiffs include in their Amended Complaint flatly refute the notion.

### 1. Rule 9(b) Requires That Plaintiffs Plead Misrepresentations With Specificity.

Plaintiffs' WCPA claim sounds in fraud and is therefore subject to the heightened pleading standard of Fed. R. Civ. P. 9(b).  Rule 9(b) requires that when fraud is alleged, "a party must state with particularity the circumstances constituting fraud …."  *Id.*  To satisfy Rule 9(b), allegations of fraud must be accompanied by "the who, what, when, where, and how" of the misconduct charged.  *Nemykina v. Old Navy, LLC*, 461 F. Supp. 3d 1054, 1059 (W.D. Wash. 2020).  It is not necessary for a plaintiff to name a cause of action "fraud"; cases that are "grounded in" fraud or "sound in fraud" must satisfy Rule 9(b) whatever their names.  *Fid. Mortg. Corp. v. Seattle Times Co.*, 213 F.R.D. 573, 575 (W.D. Wash. 2003).  Any claim relying upon a "unified course of fraudulent conduct" is "grounded in fraud."  *See, e.g.*, *Hoefs v. Sig Sauer Inc.*, No. 3:20-cv-05173-RBL, 2020 WL 3488155, at *1 (W.D. Wash. June 26, 2020); *see also Nemykina v. Old Navy, LLC*, 461 F. Supp. 3d 1054, 1058 (W.D. Wash. 2020) ("While not all claims brought under the Washington CPA must be pled with the specificity prescribed by Rule 9(b), CPA claims that allege and depend upon a 'unified course of fraudulent conduct' as the basis of the claims 'sound in fraud,' and must be averred with particularity.").

Here, Plaintiffs' WCPA claim rests on characterizations—even though unsupported by fact—of a unified course of fraudulent conduct.  The Amended Complaint pleads a combined "unfair or deceptive act or practice."  FACC ¶ 167; *see also id.* ¶ 174 (alleging "a causal link between the unfair or deceptive acts complained of and the injuries alleged").  The fundamental tenet of the claim is that Amazon concealed, failed to advise of, and thereby deceptively exploited the recording functionality of Alexa.  FACC ¶ 170 (claiming injury because Amazon allegedly never "fully disclosed that such devices are recording, storing, analyzing and utilizing [of] their personal information").  Plaintiffs allege that Amazon misrepresented that Alexa Devices "do not record all conversations unless a wake word is used."  FACC ¶ 13.  Plaintiffs also allege that Amazon misrepresented that the only usage of data is to "respond to [a user's] requests" and

"improve [Alexa's] services," when, "unbeknownst to users, … every interaction … is recorded and sent to an Amazon facility where it is permanently stored and reviewed by Amazon, its employees, and third parties." *Id.* ¶¶ 52. Throughout the Amended Complaint, Plaintiffs allege that Amazon acted "surreptitiously," "willfully," "intentionally," and "insidiously," and that Amazon engaged in "sinister practices," and knew that "intercepted conversations were not intended for Alexa." *See, e.g.*, *id.* ¶¶ 1, 3, 7, 11, 15, 57, 62, 68-75, 84-85, 92, 148, 242. Thus, because Plaintiffs' WCPA claim characterizes Amazon as falsely representing and concealing information about the collection of consumer data, this case is subject to the heightened pleading standard of Rule 9(b). *See Goodman v. HTC America, Inc.*, No. C11-1793MJP, 2012 WL 2412070, at *16 (W.D. Wash. June 26, 2012); *Short v. Hyundai Motor Co.*, No. C19-0318JLR, 2020 WL 6132214, at *5 (W.D. Wash. Oct. 19, 2020) ("a plaintiff pleading fraudulent omission or concealment must still plead the claim with particularity") (citation omitted).

### 2. Plaintiffs Allege No Facts Demonstrating Any Actionable Misrepresentation Or Unfair Conduct.

Plaintiffs "asserting causes of action for fraudulent misrepresentation under the … WCPA must allege" that they were "exposed to a particular representation that is claimed to be deceptive" to state a claim. *Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913, 924 (N.D. Cal. 2012) (dismissing plaintiff's WCPA claim for failure to allege reliance on any alleged misrepresentation in making a purchase). Nowhere in the Amended Complaint do Plaintiffs plead the "who, what, when, where, and how" of Amazon's alleged misstatements, nor that any Plaintiff ever saw or heard them.

Indeed, even if Rule 9(b) did not apply, Plaintiffs have not alleged sufficient facts to support a WCPA claim under the Rule 8(a) standard. Plaintiffs provide only conclusory generalizations, e.g., that Amazon "failed to disclose that it makes, stores, analyzes, and uses recordings," and "failed to disclose that it uses human and artificial intelligence" to evaluate recordings. FACC ¶¶ 12, 14. But the Amended Complaint and materials it cites refute that theory, failing to substantiate how Alexa's functioning as Amazon disclosed is somehow "unfair," or caused "substantial injury" to Plaintiffs that was unavoidable. Plaintiffs rewrite the truthful statements on Amazon's Your Privacy webpage in an effort to brand them as "deceptive." They

claim that Amazon's representation that "they do not record all conversations unless a wake word is used" is "patently false" because of examples of recordings allegedly lacking a wake word. FACC ¶¶ 13, 104.  ***But Amazon never made that statement***.  As the Amended Complaint itself acknowledges, Amazon discloses that "no audio is stored or sent to the cloud ***unless the device detects*** the wake word." *Id.* ¶ 12 (emphasis in original).  There is nothing false about this statement. Nowhere does—or could—Amazon promise that the device's ***detection*** will be error-free.  To the contrary, the Your Privacy webpage is consistent with Amazon's disclosures in the Alexa FAQs, which state that:  "In some cases, your Alexa-enabled device might interpret another word or sound as the wake word."  RJN, Ex. A at 2, FAQ 5 (What about "false wakes"?).  Amazon also offers voice history as a resource that users can consult to review their Alexa use, whenever they want, listen to and provide feedback for recordings, or delete them as they wish.  *See, e.g.*, FACC ¶ 60. There is nothing sinister and nefarious about any of this.

Information about Alexa's function and recording capability abound on Amazon's website. Amazon's Privacy Notice discloses that "we use your voice input, images, videos, and other personal information to respond to your requests, provide the requested service to you, and improve our services."  *Id.*, Ex. B at 3 (Privacy Notice).  The Alexa Welcome Screen expressly discloses to every Alexa registrant that "***Amazon processes and retains audio, interactions, and other data in the cloud to provide and improve our services***."  FACC ¶ 100 (emphasis added). The only way to "retain audio … in the cloud" is to store a recording.  And the Alexa FAQs, which are publicly displayed and linked from the Welcome Screen and Alexa Terms, expressly disclose that Alexa stores recordings until the user deletes them and uses those recordings for both machine learning and (rarely) for anonymous human review.  FACC ¶ 54, n.30; RJN Ex. A at 3, 5, FAQ 6, 10.  Those disclosures flatly refute Plaintiffs' conclusory allegations that Amazon fails to disclose that "it makes, stores, analyzes, and uses recordings of these interactions."  FACC ¶ 12.

These disclosures refute any notion of unfairness, or that Plaintiffs were unable reasonably to avoid any of the acts that they now complain about.  In *Davis*, plaintiff alleged that defendants violated the "unfair" prong because their advertisements of rewards programs for credit cards did not adequately disclose the annual credit card fee. 691 F.3d at 1169.  The court found no unfairness

because "the disclaimer and the terms and conditions were enough to give a reasonable consumer 'reason to anticipate' the possibility of fees." *Id.* Further, the Ninth Circuit found that any harm was avoidable because plaintiff could have terminated his account and obtained a refund, even though to do so might impact his credit score. *Id.* "The question, however, is not whether subsequent mitigation was convenient or costless, but whether it was 'reasonably possible.'" *Id.* (citation omitted). Just like the terms and conditions disclosed the annual fee in *Davis*, here, as discussed above, Amazon disclosed Alexa's recording functionality and the possibility that false wakes may occur. Further, Amazon disclosed that users can delete voice recordings (using the same functionality Plaintiffs used to review the voice recordings identified in the Amended Complaint, ¶¶ 60-84), or "you can choose not to save any voice recordings." RJN Ex. A at 3, FAQ 6 (Can I review and delete my voice recordings?). As this Court observed in a similar case, "the record shows that Defendants 'told [Plaintiff] what [they] were doing, why they were doing it, and how Plaintiff could stop what was being done.'" *Alpert*, 2019 WL 1200541 at *7. And Plaintiffs also admit that, if they were uncomfortable with Alexa's listening function, they could avoid it entirely by just turning off the microphone and using only its push-to-play functionality. FACC ¶ 49. Thus, Plaintiffs have not sufficiently alleged any unfair acts or practices.

This Court has dismissed similar attempts to challenge the sufficiency of Amazon's customer notices. In *Del Vecchio v. Amazon.com, Inc.*, in considering a motion to dismiss under the WCPA for the use of internet cookies, this Court relied on Amazon's COUs and Privacy Notice, which notified visitors about the challenged practice. No. C11-366RSL, 2012 WL 1997697, at *6 (W.D. Wash. June 1, 2012). The *Del Vecchio* plaintiffs alleged that Amazon's use of cookies violated their "property interests" in the exclusive use of their computers and "circumvented their 'right to control the dissemination and use of personal information belonging to them.'" *Id.* at *2. The Court noted that, because Amazon's Privacy Notice notified visitors about the use of cookies, "Plaintiffs' use of Defendant's site to make purchases would appear to serve ***both as an acknowledgment that cookies were being received and an implied acceptance of that fact***." *Id.* at *6 (emphasis added).[13] The same applies here. Amazon openly, notoriously,

---

[13] In *Del Vecchio*, "in an abundance of caution" the Court converted the Rule 12(b)(6) motion

and expressly discloses that it "retains audio" and that those recordings are used to improve the Alexa service, and the possibility that false wakes may occur. Plaintiffs' use of the Alexa service constitutes both an acknowledgment of those facts and an implied acceptance of that recording.

Finally, putting aside that Plaintiffs fail to identify even a single misleading Amazon statement, Plaintiffs fail also to allege that they actually saw or relied on anything that Amazon said. *See, e.g.*, *Minnick v. Clearwire US, LLC*, 683 F. Supp. 2d 1179, 1188 (W.D. Wash. 2010) (dismissing WCPA claim based on false misrepresentations where "none of the Plaintiffs identify the relied-upon statements"). Nor could they. Amazon openly discloses how Alexa works, including how the service makes, stores, and uses recordings to improve the service, and the fact that false wakes may occur. Numerous Amazon documents cited and incorporated into the Amended Complaint make this abundantly clear. *See* FACC at 27-29, Ex. B at 2, 4, 10-13; RJN Ex. A at 2-5, FAQ 2-5, 9-10, Ex. B at 2, Alexa Terms ¶ 1.3. Because Plaintiffs do not plead any actionable unfair or deceptive practice upon which they relied to their detriment, their WCPA claim fails.

### B. Plaintiffs Suffered No Injury To Their Business or Property, as Required By The WCPA.

To recover under the WCPA, "a plaintiff must suffer an injury to his 'business or property'"; "if he suffers injury other than [this] the injury is not compensable." *Keyes v.*

---

into one for summary judgment, but that is not necessary or warranted here. 2012 WL 1997697, at *8. In *Del Vecchio*, the plaintiffs claimed that the disclosures were "so buried within Amazon's website that Plaintiff did not read them." *Id.* In this case, by contrast, Plaintiffs' Amended Complaint includes screenshots showing what users saw. FACC at 27-29. Moreover, the Amazon COUs and Privacy Policy are Exhibits A and B to the Amended Complaint; they are not "outside the pleadings," they are part of them. And the Alexa FAQs are referenced and linked from the Amended Complaint. *Id.* ¶ 54 & n.30. It is well-settled that, under Rule 12(b)(6), the Court may consider materials of which it can take judicial notice or that are incorporated by reference in the complaint. *See e.g.*, *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2012) (granting Rule 12(b)(6) motion after taking judicial notice of materials "displayed publicly on the respective web sites" where "Plaintiffs quoted this prospectus in their Complaint and provided the web address where the prospectus could be found online"); *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) (under "incorporation by reference" doctrine, court can consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading.").

*Bollinger*, 31 Wn. App. 286, 295, 640 P.2d 1077 (1982).  The injury to business or property is "a crucial element of a CPA claim." *Cousineau v. Microsoft Corp.*, 992 F. Supp. 2d 1116, 1128 (W.D. Wash. 2012) (dismissing WCPA claim based on alleged wiretapping for failure to allege injury).  Personal injuries are insufficient.  Specifically, "'mental distress, embarrassment, and inconvenience,' without more, are not compensable under the Consumer Protection Act." *Gragg v. Orange Cab Co., Inc.*, 942 F. Supp. 2d 1111, 1118 (W.D. Wash. 2013); *see also Keyes*, 31 Wn. App. at 296-97.  "[A]n invasion of privacy is a 'personal' injury, rather than a 'business or property' injury, because the concept of privacy by its very nature is inherently personal, not pecuniary." *Gragg*, 942 F. Supp. 2d at 1119 (dismissing WCPA claim for lack of injury where plaintiff alleged invasion of privacy).

Unable to rely on an "invasion of privacy" to plead a WCPA claim, Plaintiffs instead claim that they did not receive the benefit of their bargain.  Plaintiffs allege that they have suffered injury "by paying more for Alexa Devices than they would have been willing to pay were it fully disclosed that such devices are recording, storing, analyzing, and utilizing their private information."  FACC ¶ 170.  But Plaintiffs allege no facts to support that conclusion.  *See Cousineau*, 992 F. Supp. 2d at 1128 (granting motion to dismiss where plaintiff alleged insufficient facts to support theory that covert tracking diminished the phone's market value).  A bare allegation that one would have paid less—with no facts to support the amount that was paid or any alternative amount the plaintiff would have willingly paid—does not state a claim.  There can be no injury when a plaintiff has received the benefits of the product she purchased.  *See, e.g.*, *Brotherson v. Pro. Basketball Club, L.L.C.*, 604 F. Supp. 2d 1276, 1296 (W.D. Wash. 2009) (finding that plaintiffs failed to establish a WCPA injury because "plaintiffs took advantage of the benefits of their 2008 season tickets to the greatest extent they could.  Plaintiffs may have enjoyed Sonics games less as it became more likely that the team would leave Seattle … but that is at best the sort of mental injury that the CPA does not recognize.").  Plaintiffs do not claim that they purchased Alexa devices based on a representation that their voices would *not* be recorded.  Nor do they allege that they were deprived of any benefits the Alexa service offers.

Plaintiffs do not even allege that they purchased an Alexa device in the first place, which

dooms any theory based on overpayment.  Earlier this year, the court in *In re Google Assistant Priv. Litig.* dismissed a similar claim under the California UCL, which requires "loss of money or property" to establish standing.  No. 19-cv-04286-BLF, 2021 WL 2711747, at *17 (N.D. Cal. July 1, 2021).  There, one of the named plaintiffs interacted with a device she did not own, and another received his device for free.  *Id.*  "Because these Named Plaintiffs have failed to allege that they paid any money for a Google Assistant Enabled Device, they cannot have been injured by overpayment."  *Id.*  The same reasoning applies with full force to every Plaintiff here.

Plaintiffs allege also that they were injured based on having "personal conversations and personal characteristics used and continuing to be used for commercial gain."  FACC ¶ 170.  But someone else's commercial benefit is not, without more, the same thing as a commercial detriment to a Plaintiff's business or property.  As this Court has noted, "[i]t is not enough to allege only that the information has value to Defendant; the term 'loss' requires that Plaintiffs suffer a detriment." *Del Vecchio*, 2012 WL 1997697, at *4.  To establish a monetary loss, "plaintiff must allege how the defendant's use of the information deprived the plaintiff of the information's economic value. Put another way, a plaintiff must do more than point to the dollars in a defendant's pocket; he must sufficiently allege that in the process he lost dollars of his own."  *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1056 (N.D. Cal. 2014) (dismissing California UCL claim for lack of standing); *see also Huynh v. Quora, Inc.*, No. 18-cv-07597-BLF, 2019 WL 11502875, at *7 (N.D. Cal. Dec. 19, 2019) (dismissing California UCL claim for lack of loss of money or property and finding that "even if '[Quora] may have gained money through its sharing or use of the [P]laintiffs' information, … that's different from saying the plaintiffs lost money'") (internal citation omitted).

Finally, Plaintiffs fare no better with their conclusion that they have been "deprived of the value inherent with their personal data" because some marketplace purportedly exists for certain recordings of voice commands.  FACC ¶ 172.  *First*, this allegation is implausible because Plaintiffs have alleged no facts showing the existence of any market for words spoken at the choice of the speaker.  This Court should therefore reject this theory of economic loss for the same reason that the *Google Assistant* court rejected it in that case:  "there are no facts to suggest that Plaintiffs intended to monetize their individual voice recordings, nor is there any facts that suggest there is

1  a market in which Plaintiffs could sell such recordings." *Google Assistant*, 2021 WL 2711747, at

2  *18.  While Plaintiffs cite to certain applications that employ people, upon command, to repeat

3  specific words multiple times—such as "my voice is my password"—that is a far cry from any

4  marketplace for random fragments of speech or background noise.[14]  Plaintiffs do not allege that

5  they made, or that Alexa recorded, the type of speech for which any payments are available.

6      *Second*, even if they had alleged the existence of such a marketplace, Plaintiffs fail to allege

7  any "impairment of the ability to participate in that market."  *See Bass v. Facebook, Inc.*, 394 F.

8  Supp. 3d 1024, 1040 (N.D. Cal. 2019) (dismissing California Consumer Legal Remedies Act claim

9  due to lack of economic injury where plaintiff failed to provide a market for his personal

10  information or show that his ability to participate in the market was impaired); *see also LaCourt*

11  *v. Specific Media, Inc.*, No. SACV 10-1256-GW(JCGx), 2011 WL 1661532, at *5 (C.D. Cal. April

12  28, 2011) (granting motion to dismiss for lack of Article III standing where plaintiffs "d[id] not

13  explain how they were 'deprived' of the economic value of their personal information simply

14  because their unspecified personal information was purportedly collected by a third party.").  In *In*

15  *re Facebook Internet Tracking Litig.*, the court held that plaintiffs failed to establish economic

16  harm from the collection of their past browsing histories because they had not alleged an "inability

17  to participate in these programs after Facebook collected their information."  140 F. Supp. 3d 922,

18  931-32 (N.D. Cal. 2015).  Notably, the court reached this conclusion despite the fact that plaintiffs

19  had alleged that there were programs that compensated users with "$5 gift cards in exchange for

20  monitoring their browsing activity."  *Id.*  Similarly, in *Low v. LinkedIn Corp.*, the court found that

21  plaintiff had failed to establish economic harm, despite alleging "that the data collection industry

22  generally considers consumer information valuable," because he failed to allege that "he was

23  foreclosed from capitalizing on the value of his personal data."  No. 11-CV-01468-LHK, 2011 WL

24  5509848, at *5 (N.D. Cal. Nov. 11, 2011).

25

26  _____

27  [14]   The Amended Complaint references only one application that employs persons to read particular words multiple times (FACC ¶ 119 & n.80), and Facebook's offer of "points" to narrowly limited persons if they read the specific words "Hey Portal" followed by a friend's name,

28  also multiple times.  *Id.* ¶ 120 & n.81.

1   The Court should find the same here. Plaintiffs do not allege how they were somehow

2   deprived of the ability to repeat particular words and make money, simply because Alexa recorded

3   them doing something else. If Plaintiffs wish to access any market that would pay them to recite

4   phrases, they still can. And if they did not access such a market before, that was not due to any

5   act by Amazon. Any loss therefore is not causally linked to their claims here. *See Hangman*

6   *Ridge*, 105 Wn.2d at 531. Indeed, as Plaintiffs have admitted (FACC ¶ 63), they have easy access

7   to their recordings. If there were really a market for voice recordings, Plaintiffs could even

8   download and attempt to sell any purported voice recordings if they wish. It is not sufficient to

9   allege that information has external value, Plaintiffs must show that the information has economic

10  value to ***them***, of which ***they*** have been deprived, to establish a loss of money or property. *Bass*,

11  394 F. Supp. 3d at 1040. Plaintiffs have not done so. And, as this Court has recognized,

12  "[c]ollection of data itself is not actionable, absent a specific statutory or constitutional right.

13  'Demographic information is constantly collected on all consumers by marketers, mail-order

14  catalogues and retailers,' but courts have not held that 'the value of this collected information

15  constitutes damage to consumers or unjust enrichment.'" *Goodman*, 2012 WL 2412070, at *7.

16      In sum, the Court should dismiss Plaintiffs' WCPA claims based on their failure to plead

17  that Amazon committed an unfair or deceptive practice or that they suffered any injury to their

18  business or property.

19  **IV.   PLAINTIFFS STATE NO CLAIM UNDER THE FEDERAL WIRETAP ACT.**

20      The Amended Complaint fails to state a claim under the Federal Wiretap Act (Count XII)

21  because Amazon, as the intended recipient of the disputed communications, was "a party to the

22  communications" and therefore could not violate the act. 18 U.S.C. § 2511(d) ("it shall not be

23  unlawful under this chapter for a person … to intercept a … communication where such person is

24  a party to the communication").

25      The Federal Wiretap Act provides a civil cause of action to a person whose wire, electronic

26  or oral communications to another are intentionally intercepted without the consent of at least one

27  party to the communication, unless one of the Act's exceptions applies. 18 U.S.C. §§ 2511(1)(a),

28  2520(a); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 606-07 (9th Cir. 2020), *cert.*

*denied sub nom. Facebook, Inc. v. Davis*, 141 S. Ct. 1684 (2021).  Unlike Washington's and other state's all-party consent statutes, under the Federal Act, one party's consent is sufficient to defeat a claim.  "[A] communication will always consist of at least two parties: the speaker and/or sender, and at least one intended recipient," who is necessarily one of the parties to the communication. *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 143 (3d Cir. 2015) ("*In re Google Cookie*").  Here, there can be no violation of the Federal Act because Amazon would be a party to, and thus the intended recipient of, voice commands directed to the Alexa service. FACC ¶ 337; 18 U.S.C. § 2511(2)(d).  When the speaker commands "Alexa, play next song," or "Alexa, what's the weather," Amazon is indisputably the intended recipient.  Count XII must, as an initial matter, be dismissed as to all commands directed to Alexa.

Moreover, it is indisputable that Amazon is an "intended recipient" of both intentional interactions with Alexa and inadvertent "false wakes."  Plaintiffs admit that the Alexa service is designed to record "[o]nce the Alexa Device recognizes the wake word."  FACC ¶ 7.  In other words, owners and users of an Alexa device are plainly aware that the Alexa-enabled device installed in their vicinity uses microphones (*id.* ¶ 122) to listen for noises until it "recognizes the wake word."  *Id.* ¶ 49.  And they intend for Amazon then to "start[] recording communications and transmit[] the recording to Amazon's servers … to generate a response."  *Id.*  None of the Plaintiffs alleges that he or she was unaware that the Alexa service was listening for instructions to which it should respond.  Indeed, Plaintiffs know that this process is inherent in a voice-activated device, admitting that "the device is intended to be 'hands free' and on 'standby' to receive commands and provide information."  *Id.*  Plaintiffs' self-serving claim that they were unaware that Amazon would *retain* their speech after processing—because they chose not to read Amazon's detailed written disclosures on that point, somehow missed the extensive media coverage about it, and never used conspicuous features and settings within the Alexa App—does not make Amazon any less an "intended recipient" of Plaintiffs' communication.  Again, the allegation of "retained recordings" is a red herring in determining whether wiretapping has occurred.  Thus, the statutory exception in Section 2511(2)(d) defeats Plaintiffs' Wiretap Act claim as to "false wakes."[15]

---

[15]  Plaintiffs ignore altogether the threshold question whether their "oral instructions" to Alexa

The Amended Complaint does not state a cause of action under the Federal Wiretap Act.

## V.  PLAINTIFFS STATE NO CLAIM UNDER THE FEDERAL STORED COMMUNICATIONS ACT.

The Amended Complaint also fails to state a claim under Section 2702(a)(1) of the Federal Stored Communications Act ("SCA") (Count XIII).  *See* FACC ¶¶ 342-357; 18 U.S.C. § 2702. That section of the SCA prohibits a "person or entity providing an electronic communication service to the public" from "knowingly divulg[ing] to any person or entity the contents of a communication while in electronic storage by that service."  18 U.S.C. § 2702(a)(1).  To state a claim under § 2702(a)(1), Plaintiffs must plausibly allege that (1) the Alexa service is an "electronic communication service" ("ECS"); (2) the communications at issue are "in electronic storage"; and (3) Amazon "divulged" those communications to a third party while the communications were in electronic storage.  *Id.*  The Amended Complaint fails on all counts.

### A.  Plaintiffs Have Failed To Allege That Alexa Is An Electronic Communication Service Under The SCA.

By its plain language, Section 2702(a)(1) applies only to the provider of an ECS.  Plaintiffs do not allege that Amazon, or any part of the Alexa service, is an ECS, much less plead facts that plausibly would support that conclusion.  *See* FACC ¶¶ 342-347.  The SCA incorporates the Federal Wiretap Act's definition of an ECS.  18 U.S.C. § 2711(1) (incorporating terms defined in 18 U.S.C. § 2510).  The Federal Wiretap Act defines an ECS as "any service which provides to users thereof the ability to send or receive wire or electronic communications."  18 U.S.C. § 2510(15).  An ECS is a service that enables users to send or receive electronic communications to or from *other users*, such as an email service provider or text messaging service.  A business

---

are even the "electronic communications" for which they invoke the Federal Wiretap Act in the first place.  *See* FACC ¶¶ 332 (citing § 2520(12)'s definition of "electronic communications" as including transfer "by a wire, radio, electromagnet, photoelectronic or photo-optical system"), 336 (alleging violation because devices "include software used to intercept electronic communications"), 337 (alleging interception of "electronic communications").  The Wiretap Act expressly defines electronic communications to *exclude* "any … oral communication."  *Id.* § 2510(12)(A).  The converse is also true: "oral communications" do not include any "electronic communications."  18 U.S.C. § 2510(2).  Plaintiffs identify no "electronic communications" to which the Federal Wiretap Act would apply.

that merely provides a service that enables customers or users to communicate *with that business* is not an ECS. *See, e.g.*, *Crowley v. CyberSource Corp.*, 166 F. Supp. 2d 1263, 1270-71 (N.D. Cal. 2001) (Amazon.com is not an ECS merely because it provides a website that customers access to purchase goods); *In re: JetBlue Airways Corp. Priv. Litig.*, 379 F. Supp. 2d 299, 307 (E.D.N.Y. 2005) (dismissing SCA claim based on alleged sharing of website user information with third party, holding that a company "does not become an 'electronic communication service' provider simply because it maintains a website that allows for the transmission of electronic communications between itself and its customers").

*First*, Plaintiffs do not allege that Alexa is an ECS or performs the functions of an ECS by providing a means for users to send or receive wire or electronic communications to other users. The Amended Complaint mentions an ECS just three times while quoting from various provisions of the SCA and Wiretap Act. *See* CC ¶¶ 344, 346-47. Because the Amended Complaint does not allege the Alexa service is an ECS, the SCA claim fails as a matter of law and should be dismissed on this basis alone.

*Second*, even if Plaintiffs had alleged that the Alexa service is an ECS, the Amended Complaint pleads no facts to support such a finding. As noted above, the mere receipt of transmissions over the internet is insufficient. Ultimately, the SCA is meant to protect information "'held by *centralized* communication providers.' … The statute is not meant to provide a 'catch-all … to protect the privacy of stored internet communications.'" *Lopez v. Apple, Inc*., 519 F. Supp. 3d 672, 687 (N.D. Cal. 2021) (emphasis added) (quoting *In re Google Cookie*, 806 F.3d at 147) (internal citations omitted). In *Lopez*, the court dismissed SCA claims nearly identical to Plaintiffs', namely that Apple's Siri virtual assistant violated Section 2702(a) by disclosing recordings to third-party contractors. *See Lopez*, 519 F. Supp. 3d at 687. The court found that plaintiffs had failed to allege "that Siri is an electronic communication service" and that Siri's mere use of the internet was insufficient. *Id.*; *see also Keithly v. Intelius Inc.*, 764 F. Supp. 2d 1257, 1271-72 (W.D. Wash. 2011) (entity is not an ECS merely because it "uses electronic communications to conduct its business on the internet" and "does not provide the wire or electronic communication services utilized by its customers"). The same result should follow here.

Plaintiffs' Amended Complaint alleges only that Alexa is an internet-enabled voice assistant that receives queries from users, processes them, and then responds or takes an action requested by the user. *See* FACC ¶¶ 49, 52. That is not an ECS.

**B.      Plaintiffs Fail To Allege That Alexa Recordings Are "In Electronic Storage."**

Plaintiffs also fail to allege that Alexa interactions retained by Amazon are "in electronic storage" as required by the SCA. Electronic storage is "any ***temporary, intermediate storage*** of a wire or electronic communication incidental to the electronic transmission thereof" or "any storage of such communication by an electronic communication service for ***purposes of backup*** protection of such communication." 18 U.S.C. § 2510(17) (emphasis added). Even after Plaintiffs' revisions to their pleading, the Amended Complaint can satisfy neither requirement.

*First*, Plaintiffs admit that Alexa recordings are not in "temporary, intermediate storage," 18 U.S.C. 2510(17), meaning "messages not yet delivered to their intended recipient." *Theofel v. Farey-Jones*, 359 F.3d 1066, 1075 (9th Cir. 2004). To the contrary, Plaintiffs allege, as the core of their theory of wrongdoing, that "Amazon records and permanently stores these recordings." FACC ¶ 5; *see also id.* ¶¶ 7, 52, 67, 106, 108. Such "permanent" storage, as alleged by Plaintiffs, is plainly not "temporary." *See, e.g.*, *Wesch v. Yodlee, Inc.*, No. 20-cv-05991-SK, 2021 WL 1399291, at *4 (N.D. Cal. Feb. 16, 2021) ("Courts have held that communications stored for long periods, such as one year, do not qualify as 'temporary, intermediate storage.'").

Nor do Plaintiffs plausibly allege that Alexa stores communications incidental to transmission to any recipient other than Amazon or the Alexa service itself. "[T]he SCA has typically only been found to apply in cases involving a centralized data-management entity; for instance, to protect servers that stored emails for significant periods of time between their being sent and their recipients' reading them." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 609. In other words, the SCA "only protects electronic communications stored 'for a limited time' in the 'middle' of a transmission, i.e. when an electronic communication service temporarily stores a communication while waiting to deliver it." *In re Toys R Us, Inc., Priv. Litig.*, No. 00-cv-2746, 2001 WL 34517252, at *3 (N.D. Cal. Oct. 9, 2001) (quoting *In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d 497, 511-13 (S.D.N.Y. 2001)). There are no allegations anywhere in the

Amended Complaint about the purported recording of communication with anyone other than Amazon, much less that any such communications were stored during transmission. *See Casillas v. Cypress Ins. Co.*, 770 F. App'x 329, 331 (9th Cir. 2019) (finding that online service is not an ECS where "documents and accompanying comments do not travel directly from the sender to the recipient"). To the contrary, the recordings described throughout the Amended Complaint are either communications *to Amazon's servers* for processing (FACC ¶ 49) or fragments of inadvertently recorded audio to another person near a device (FACC ¶¶ 65-67, describing two recordings of Plaintiff Lenehan allegedly not intended for processing by Alexa). In short, no Plaintiff has alleged that they used Alexa to communicate with another person or that Amazon has "divulged" any such communications while it is in temporary storage.

*Second*, Plaintiffs make only a single conclusory allegation that "Amazon stores Plaintiffs' and Class members' electronic communications for backup," but do not plead any facts to support that conclusion. FACC ¶ 353. While "backup" is not defined by the SCA, the Ninth Circuit found in *Theofel* that copies of email messages stored on a server were stored for backup purposes because the storage allowed users to re-download "a second copy" of email messages after they had been delivered, "if, for example, the message is accidentally erased from the user's own computer." *Theofel*, 359 F.3d at 1075. Plaintiff makes no similar allegation here—to the contrary, they allege that the purpose of the recording is to benefit Amazon by improving the functioning of Alexa.

Plaintiffs' SCA claim should be dismissed because they cannot allege that any recordings are divulged by Amazon while "in electronic storage," as defined by Section 2702.

### C.   Plaintiffs Make No Plausible Allegation That Any Alexa Recordings Were "Divulged" From Electronic Storage To A Third Party.

Plaintiffs' SCA claim also fails for the independent reason that the Amended Complaint does not plead factual allegations that Amazon has "divulge[d] to any person or entity the contents of a communication" that is not exempt under the plain language of Section 2702(b). 18 U.S.C. § 2702(a)(1).

*First*, Plaintiffs have made only conclusory allegations that Amazon has disclosed the contents of Alexa recordings, while failing to allege that any of the *Plaintiffs'* communications have been disclosed.  Unlike the subset of plaintiffs in *Google Assistant*, whose claims survived the motion to dismiss because they alleged that Google divulged the contents of their communications to third-party Instagram for the purposes of targeted advertising, 2021 WL 2711747, at *7-9, Plaintiffs here allege no similar practice by Amazon.  Instead, Plaintiffs' claims resemble those of the other plaintiffs in *Google Assistant*, whose SCA claims were dismissed because they did *not* allege third-party disclosure.  *Id.*

The Amended Complaint alleges that the Plaintiffs' voices were recorded but then makes only conclusory, non-specific allegations that their recordings were "disseminated among Amazon employees, contractors, and third parties" (FACC ¶ 88), and that "Amazon has the *capability* to use the recorded conversations to help Amazon send targeted advertisements" (FACC ¶ 109 (emphasis added)).  Of course, as in *Google Assistant*, whether Amazon is "capable" of using Alexa recordings for targeted advertising is not the same as an allegation that it does so.  Plaintiffs do not identify a single targeted ad they received from Amazon, let alone one somehow tied to their use of Alexa.  Indeed, Plaintiffs appear to admit that "the extent to which this data is shared with third parties, and how those third parties use and control that information, is still unclear." FACC ¶ 108 (quoting Press Release, Sen. Chris Coons, *Amazon responds to Sen. Coons' concerns about consumer privacy practices for Alexa devices* (July 3, 2019)).  Speculation about whether Amazon *might* use Plaintiffs' Alexa interactions for marketing purposes is neither evidence nor sufficient to plead a viable claim.  Moreover, as the court in *Google Assistant I* found when it dismissed similar claims, "[d]efendants' own use of Plaintiffs' data for advertising purposes [if any] does not constitute an unlawful 'disclosure.'"  *Google Assistant I*, 457 F. Supp. 3d at 822. Section 2702(b)(1) similarly compels dismissal here, where Plaintiffs allege no actual targeted advertising, much less disclosure to third parties for that purpose.

*Second*, Plaintiffs' generalized allegation that unspecified "Alexa recordings are reviewed by Amazon workers and contractors" (FACC ¶ 109) cannot establish a violation of Section 2702. The SCA exempts disclosures (i) "to an addressee or intended recipient of such communication or

[its] agent," or (ii) made "with the lawful consent of the originator or an addressee or intended recipient." 18 U.S.C. § 2702(b)(1), (3). Either subsection suffices to exempt the disclosures pled in the Amended Complaint.

As discussed above, the Amended Complaint alleges that Amazon is the intended recipient of both intentional interactions with Alexa and inadvertent "false wakes." The plain text of subsection 2702(b)(1) authorizes Amazon, as the intended recipient of the communications, to receive Alexa recordings. Indeed, that is the only way the Alexa service can function. FACC ¶ 49. That same subsection also authorizes disclosure to Amazon personnel, for use in improving Amazon's Alexa service. *See* 18 U.S.C. § 2702(b)(1); FACC, Ex. B at 3 (disclosing that Amazon uses voice information to "improve [its] services"); *id.* at 4-5 (disclosing that Amazon shares data with "other companies and individuals to perform functions on [Amazon's] behalf").

Alternatively, subsection (b)(3) further exempts disclosures made with Amazon's or the user's consent. *See* 18 U.S.C. § 2702(b)(3). The Amended Complaint repeatedly acknowledges that Amazon, an intended recipient of commands to Alexa, has consented to the alleged disclosures to personnel. *See* FACC ¶¶ 183, 202, 222, 354.

In sum, Plaintiffs have failed to state a claim under Section 2702 because the Amended Complaint does not show that any non-exempt communications were divulged by the provider of an electronic communication service. Plaintiffs' SCA claim should therefore be dismissed.

### CONCLUSION

Plaintiffs have failed to plead any viable claim. Any further amendment is also futile, as Plaintiffs cannot overcome their own allegations demonstrating their knowledge of Alexa's recording capability and express and implied consent to Amazon's recording practices in connection with the Alexa service. For the foregoing reasons, pursuant to Rule 12(b)(6), Amazon respectfully requests that the Court dismiss Plaintiffs' First Amended Consolidated Complaint in its entirety, without leave to amend and with prejudice.

1   Dated: December 15, 2021

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

FENWICK & WEST LLP

By: */s/ Brian D. Buckley*
    Brian D. Buckley, WSBA No. 26423

FENWICK & WEST LLP
1191 Second Avenue, 10th Floor
Seattle, WA 98101
Telephone: 206.389.4510
Facsimile: 206.389.4511
Email:     bbuckley@fenwick.com

Laurence F. Pulgram (admitted *pro hac vice*)
Jedediah Wakefield (admitted *pro hac vice*)
Esther D. Galan (admitted *pro hac vice*)

FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300
Facsimile: 415. 281.1350
Email:     lpulgram@fenwick.com
          jwakefield@fenwick.com
          egalan@fenwick.com

*Counsel for Defendants*
AMAZON.COM, INC. and
AMAZON.COM SERVICES, LLC

MOTION TO DISMISS FACC         - 49 -         FENWICK & WEST LLP
CASE NO.: 2:21-CV-00750-RSL                1191 SECOND AVENUE, 10TH FLOOR
                                              SEATTLE, WASHINGTON 98101