1
2
3
4
5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

6   KAELI GARNER, *et al.*,                           Cause No. C21-0750RSL

7                    Plaintiffs,

8          v.                                          ORDER GRANTING IN
                                                       PART DEFENDANTS'
     AMAZON.COM, INC., *et al*.,                       MOTION TO DISMISS
9
                     Defendants.
10

11          This matter comes before the Court on defendants' "Motion to Dismiss First Amended

12   Consolidated Complaint" (Dkt. # 63) and a "Request for Judicial Notice" in support of that

13   motion (Dkt. # 64). Plaintiffs allege that (1) Amazon's Alexa devices record, permanently store,

14   use, and transmit to third parties (including human reviewers) communications in the absence of

15   a wake word and (2) plaintiffs reasonably expected that the devices would respond to a question

16   or command only if the wake word were used and that, in doing so, the question or command

17   would be stored only long enough to process the communication and generate a response.

18   Plaintiffs further allege that Alexa devices are fully capable of functioning without the need to

19   record, store, and/or share voice recordings. The named plaintiffs either live in a household with

20
21
22   ORDER GRANTING IN PART
     DEFENDANTS' MOTION TO DISMISS  - 1

1  an Alexa device they registered themselves ("registered users") or live in a household with an

2  Alexa device that was registered by someone else ("unregistered users").

3       In the pending motion to dismiss, defendants assert (a) that Washington law governs the

4  claims of registered users, all of whom agreed to Amazon's Conditions of Use, (b) that all

5  claims brought by registered users under other states' laws must be dismissed in favor of

6  Washington law, and (c) that the registered users have consented to the recordings at issue in the

7  First Amended Consolidated Complaint and cannot plausibly allege a violation of Washington's

8  wiretap law. With regards to unregistered users, defendants argue that they impliedly consented

9  to the voice recordings under Washington law[1] because they knew or should have known the

10  way Alexa works and because the recordings to which plaintiffs object are inherent in the

11  technology plaintiffs used. Defendants seek dismissal of plaintiffs' Washington Consumer

12  Protection Act claims for failure to plausibly allege an unfair or deceptive practice or injury to

13  business or property, dismissal of the Federal Wiretap Act claims because defendants were the

14  intended recipients of the communications, and dismissal of the Federal Stored Communications

15  Act claims for failure to plausibly allege that Alexa is an electronic communication service, that

16  the recordings are in electronic storage, or that they were divulged to a third party.

17       The question for the Court on a motion to dismiss is whether the facts alleged in the

18  complaint sufficiently state a "plausible" ground for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S.

19

----

20      [1] Defendants do not explain why Washington law applies to the claims of unregistered users and
have not sought dismissal of the claims brought by unregistered users under other states' wiretapping

21  laws.

22  ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS  - 2

544, 570 (2007). In the context of a motion under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, the Court must "accept factual allegations in the complaint as true and construe the

pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire &*

*Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted). The Court's review is

generally limited to the contents of the complaint. *Campanelli v. Bockrath*, 100 F.3d 1476, 1479

(9th Cir. 1996). "We are not, however, required to accept as true allegations that contradict

exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations

that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."

*Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

> To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege
> "enough facts to state a claim to relief that is plausible on its face." []*Twombly*,
> 550 U.S. [at 570]. A plausible claim includes "factual content that allows the court
> to draw the reasonable inference that the defendant is liable for the misconduct
> alleged." *U.S. v. Corinthian Colls.*, 655 F.3d 984, 991 (9th Cir. 2011) (quoting
> *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Under the pleading standards of Rule
> 8(a)(2), a party must make a "short and plain statement of the claim showing that
> the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). . . . A complaint "that
> offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause
> of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).
> Thus, "conclusory allegations of law and unwarranted inferences are insufficient
> to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir.
> 2004).

*Benavidez v. Cty. of San Diego*, 993 F.3d 1134, 1144–45 (9th Cir. 2021). If the complaint fails

to state a cognizable legal theory or fails to provide sufficient facts to support a claim, dismissal

is appropriate. *Shroyer v. New Cingular Wireless Servs., Inc*., 622 F.3d 1035, 1041 (9th Cir. 2010).

Having reviewed the memoranda, declarations, and exhibits submitted by the parties and having heard the arguments of counsel, the Court finds as follows:

**A. Request for Judicial Notice**

When ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court's review is generally limited to the allegations of the complaint, documents attached to or incorporated by reference into the complaint, and matters of judicial notice. *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). Defendants assert that the First Amended Consolidated Complaint expressly references and/or is based upon three documents found on their website (the "Alexa and Alexa Device FAQs," the "Alexa Terms of Use," and "Alexa, Echo Devices, and Your Privacy") and a survey published on www.researchgate.net entitled "Privacy Attitudes of Smart Speaker Users." They request that the Court take judicial notice of the same.

**1. Incorporation by Reference**

A document that is not physically attached to a complaint may nevertheless be incorporated by reference into a complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Ritchie*, 342 F.3d at 908. Mere reference to a document in the complaint is not sufficient: rather, the document must be integral to or form the basis of plaintiff's claims. *Id.* at 908-09. In addition, the document's authenticity must not be in question and there must be no disputed issues as to the document's relevance. *Coto Settlement*

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS  - 4

1  *v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (citations omitted). The authenticity of the

2  four documents is not disputed, and defendants concede that the handful of references to those

3  documents is not "extensive."[2] The issue, then, is whether the FAQs, Terms of Use, Your

4  Privacy document, and Privacy Survey serve as the basis for plaintiff's claims.

5      Although the references to the FAQs, the Terms of Use, and the Privacy Notice are few

6  and far between, they play an important function in the First Amended Consolidated Complaint,

7  offered to bolster plaintiffs' allegations that Amazon failed to adequately disclose how Alexa

8  works and to show what Amazon does with a user's communications. Whether Amazon

9  misrepresented or omitted key facts or whether it failed to announce in an effective manner that

10 it records, stores, and reviews communications occurring near Alexa are critical elements of the

11 First Amended Consolidated Complaint for which plaintiffs rely, at least in part, on Amazon's

12 public-facing documents. As was the case in *Coto Settlement*, these facts suggest that the

13 documents are integral to at least some of plaintiffs' claims and can be considered on a motion

14 to dismiss. 593 F.3d at 1038.

15     With regards to the Privacy Survey, there are very limited references to the document

16 and, while plaintiffs incorporate certain statements contained therein into the First Amended

17 Consolidated Complaint, they in no way vouch for the accuracy of the entire document. Nor do

18 their claims depend on the Privacy Survey itself. Rather, the survey is cited to support plaintiffs'

19

20     [2] Plaintiffs chose not to raise their relevance objection in their opposition to the request for
judicial notice. The relevance of the documents is therefore considered when discussing the claims

21 asserted.

22 ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS  - 5

1  contention that users of Alexa are generally unaware that a recording of their interactions is

2  made, a factual allegation that could have been asserted without citation to this document. If

3  defendants intend to dispute plaintiffs' allegations that users are unaware of how Alexa works,

4  they will have to do so through the presentation of contrary evidence on summary judgment, not

5  by incorporating a non-integral document into the complaint.

6  **2. Judicial Notice**

7  As an alternative to incorporation by reference, the Court could take judicial notice of the

8  Privacy Survey. Pursuant to Federal Rule of Evidence 201(b), facts that can be judicially noticed

9  "are not subject to reasonable dispute" because it "is generally known" or "can be accurately

10  and readily determined from sources whose accuracy cannot reasonably be questioned."

11  Amazon argues that the Privacy Survey can be considered in the context of the motion to

12  dismiss because it was published on the internet and, having cited it themselves, plaintiffs have

13  not disputed its existence, authenticity, or accuracy. *See Daniels-Hall*, 629 F.3d at 998-99

14  (taking judicial notice of a list of approved vendors "displayed publicly" on websites). The

15  Privacy Survey meets the standards for judicial notice set forth in Federal Rule of Evidence

16  201(b).

17

18

19

20

21

22  ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS  - 6

### 3. Scope of the Judicial Notice

In the circumstances presented here, neither incorporation by reference nor judicial notice under Rule 201 means that the Court must accept the statements contained in the documents as true. Plaintiffs' cite the FAQs, Terms of Use, and Privacy Notice document as support for specific factual assertions or to show how Amazon represented the Alexa devices to users. Their use does not suggest that they vouch for the accuracy of the cited documents or even the accuracy of the statements they quote. The accuracy of every statement contained therein will not be presumed simply because the document was cited for certain purposes. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014-15 (9th Cir. 2018); *Lopez v. Apple, Inc.*, No. 19-CV-04577-JSW, 2021 WL 4059106, at *2 n.2 (N.D. Cal. Sept. 2, 2021). With regard to the Privacy Survey, "[c]ourts may take judicial notice of publications introduced to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (internal quotation marks and citations omitted); *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp.3d 1011, 1029 (C.D. Cal. 2015) (collecting cases). The Court will therefore consider the four documents for purposes of understanding what representations were in the public realm at a particular time, not for the truth of those representations.

### B. Choice of Law

Defendants maintain that the wiretapping claims asserted by registered users of an Alexa device are governed by Washington law under the governing Conditions of Use, which provide

1  that use of any Amazon service constitutes agreement "that applicable federal law, and the laws

2  of the state of Washington, without regard to principles of conflict of laws, will govern these

3  Conditions of Use and any dispute of any sort that might arise between you and Amazon." Dkt.

4  # 59 at 94. They therefore request that all claims brought by registered users under the wiretap

5  laws of other states be dismissed. Plaintiffs agree that Washington law likely governs the

6  wiretap claims of all registered users, but comes to that conclusion under Washington's "most

7  significant relationship" test rather than under a contract analysis. Plaintiffs argue that the

8  contractual choice of law provision does not apply to the tort claims asserted here and that a full

9  choice of law analysis at this stage would be premature. They request that the non-Washington

10  wiretap claims be permitted to proceed until the parties are able to take discovery and address

11  the respective states' interests under the "most significant relationship" test.

12         To the extent plaintiffs are arguing that a choice of law cannot be made at the pleading

13  stage, the Court disagrees. "The question of whether a choice-of-law analysis can be properly

14  conducted at the motion to dismiss stage depends on the individual case. . . .  As long as a court

15  has sufficient information to thoroughly analyze the choice-of-law issue . . . and discovery will

16  not likely affect the analysis . . . , it is appropriate for the Court to undertake a choice-of-law

17  analysis at the motion-to-dismiss stage." *Bartel v. Tokyo Elec. Power Co., Inc.*, 371 F. Supp.3d

18  769, 790 (S.D. Cal. 2019) (internal citations and quotation marks omitted). Plaintiffs have not

19  identified any facts that need to be discovered or which "may develop in a number of ways

20  before us at trial, reducing our opinion to nothing more than an advisory opinion." *Southwell v.*

21

22  ORDER GRANTING IN PART
   DEFENDANTS' MOTION TO DISMISS  - 8

*Widing Transp., Inc.*, 101 Wn.2d 200, 207 (1984). Nor is there any real dispute regarding the

forum's choice-of-law rules. Thus, there is no reason to delay making the choice of law

determination in this case. *See Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549,

558-59 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1735, 209 L. Ed. 2d 503 (2021).

Whether claims arising in tort are controlled by a choice-of-law provision in a related

contract is not entirely clear under Washington law. *Compare Haberman v. Wash. Pub. Power*

*Supply Sys.*, 109 Wn.2d 107, 159 (1987) ("Although a choice of law provision in a contract does

not govern tort claims arising out of the contract, it may be considered as an element in the most

significant relationship test used in tort cases") *with Schnall v. AT & T Wireless Servs., Inc.*, 171

Wn.2d 260, 269 (2011) (applying contractual choice-of-law provision to both contract and

Consumer Protection Act claims). Regardless, the Court finds that Washington law applies to

the wiretap claims asserted in this case.

"[W]hen choice of law is disputed, there must be an actual conflict between the laws or

interests of Washington and the laws or interests of another state before Washington courts will

engage in a conflict of laws analysis." *FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp.*

*Holdings, Inc.*, 180 Wn.2d 954, 967 (2014). As an initial matter, there does not appear to be any

dispute about which law applies. Defendants contend that Washington law governs the wiretap

claims of registered users, a contention with which plaintiffs "preliminarily agree" without

identifying any factual or legal issue that suggests a different choice. Dkt. # 65 at 20. In fact,

plaintiffs affirmatively argue that Washington has the most significant relationship to the dispute

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS  - 9

1    and to the parties. Dkt. # 65 at 19-20. Second, plaintiffs make no effort to dispute or rebut

2    defendants' showing that there is no actual conflict between Washington's wiretap law and the

3    wiretap laws of California, Florida, Illinois, Maryland, Massachusetts, Michigan, New

4    Hampshire, or Pennsylvania. Absent a showing that the result for a particular issue would be

5    different under the laws of the competing states, there is no "real" conflict, and the local law of

6    the forum is applied. *Woodward v. Taylor*, 184 Wn.2d 911, 917 (2016); *Erwin v. Cotter Health*

7    *Ctrs.*, 161 Wn.2d 676, 692 (2007).

8         Even if the Court assumes that the contractual choice-of-law provision does not apply to

9    plaintiffs' wiretap claims, that there is a dispute as to the appropriate choice of law with regards

10   to that claim, and that an actual conflict exists, application of Washington's choice-of-law rules

11   leads to the conclusion that Washington's wiretap law applies. Washington utilizes a two-step

12   "most significant relationship" test set forth in Restatement (Second) of Conflicts of Laws ¶¶ 6

13   and 145-46. *Woodward*, 184 Wn.2d at 917.

14        For the first part of the most significant relationship test, the court evaluates the
          contacts each interested jurisdiction has with the parties and the occurrence under
15        the factors of Restatement section 145[3] plus any more specific section of the

16

17        [3] Pursuant to Restatement § 145(2), the contacts to be taken into account when determining
     which state has the most significant relationship to a tort claim include:
18
          (a) the place where the injury occurred,
19
          (b) the place where the conduct causing the injury occurred,
20
          (c) the domicil, residence, nationality, place of incorporation and place of business of the parties,
              and
21
          (d) the place where the relationship, if any, between the parties is centered.

22   ORDER GRANTING IN PART
     DEFENDANTS' MOTION TO DISMISS  - 10

> Restatement that is relevant to the cause of action. The approach is not merely to count contacts, but rather to consider which contacts are most significant and to determine where these contacts are found.
>
> For the second part of the most significant relationship test, the court must then evaluate the interests and policies of the potentially concerned jurisdictions by applying the factors set forth in Restatement section 6.[4]

*Woodward*, 184 Wn.2d at 918-19 (internal footnotes, citations, and quotation marks omitted). This two-part test leads to the conclusion that Washington law applies where the injury-causing conduct (the design, marketing, and sale of products that unlawfully record conversations) occurred in or was orchestrated from Washington, the place of injury (the location of the millions of devices sold) was fortuitous and widespread, the wiretap laws of the other interested states are similar such that the legislative interests of other states can be protected under

---

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

The general rule that the local law of the state where the injury occurred applies in a personal injury action gives way when some other state has a more "significant relationship under the principles stated in § 6 to the occurrence and the parties." Restatement § 145(1) and § 146.

[4] Pursuant to Restatement (Second) of Conflict of Laws § 6 (1971), the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS  - 11

1   Washington law, and application of Washington law is consistent with the expectations of the

2   parties as indicated in their contractual choice-of-law provision.[5]

3   **C. Wiretap Claims Under Washington Law**

4           Washington's wiretap law makes it unlawful to use "any device electronic or otherwise

5   designed to record and/or transmit" a private conversation without first obtaining the consent of

6   all the participants in the conversation. RCW 9.73.030(1)(a) and (b). "This statute is considered

7   one of the most restrictive in the nation." *State v. Townsend*, 147 Wn.2d 666, 672 (2002).

8   Defendants do not dispute that the communications picked up by the Alexa devices were

9   "private" or that they were recorded and transmitted. Rather, it argues that registered users of an

10  Alexa device expressly consented to the recording and retention of the communications and that

11  both registered and unregistered users impliedly consented to the recording under Washington

12  law.

13          **1. Registered Users**

14          During the registration process, users are asked to sign in and to provide a mobile phone

15  number. Both screens notify the user that by continuing, he or she agrees to Amazon's

16

17

18

19  _____

20  [5] This last factor does not apply to users of an Alexa device who did not register or otherwise
    agree to Amazon's Conditions of Use, and defendants did not seek a determination that Washington law
    applies to the claims of unregistered users. The Court therefore declines to conduct a choice-of-law
21  analysis with regards to the wiretap claims of unregistered users.

22  ORDER GRANTING IN PART
    DEFENDANTS' MOTION TO DISMISS  - 12

1  Conditions of Use and Privacy Notice, which are made available via hyperlink. Dkt. # 59 at

2  ¶¶ 95 and 100.[6] The user is then presented with the following Terms of Use:

3      Welcome to Alexa!

4      Alexa is a cloud-based voice service. Amazon processes and retains audio,
       interactions, and other data in the cloud to provide and improve our services.

5      Learn how Alexa is designed to protect your privacy. . . . By tapping "Continue,"
       you agree to Amazon's Conditions of Use and all the terms found here.

6

7  Dkt. # 59 at ¶ 100 (underlined phrases are hyperlinks). Throughout the setup process users are

8  reminded that by proceeding they agree to Amazon's conditions and terms of use. *Id.* According

9  to plaintiffs, those documents represented "that users 'control Alexa with [their] voice' and that

10

11  ───────────────
       [6] Although the FAQs, Terms of Use, and Privacy Notice submitted by Amazon can be
12  considered in the context of this Motion to Dismiss, the Court finds them irrelevant to the issues
    presented. Amazon provides a version of the FAQs that was apparently downloaded on December 15,
13  2021, approximately six months after these consolidated actions were filed. Amazon asserts that it is the
    version of the FAQs that "appeared on Amazon's website at the time that counsel for Plaintiffs last
14  visited the FAQs" (Dkt. # 64 at 2), but it is unclear why counsel's review is relevant. There is no
    indication that this version of the FAQs is the one that was available to the public at the time plaintiffs
15  registered their Alexa devices or even at the time they filed their complaints. Amazon apparently offers
    a full version of the FAQs in an effort to show that registered users consented to the recording of their
16  communications with an Alexa device and/or that Amazon fully and accurately represented their
    product. But a version of the FAQs that post-dates plaintiffs' registration of their devices cannot serve
    those purposes.
17
          With regards to the Terms of Use and Privacy Notice, the versions presented for consideration
18  were also printed in mid-December. The Terms of Use state that they had been updated as recently as
    September 2021 (after the First Amended Consolidated Complaint was filed). Amazon represents that
19  these documents were in effect "at the time of the Amended Complaint" (Dkt. # 64 at 2), but at least
    with regards to the Terms of Use, that appears not to be the case. Again, without the versions of the
20  Terms of Use and Privacy Notice that were presented to users at the time of registration, it is impossible
    to ascertain what terms and conditions were accepted and whether Amazon's disclosures were adequate
21  and accurate. Plaintiffs specifically allege that Amazon materially changed the way it described the
    workings of an Alexa device in its published materials. *See* Dkt. # 59 at ¶¶ 88 and 93.

22  ORDER GRANTING IN PART
    DEFENDANTS' MOTION TO DISMISS  - 13

1   interactions with Alexa were 'stream[ed] . . . to the cloud" and were used to 'respond to [a

2   user's] requests' and 'improve [Alexa's] services.'" Dkt. # 59 at ¶ 52 (alterations in original).

3   The version of the Privacy Notice attached as Exhibit B to the First Amended Consolidated

4   Complaint discloses that defendants "receive and store any information [users] provide in

5   relation to Amazon Services" and use user's voice inputs "to respond to [the user's] requests,

6   provide the requested service . . . , and improve [Amazon's] services." Dkt. # 59 at 101-02.[7]

7   Amazon further disclosed that "'[o]n some occasions' [Alexa] will accidentally record without a

8   wake word, analogizing it to 'when a person walking down the street turns their head when they

9   hear what sounds like their name,'" an event called a "false wake." Dkt. # 59 at ¶ 87 (alteration

10  added). In response to the question "Is Alexa recording all my conversations," Amazon answers

11  "No," further stating that "No audio is stored or sent to the cloud unless the device detects the

12  wake word (or Alexa is activated by pressing a button)." Dkt. # 59 at ¶ 103. [8]

13

_____

14      [7] At oral argument, plaintiffs asserted that because defendants have not produced a copy of the
    terms and conditions that were in place when each plaintiff registered their Alexa device, it would be

15  improper to dismiss any claims based on the missing disclosures. But plaintiffs chose to attach specific
    versions of the disclosures to their complaint, making them part of the operative pleading. For purposes
    of this motion to dismiss, the Court will consider the First Amended Consolidated Complaint as a whole,

16  including its attachments. If discovery reveals versions of the terms and conditions that vary materially
    from those attached to the complaint, they may move for reconsideration based on the new evidence.

17      [8] If Amazon could show that the FAQs, Terms of Use, and Privacy Notice it submitted for
    consideration were from (or were materially unchanged from) the relevant time period, there are a

18  number of other representations that impact the analysis regarding the scope of a registered user's
    consent. In particular, the "terms" that are accessible via a hyperlink describe a user's interactions with

19  Alexa as follows:

20          You control Alexa with your voice. Alexa records and sends audio to the cloud when you
            interact with Alexa. Amazon processes and retains your Alexa Interactions, such as your

21          voice inputs, music playlists, and your Alexa to-do and shopping lists, in the cloud to
            provide, personalize, and improve our services. Learn more about Alexa, including how

22  ORDER GRANTING IN PART
    DEFENDANTS' MOTION TO DISMISS  - 14

Plaintiff argues that accepting the above terms and conditions of use does not constitute "consent" under RCW 9.73.030 because (a) Amazon did not obtain agreement/consent each and every time a recording was made and (b) Amazon never announced that it would record private conversations in the absence of a wake word. The primary issue is whether registered users consented to the recording of their communications with Alexa.

> If [they] did the recording was not unlawful. That is so because . . . it is not unlawful to record a communication on a device where the 'consent of all the participants in the communication" has been obtained. RCW 9.73.030(1)(a). A party is deemed to have consented to a communication being recorded when another party has announced in an effective manner that the conversation would be recorded. RCW 9.73.030(3). In addition, a communicating party will be deemed to have consented to having his or her communication recorded when the party knows that the messages will be recorded. *See In re Marriage of Farr*, 87 Wn. App. 177, 184 (1997), in which the Court of Appeals held that a party had

_____

to delete voice recordings associated with your account and manage our use of those voice recordings.

Dkt. # 64-2 at 3 (underlined phrase is a hyperlink). The "Learn more" hyperlink takes the user to Amazon's FAQs, which cover topics such as "How are my voice recordings used?" and "How do my voice recordings and text transcripts improve Alexa?" In answer to those questions, defendants reveal that Alexa uses voice recordings "and other information, including from third-party services, to answer your questions, fulfill your requests, and improve your experience and our services" (Dkt. # 64-1 at 5) and "to train our speech recognition and natural language understanding systems," which sometimes involves having humans review samples of requests in an effort to help Alexa be more responsive in the future (Dkt. # 64-1 at 5-6). The FAQs also disclose that Alexa devices "stream audio to the cloud if the wake word is detected (or Alexa is activated by pressing a button)" and that when Alexa detects a wake word "a visual or audible indicator will signal it is recording audio to stream to the cloud." Dkt. # 64-1 at 3-4. Users are warned that "[i]n some cases, your Alexa-enabled device might interpret another word or sound as the wake word." Dkt. # 64-1 at 3. Users can review the voice recordings associated with their account and have a number of options for deleting them, including choosing not to save any voice recordings, in which case "we will automatically delete your voice recordings after we process your requests and automatically delete all of those voice recordings currently in your Voice History as well." Dkt. # 64-1 at 4.

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS  - 15

1
2

> consented to the recording of his messages when he left the message on a
> telephone answering machine, the only function of which is to record messages.

3   *Townsend*, 147 Wn.2d at 675-76. Through its registration process, Amazon announced that if

4   the user chose to activate the Alexa device, it would record any conversation the device thought

5   was directed at it. Thus, Amazon disclosed that the device would record whenever activated.

6   Plaintiffs' first argument is not that these warnings and notices were ambiguous or ineffective,

7   but rather that the announcements had to be repeated every time the Alexa device woke. No case

8   law or other authority is cited for the proposition. The language of the initial announcements

9   clearly indicated that if the user activates an Alexa device, communications would be recorded

10  in the future whenever the device awoke. Plaintiffs apparently activated their devices, thereby

11  indicating consent to the recording of future communications. Plaintiffs offer no reason why the

12  law should assume that registered users *sub silentio* withdrew their consent at some point after

13  registration.

14          With regards to the argument that Amazon's announcement did not disclose that

15  registered plaintiffs' "private conversations not intended for Alexa Devices and where a wake

16  word is never used would be recorded, stored, transmitted, and disclosed" (Dkt. # 65 at 23),

17  plaintiffs do not acknowledge the announcement that Alexa devices are susceptible to "false

18  wakes" (Dkt. # 59 at ¶ 87). Amazon's statement that Alexa devices record only when "the

19  device detects the wake word" (Dkt. # 59 at ¶ 103) does not erase or make ineffective the

20  disclosure that the devices sometimes detect the wake word even when it was not actually

21  spoken. Whether Amazon adequately disclosed how long it stores the recordings and what it

22  ORDER GRANTING IN PART
    DEFENDANTS' MOTION TO DISMISS  - 16

1   does with them after they are made is not relevant to the Washington wiretap claim: the law

2   focuses on whether the recordings were unlawfully made and does not address or prohibit post-

3   recording activities.

4         Registered user plaintiffs have not adequately alleged a violation of RCW 9.73.030

5   because the allegations of the First Amended Consolidated Complaint and the attached

6   documents show that they consented to the recordings.

7   **2. Unregistered Users**

8         With regards to individuals who did not register an Alexa device and were never

9   presented with the disclosures and documents discussed above, plaintiffs' allegations give rise to

10  a plausible inference that their conversations were recorded without consent. Amazon argues

11  that any person who uses an Alexa device impliedly consents to having the communication

12  recorded because (a) the technology cannot work unless the communication is recorded and

13  (b) users know that. Neither of these "facts" is alleged in the First Amended Consolidated

14  Complaint or supported by the attached documents. To the contrary, plaintiffs allege that Alexa

15  could process interactions locally on the device and send only a digital query, rather than a voice

16  recording, to Amazon's servers (Dkt. # 59 at ¶ 54), that other voice-activated devices do not

17  make recordings (*Id*. at ¶ 56), and that Amazon sells a version of Alexa to senior living facilities

18  and healthcare providers that does not save and/or share the communications (*Id.* at ¶ 55).

19  Plaintiffs allege that this is exactly how most people believe Alexa works (*i.e.*, that "their voice

20  is temporarily processed so that Alexa can generate a response or carry out the user's command"

21

22  ORDER GRANTING IN PART
    DEFENDANTS' MOTION TO DISMISS  - 17

1  and then the communication is deleted). Dkt. # 59 at ¶ 5. *See also Id.* at ¶ 53. Drawing all

2  reasonable inferences in favor of plaintiffs, this situation differs from that in *Townsend* because

3  the recording of the commands or inquiries was not an "inherent" part of a conversation with

4  Alexa[9] and there is no reason to infer that an unregistered user of an Alexa device – for which

5  there is no written instructions or consent form – would have been familiar with Amazon's

6  written disclosures. 147 Wn.2d at 678. Nor does the fact that the Alexa device flashes a light or

7  makes a sound when it wakes adequately disclose that it is recording, as opposed to simply

8  being responsive.

9  **D. Washington Consumer Protection Act ("CPA")**

10     To prevail on a Consumer Protection Act claim under Washington law, a private plaintiff

11  must establish "(1) an unfair or deceptive act or practice, (2) occurring in trade or commerce,

12  (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation."

13  *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 37 (2009). "[A] claim under the

14  Washington CPA may be predicated upon a per se violation of statute, an act or practice that has

15  the capacity to deceive substantial portions of the public, or an unfair or deceptive act or practice

16

---

17     [9] Amazon analogizes a conversation with Alexa to Townsend's use of email or a messaging
18  service. In order to use email, one creates a written record which is then sent to the recipient, to be
    subsequently read, saved, printed, or deleted at the recipient's whim. The user in effect makes the
19  recording and transmits it to another. In this case, however, the conversation is (or at least appears to be
    to the user) oral and is more analogous to a telephone call. While Amazon may ultimately be able to
20  show that recording of the oral communication is essential to the functioning of the product, that
    inference is not compelled by the allegations of the First Amended Consolidated Complaint, is not in the
21  light most favorable to plaintiffs, and would still require Amazon to show that the unregistered users
    knew that.

22  ORDER GRANTING IN PART
    DEFENDANTS' MOTION TO DISMISS  - 18

1    not regulated by statute but in violation of public interest." *Klem v. Wash. Mut. Bank*, 176

2    Wn.2d 771, 787 (2013).

3          Defendants argue that plaintiffs have not adequately alleged the first and fourth elements

4    of a CPA claim. With regards to the first element, defendants argue that plaintiffs have failed to

5    plead with the particularity required under Rule 9(b) any material misrepresentation of fact on

6    which plaintiffs relied. The Washington Supreme Court has recently held, however, that neither

7    materiality nor reliance are necessary to show an unfair or deceptive act or practice under the

8    CPA:

9          To satisfy the first element of a CPA claim, a plaintiff need not show that they—or
          anyone—was in fact deceived. Instead, the plaintiff must establish that the unfair
10         or deceptive act or practice had the capacity to deceive a substantial portion of the
          public. This is consistent with the foundational case, *Hangman Ridge*, where we
11         observed that "[t]he purpose of the capacity-to-deceive test is to deter deceptive
          conduct before injury occurs." 105 Wn.2d at 785.
12

13         Nor is there a need to prove reliance to establish the first element.

14         Similarly, materiality is not a necessary component of the first element. While we
          have mentioned materiality in passing, generally in noting that a deceptive framing
15         or omitted fact was sufficiently material to establish the element, we have never
          found materiality was necessary as a matter of law. We specifically reject that
16         proposition now.

17
     *Young v. Toyota Motor Sales, U.S.A.,* 196 Wn.2d 310, 317-18 (2020) (internal citations and
18
     parenthetical omitted).
19
          Plaintiffs allege that Amazon advertised its Alexa device as a web-based assistant that
20
     comes to life when a wake word is spoken – usually "Alexa" or "Echo" – when in actuality the
21

22   ORDER GRANTING IN PART
     DEFENDANTS' MOTION TO DISMISS  - 19

devices are designed to intercept and record conversations even before a wake word is uttered. Dkt. # 59 at ¶¶ 49-50 and 87. This design feature makes false Amazon's representations regarding the rarity of "false wakes" and the care it takes to avoid unjustified recordings. *Id.* at ¶¶ 86-87 and 90. *See also Id.* at ¶ 107 ("Amazon's deceptive practice of improperly recording and intercepting communications is rampant."). It also, according to plaintiffs, is intentional in that it furthers Amazon's overall goal of gathering user data regarding everything from location to consumer needs/preferences to voice samples. *Id.* at ¶¶ 56-57, 109, and 114-21. Plaintiffs allege that even when Amazon knows that a particular communication was recorded in the absence of a wake word, it retains (and sometimes discloses) the recording. *Id.* at ¶¶ 61, 85, and 88.

Plaintiffs also allege that Amazon failed to accurately describe what it does with voice interactions, intentional or not. According to plaintiffs, prior to November 2020, Amazon represented that it simply streamed user voices to the cloud for processing, giving rise to the reasonable inference that once Alexa responded to an inquiry, the communication was deleted, erased, or written over. *Id.* at ¶¶ 88 and 110. Alexa could, according to plaintiffs, operate in this manner. In fact, if Amazon wanted to, Alexa could process audio interactions locally without saving, transcribing, and/or distributing user interactions. *Id.* at ¶¶ 54-56. It also could have used simple and straightforward means to disclose and obtain consent for its permanent recording of conversations (and distribution to third parties and human reviewers) if that were its intent. *Id.* at ¶ 122. Plaintiffs allege that it does not want to do so, however, because Amazon uses Alexa

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS  - 20

devices to accumulate and monetize data, and full disclosure would retard sales and limit the reach of devices. *Id.* at ¶ 123. According to plaintiffs, Amazon permanently stores audio recordings made by Alexa devices and transcripts of those communications, transmits the communications internally and to third parties, and reveals the communications to human reviewers (sometime with identifying information still attached). *Id.* at ¶¶ 52, 87 and 108-09. These uses were not disclosed and the omissions were deceptive, plaintiffs allege, misleading almost half of survey participants into believing that their voices were fleetingly processed in order to respond to a request or inquiry and keeping the public unaware that humans listened to communications with Alexa. *Id.* at ¶¶ 53 and 108; *see also Id*. at ¶ 111 (Senior Vice President of Devices and Services at Amazon.com acknowledging that Amazon could have been "more clear on how we were using human beings to annotate a small percentage of the data" and that "customers didn't clearly understand this" aspect of the device).

In the face of these specific factual allegations of misrepresentations and omissions, defendants' insistence that the First Amended Consolidated Complaint contains only conclusory allegations of unfair or deceptive conduct is unpersuasive. Regardless whether the allegations are considered under Rule 8(a) or Rule 9(b), plaintiffs have plausibly alleged that Amazon's representations and omissions had the capacity to deceive a substantial portion of the public.

With regards to the "injury to business or property" element of a CPA claim, plaintiffs have adequately alleged that they paid more for their Alexa devices than they would have been willing to pay had they known that Amazon designed the devices to record even in the absence

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS  - 21

1  of a wake word, permanently stores even accidental recordings, and shares recordings

2  (intentional or not) with employees and third-parties. Dkt. # 59 at ¶ 170. *See Panag v. Farmers*

3  *Ins. Co. of Washington*, 166 Wn.2d 27, 57 (2009) (noting that "the injury requirement is met

4  upon proof the plaintiff's property interest or money is diminished because of the unlawful

5  conduct even if the expenses caused by the statutory violation are minimal") (internal quotation

6  marks and citation omitted); *Grigsby v. Valve Corp.*, No. C12-0553JLR, 2013 WL 12310666, at

7  *3 (W.D. Wash. Mar. 18, 2013) (allegation that had plaintiff known that defendant was not

8  reasonably protecting the personal and private information that he provided when purchasing

9  defendant's products, he would not have paid the price he did for the products is sufficient to

10 state injury to property).[10] Plaintiffs also allege that Amazon took and monetized plaintiffs'

11 personal data for its own commercial benefit without payment, thereby depriving plaintiffs of

12 the monetary value inherent in the data that was intercepted. Dkt. # 59 at ¶ 121. *See Frias v.*

13 *Asset Foreclosure Servs., Inc.*, 181 Wn.2d 412, 431 (2014) (noting that "injury . . . to business

14 or property excludes personal injury, mental distress, embarrassment, and inconvenience . . .

15 [but is otherwise] relatively expansive") (internal quotation marks and citations omitted).

16

17

18  _____

[10] Amazon argues that users could avoid injury by turning the Alexa device off once they realize
19 that it is recording, transmitting, and storing communications. But then, of course, the user has lost the
value of the purchased product in its entirety. At oral argument, Amazon suggested that the CPA claim
20 should fail because plaintiffs had failed to allege that any of them purchased an Alexa device. Taking the
allegation that "Plaintiffs and the Class members have been injured by paying more for Alexa Devices
21 than they would have" in the light most favorable to plaintiffs, however, the Court rejects this argument.

22 ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS  - 22

1  Plaintiffs' allegations of injury to business or property are sufficient to avoid dismissal at this

2  stage of the proceeding.

3  **E. Federal Wiretap Act**

4       The Wiretap Act prohibits the unauthorized interception of any oral communication and

5  the disclosure or use of a communication known to have been intercepted in violation of the Act.

6  18 U.S.C. § 2511(1)(a), (c), and (d). It is not, however, unlawful "for a person . . . to intercept

7  a[n] . . . oral . . . communication where such person is a party to the communication or where

8  one of the parties to the communication has given prior consent to such interception unless such

9  communication is intercepted for the purpose of committing any criminal or tortious act in

10  violation of the Constitution or laws of the United States or of any State." 18 U.S.C.

11  § 2511(2)(d).

12       For the reasons discussed above in Section C, the Court finds that registered users gave

13  prior consent to the interception of their oral communications. While registered users may not

14  have understood how often Alexa would begin recording in the absence of a wake word, the fact

15  that false wakes occur was disclosed and accepted during the registration process.

16       With regards to unregistered users, plaintiffs agree that communications directed to Alexa

17  (*i.e.*, those that are preceded by a wake word) do not violate the Federal Wiretap Act because

18  Amazon is a party to those communications. But where Amazon starts recording private

19  conversations not directed toward Alexa and not preceded by the wake word, one could

20  reasonably conclude that Amazon is an interloper rather than a party to the communication.

21

22  ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS  - 23

Amazon, however, asserts that it is a party to every conversation that occurs in an Alexa-enabled house because "intercept" is defined to mean "the aural . . . acquisition of the contents" of an oral communication, and Alexa is always listening for the wake word. *See* 18 U.S.C. § 2510(4). Plaintiffs did not have an opportunity to respond to this argument, which was raised for the first time in reply, but there is a difference between monitoring ambient sounds to detect a word or phrase and being cognizant of – or otherwise acquiring - the contents of the conversation. Amazon's analogy for a false wake highlights the difference. The person walking down the street likely hears a lot of things: traffic noise, kids playing, doors slamming, people talking, music, birds, *etc.* But the person does not start attending to the substance of the communication until he or she hears their name. Amazon repeatedly assures the public that it is only monitoring for a discrete sound, not eavesdropping on every conversation occurring in an Alexa-enabled home. Unregistered plaintiffs have plausibly alleged interception with regards to the acquisition of the contents of oral communications in the absence of a wake word.

**F. Federal Stored Communications Act**

The Federal Stored Communications Act prohibits any person or entity providing an "electronic communication service" from knowingly divulging the contents of a communication that is stored by the service. 18 U.S.C. § 2702(a)(1). An "electronic communication service" is a service that provides users the ability to send or receive "electronic communications," which are further defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature" but does not include an "oral communication."  18 U.S.C. § 2510(12) and (15).

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS  - 24

Amazon points out that "electronic communication service" means services like email, where the entity provides a service or platform through which users can communicate with each other. It is in that arena that Congress meant to forbid the disclosure of the contents of third-party communications:

> When Congress enacted the SCA, it stated that one of the Act's primary purposes was to protect email communication, noting that a primary example of an ECS was an email service in which "messages are typed into a computer terminal, and then transmitted ... to a recipient computer operated by [email]." S. Rep. 99-541, at 8, 14 (1986).
>
> In the ensuing years, we have held that websites and services that permit users to communicate directly with one another are considered ECS providers. For instance, an email provider is "undisputedly" an ECS provider. *Quon v. Arch Wireless Operating Co.*, 529 F.3d 892, 902 (9th Cir. 2008*), rev'd on other grounds sub nom. City of Ontario v. Quon*, 560 U.S. 746 (2010*); see also Theofel v. Farey-Jones*, 359 F.3d 1066, 1075 (9th Cir. 2004) (holding that an email service provider constituted an ECS provider).
>
> Plaintiffs allege that "[defendant's] website, database and servers were used by Plaintiff[s] and [their] counsel to send electronic communications among themselves by uploading and downloading documents, as well as by appending notes to those documents." However, taking this allegation as true, it is evident that [defendant] does not permit users to communicate directly with each other. The documents and accompanying comments do not travel directly from the sender to the recipient; instead, the recipient of any message would have to retrieve it by downloading it from [defendant's] server. Because Plaintiffs do not allege that any direct communication takes place, the district court correctly determined that Plaintiffs fail to plead that [defendant] constitutes an ECS provider.

1    *Casillas v. Cypress Ins. Co.*, 770 F. App'x 329, 330-31 (9th Cir. 2019) (some alterations in

2    original, some added). *See also Wesch v. Yodlee, Inc.*, No. 20-CV-05991-SK, 2021 WL

3    6206644, at *3 (N.D. Cal. July 19, 2021) (conclusory allegation that a service allowed plaintiffs

4    to communicate with their financial institutions ignored where, in fact, the service is used to

5    effectuate PayPal payments and does not allow plaintiffs to send or receive messages); *In re*

6    *Jetblue Airways Corp. Priv. Litig.*, 379 F. Supp.2d 299, 307 (E.D.N.Y. 2005) (holding that the

7    term "electronic communication service," "refers to a service that provides users with capacity

8    to transmit electronic communications"). In addition, § 2702(a)(1) specifically applies to entities

9    providing "electronic communication service *to the public.*" A company that merely utilizes

10   electronic communications in the conduct of its own business is generally considered a

11   purchaser or user of the communications platform, not the provider of the service to the public.

12   *See Lopez v. Apple, Inc.*, 519 F. Supp.3d 672, 687 (N.D. Cal. 2021) (rejecting plaintiffs' claim

13   that Apple violated § 2702(a) when it disclosed Siri recordings to third-party contractors

14   because Apple receives information its customers send to its servers and is not an "electronic

15   communication service" provider); *In re Jetblue Airways*, 379 F. Supp.2d at 307 ("Although

16   JetBlue operates a website that receives and transmits data to and from its customers, it is

17   undisputed that it is not the provider of the electronic communication service that allows such

18   data to be transmitted over the Internet. Rather, JetBlue is more appropriately characterized as a

19   provider of air travel services and a consumer of electronic communication services. The

20   website that it operates, like a telephone, enables the company to communicate with its

21

22   ORDER GRANTING IN PART
     DEFENDANTS' MOTION TO DISMISS  - 26

customers in the regular course of business. Mere operation of the website, however, does not transform JetBlue into a provider of internet access, just as the use of a telephone to accept telephone reservations does not transform the company into a provider of telephone service. Thus, a company such as JetBlue does not become an "electronic communication service" provider simply because it maintains a website that allows for the transmission of electronic communications between itself and its customers."); *Crowley v. CyberSource Corp.*, 166 F.Supp.2d 1263, 1270 (N.D. Cal. 2001) (holding that Amazon, an on-line merchant, is not an electronic communication service simply because it receives electronic communications from customers); *Andersen Consulting LLP v. UOP*, 991 F. Supp. 1041, 1042-43 (N.D. Ill. 1998) (holding that a company that allowed its consultants to use its email system was not an electronic communication service because it did not provide electronic communication service "to the public" and instead had to purchase internet service from an electronic communication service provider). Plaintiffs do not acknowledge or respond to this argument, which is dispositive of their Stored Communications Act claim.

For all of the foregoing reasons, defendants' motion to dismiss (Dkt. # 63) is GRANTED in part. The non-Washington state law claims, the Washington wiretap claim, and the federal wiretap claim of registered users are hereby DISMISSED. The federal wiretap claim of unregistered users is also DISMISSED to the extent it is based on intentional communications with an Alexa device. All plaintiffs' Stored Communications Act claims are DISMISSED. The following claims may proceed:

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS  - 27

1    ▪ plaintiffs' CPA claim;

2    ▪ the non-Washington state law claims of unregistered users;

3    ▪ the Washington wiretap claim of unregistered users

4    ▪ the federal wiretap claim of unregistered users to the extent it is based on unintentional

5    communications with an Alexa device.

6         Defendants' request for incorporation by reference or judicial notice (Dkt. # 64) is

7    GRANTED, although the documents have only been considered as an indication of what was in

8    the public realm at the time and, because they apparently post-date plaintiffs' complaint (and

9    registration), they are not relevant.

10

11        Dated this 6th day of May, 2022.

12

13        Robert S. Lasnik
          United States District Judge

14

15

16

17

18

19

20

21

22   ORDER GRANTING IN PART
     DEFENDANTS' MOTION TO DISMISS  - 28