THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

KAELI GARNER, *et al.*,

Plaintiffs,

v.

AMAZON.COM, INC., a Delaware
Corporation, and AMAZON.COM SERVICES
LLC, a Delaware Limited Liability Company,

Defendants.

Case No. 2:21-cv-00750-RSL

**DECLARATION OF Y. MONICA CHAN**

Y. Monica Chan declares as follows:

1.    I am an attorney licensed to practice law in the State of Washington and the State of New York.  I am an attorney at the law firm of Fenwick & West LLP, counsel of record for Defendants Amazon.com, Inc. and Amazon.com Services LLC.  I am familiar with the facts set forth in this declaration and, if called upon to do so, I could competently testify to those facts.

**I.    Discovery Relating To Plaintiffs**

2.    During discovery, Amazon served interrogatories on Plaintiffs seeking, among other things, information regarding the Alexa audio recordings associated with Plaintiffs' identified Amazon accounts, including whether (according to Plaintiffs) each recording allegedly contains a Plaintiff's voice, is private or confidential, was of a conversation, was directed to the Alexa service, and was specifically referenced and alleged to be at issue in the operative First Amended Consolidated Complaint ("FACC").

3.    Plaintiffs refused to substantively respond to these interrogatories.  On August 18, 2022, Amazon moved to compel Plaintiffs' responses to these interrogatories seeking in particular Plaintiffs' identification of their Alexa recordings.  (The relevant interrogatories are numbered 5 through 8 or 9.  Amazon propounded an additional interrogatory to certain Plaintiffs addressing their particular allegations in the FACC; therefore, the numbering for the interrogatories varied by Plaintiff.)  In that motion, Amazon explained that only Plaintiffs can identify, for instance, which recordings contained Plaintiffs' voices and allegedly provided the basis for their claims against Amazon.  Dkt. 106 at 5.

4.    On October 3, 2022, the Court granted Amazon's motion to compel and ordered Plaintiffs to "identify all of their audio recordings and annotate the corresponding transcripts to identify communications at issue in this litigation." Dkt. 123 at 8.  In rejecting Plaintiffs' argument that identifying their recordings was unduly burdensome, the Court found that "[e]ach plaintiff's familiarity with and use of Alexa will shed light on the adequacy of Amazon's disclosures, the user's awareness that recordings were made, stored, and reviewed, and the user's control over the recordings.  Each plaintiff will ultimately have to show that communications were improperly recorded: requiring them to identify the recordings that form the basis of their wiretap claims is

1    therefore entirely proportional to the needs of the case." *Id.* at 4.  The Court ordered Plaintiffs to

2    provide verified amended interrogatory responses no later than three weeks before their scheduled

3    depositions. *Id.* at 5.

4         5.    On March 22, 2023, Plaintiff Jodi Brust served Amazon with her second amended

5    interrogatory responses, identifying and annotating only 15 Alexa audio recordings out of the over

6    8,000 recordings associated with her Amazon account.  Attached as **Exhibit 1** is a true and correct

7    copy of Ms. Brust's Amended Responses to Amazon's Interrogatories, dated March 22, 2023.

8    Plaintiffs took the position that the Court only ordered them to identify the subset of recordings

9    that they subjectively believe are at issue in this litigation.  (Ms. Brust's interrogatory responses

10   were not designated confidential.  Nonetheless, in an abundance of caution, Amazon has redacted

11   certain information from the exhibit, such as address, email address, and device serial number.)

12        6.    On March 30, 2023, Amazon filed a motion to compel compliance with the Court's

13   October 3, 2022 Order.  Dkt. 153.

14        7.    On June 20, 2023, the Court once again granted Amazon's motion to compel and

15   ordered (for the second time) Plaintiffs to: "(1) identify all recordings that contain their voice, in

16   response to Amazon's Interrogatory No. 5; (2) further identify the subset of their recordings that

17   they contend are at issue in this case, in response to Amazon's Interrogatory Nos. 6 through 8 (and

18   for some plaintiffs, No. 9)."  Dkt. 182 at 2.  The Court noted that "Plaintiffs were ordered to

19   'identify all of their audio recordings' and annotate the transcripts of those recordings to identify

20   the communications that are at issue in this case." *Id.*

21        8.    Following the Court's June 20, 2023 Order, each Plaintiff provided amended

22   interrogatory responses, including identifying which recordings they contend (1) contain a

23   Plaintiff's voice, (2) contain an alleged "conversation," (3) are confidential or private,

24   (4) correspond to certain Plaintiffs' allegations of recording in the FACC, and/or (5) are not

25   directed at the Alexa service.  Plaintiffs' amended interrogatory responses are attached as

26   Exhibits R–AA to the Declaration of Michael Canty (Dkt. 255-20–Dkt. 255-29).

27

28

**A.    Plaintiffs' Deposition Testimony**

9.    On August 1, 2023, Amazon's counsel deposed Ms. Brust.  Attached as **Exhibit 2** is a true and correct copy of an excerpt from Ms. Brust's deposition transcript.

10.    On August 8, 2023, Amazon's counsel deposed Plaintiff Jeffrey Hoyt.  Attached as **Exhibit 3** is a true and correct copy of an excerpt from Mr. Hoyt's deposition transcript.

11.    On August 9, 2023, Amazon's counsel deposed Plaintiff Lorlie Tesoriero. Attached as **Exhibit 4** is a true and correct copy of an excerpt from Ms. Tesoriero's deposition transcript.

12.    On August 15, 2023, Amazon's counsel deposed Plaintiff Ricky Babani.  Attached as **Exhibit 5** is a true and correct copy of an excerpt from Mr. Babani's deposition transcript. (Although not designated confidential, in an abundance of caution, Amazon has redacted from the exhibit Mr. Babani's email addresses.)

13.    On September 20, 2023, Amazon's counsel deposed Plaintiff Michael McNealy. Attached as **Exhibit 6** is a true and correct copy of an excerpt from Mr. McNealy's deposition transcript.

14.    On September 21, 2023, Amazon's counsel deposed Plaintiff Diane McNealy. Attached as **Exhibit 7** is a true and correct copy of an excerpt from Mrs. McNealy's deposition transcript.

15.    On September 26, 2023, Amazon's counsel deposed Plaintiff Kaeli Garner. Attached as **Exhibit 8** is a true and correct copy of an excerpt from Ms. Garner's deposition transcript.

16.    On October 11, 2023, Amazon's counsel deposed Plaintiff Selena Johnson. Attached as **Exhibit 9** is a true and correct copy of an excerpt from Mrs. Johnson's deposition transcript.

17.    On October 12, 2023, Amazon's counsel deposed Plaintiff Ronald Johnson. Attached as **Exhibit 10** is a true and correct copy of an excerpt from Mr. Johnson's deposition transcript.  (Although not designated confidential, in an abundance of caution, Amazon has redacted from the exhibit Mr. Johnson's email address.)

18.     On January 25, 2024, Amazon's counsel deposed Plaintiff Caron Watkins. Attached as **Exhibit 11** is a true and correct copy of an excerpt from Ms. Watkins' deposition transcript.

19.     Plaintiffs' depositions confirmed that every Plaintiff misidentified voices in Alexa recordings, including their own voice.   In her amended interrogatory responses, Ms. Brust identified a recording as containing her voice, **Ex. 1** (identifying the recording produced as AMZ_GARNER_AU_00016054, **Ex. 15** attached hereto, as "Jodi Brust"), but later admitted in her deposition that it was a recording from the television show "Cougar Town," **Ex. 2** (Excerpt of Brust Tr.) at 155:15-156:4.

20.     In his amended interrogatory responses, Mr. Hoyt identified a recording as containing his voice, but later testified that the recording was in fact of his wife, Ms. Tesoriero. **Ex. 3** (Excerpt of Hoyt Tr.) at 142:17-143:3.   Similarly, in her amended interrogatory responses, Ms. Tesoriero identified a recording as containing her voice, but upon listening to the recording, testified that it was in fact her husband.   **Ex. 4** (Excerpt of Tesoriero Tr.) at 89:11-90:11.

21.     Mr. Babani initially identified a recording as containing his voice in his amended interrogatory responses, but then testified that the recording was of the television.   **Ex. 5** (Excerpt of Babani Tr.) at 86:25-87:23.

22.     Mr. McNealy testified that "there were ones I couldn't really know if it was me or not, but most of them, if it's me, it's me, I can tell.   But there was a couple I couldn't."   **Ex. 6** (Excerpt of M. McNealy Tr.) at 175:1-7.   In her amended interrogatory responses, Mrs. McNealy initially identified a recording as containing her voice, but then testified that she could not actually tell whether the voice contained her voice or a television commercial.   **Ex. 7** (Excerpt of D. McNealy Tr.) at 147:8-149:15.

23.     In her amended interrogatory responses, Ms. Garner initially identified a recording as containing her voice, but then testified that she did not hear her own voice.   **Ex. 8** (Excerpt of Garner Tr.) at 150:24-152:19.

24.     Mrs. Johnson listened to a recording and testified that it sounded like her voice, but after being informed that she had previously annotated that recording as "Plaintiff's daughter

speaking" in her amended interrogatory responses (*see* Canty Ex. Y, Ex. A at 22), she testified that "[i]t sounded like her" daughter.  **Ex. 9** (Excerpt of S. Johnson Tr.) at 139:1-22.  After listening to a recording, Mr. Johnson testified that "I can't distinguish if it's Trey or myself.  It kind of sounds like me, but I'm not sure."  **Ex. 10** (Excerpt of R. Johnson Tr.) at 122:22-123:13.

25.    In her amended interrogatory responses, Ms. Watkins identified a recording as containing her voice, but then testified that she did not in fact know whether it contained her voice, admitting "I can't tell what it is or what's happening."  **Ex. 11** (Excerpt of Watkins Tr.) at 133:8-134:1.

26.    Multiple Plaintiffs also testified that they could not identify the speaker in a recording or identify the content of the recording.  For example, during Mrs. Johnson's deposition, she listened to recordings and, when asked whether she heard her voice, responded, "[i]t sounded like me, but I'm not positive," and "I don't know if that's my voice or not."  **Ex. 9** (Excerpt of S. Johnson Tr.) at 134:3-5, 135:4-5.

27.    During Mr. McNealy's deposition, he listened to a recording and, when asked if it contained his voice, responded, "[t]hat isn't me.  That is not me."  **Ex. 6** (Excerpt of M. McNealy Tr.) at 129:5-11.  After being asked, "[d]o you know who that is," Mr. McNealy responded, "[n]o, I don't.  If you play it again, I can try and figure it out" and then "[n]o, I don't have a clue who that is."  *Id.*

28.    During Ms. Brust's deposition, she listened to a recording and, when asked if it contained her voice, responded, ███████████  **Ex. 2** (Excerpt of Brust Tr.) at 139:16-22.

29.    During Mr. Johnson's deposition, he listened to a recording and was asked "who did you hear," and he responded, "I hear -- I heard somebody say 'Sirius XL,' I think that's what it was, but I don't know who that is."  **Ex. 10** (Excerpt of R. Johnson Tr.) at 167:2-168:11.  Mr. Johnson was asked whether he recognized any of the voices on the recording and he did not.  *Id.*

30.    During Ms. Tesoriero's deposition, she listened to a recording, and after being asked to identify the speaker, she responded, "I can't tell, to be honest with you, I can't tell."  **Ex. 4**

(Excerpt of Tesoriero Tr.) at 100:1-19.  During his deposition, Mr. Hoyt was asked whether he recognized the voice on a particular recording, and after asking to hear it again, responded "Yeah, I can't -- yeah, I can't for sure say.  One more time. … I can't conclude one way or another if that's me or not."  **Ex. 3** (Excerpt of Hoyt Tr.) at 144:21-145:19.

31.    These are recordings that Plaintiffs claim were made in their homes by their Alexa-enabled devices, but even Plaintiffs were unable to accurate identify the voices in those recordings.

32.    Plaintiffs also identified recordings as "not intended for Alexa" when the recordings contained the wake-word (typically "Alexa").  Either the recording itself contained the word "Alexa," or it was part of a continuing series of commands to Alexa.  For instance, Ms. Brust listened to a recording that she identified as "not intended for Alexa" in her amended interrogatory responses, but during her deposition she testified that, "[t]his was a conversation with Alexa trying to get that to happen.  I never did get it to happen."  Ms. Brust confirmed that the recording was directed at Alexa because it was "a continuing conversation with Alexa."  **Ex. 2** (Excerpt of Brust Tr.) at 205:1-207:8.

33.    Mrs. McNealy testified that whether something was directed to Alexa depended on the surrounding context.  **Ex. 7** (Excerpt of D. McNealy Tr.) at 163:8-164:22.   During Mr. McNealy's deposition, he listened to a recording that he had identified as "not directed at Alexa" in his amended interrogatory responses.  He was asked, "[d]o you consider this recording to be directed at Alexa," and he responded: "Yes, I guess so.  Now, I do.  Now that I heard my sisters say, 'Hey, Alexa,' that would be directed at Alexa now, wouldn't it?"  **Ex. 6** (Excerpt of M. McNealy Tr.) at 140:5-143:13.

34.    During Mrs. Johnson's deposition, she testified that a recording that she had indicated was "not directed at Alexa" in her amended interrogatory responses was in fact directed at Alexa.  **Ex. 9** (Excerpt of S. Johnson Tr.) at 152:2-23.  Mrs. Johnson testified, "I just heard 'Alexa'.  I must not have heard it earlier."  *Id.*  Mr. Johnson identified a recording as "not directed at Alexa" in his amended interrogatory responses but later testified "that was directed at Alexa," and acknowledged that he heard himself say "Alexa" in the beginning of the recording.  **Ex. 10** (Excerpt of R. Johnson Tr.) at 145:18-146:14.

35.    Plaintiffs also misidentified the content of recordings in their discovery responses. In her amended interrogatory responses, Ms. Brust identified a recording as "of a conversation," but later testified that "I heard only static." **Ex. 2** (Excerpt of Brust Tr.) at 207:10-208:14 (listening to AMZ_GARNER_AU_00022561).  After listening to a different recording she had initially identified as "of a conversation" in her amended interrogatory responses, Ms. Brust admitted that she could not make out what the recording said. *Id.* at 226:16-227:2.

36.    During Mrs. McNealy's deposition, she was asked about a recording that, according to paragraph 68 of the FACC, was allegedly about cancer treatment.  But Mrs. McNealy testified that, in fact, the recording was "me talking about my need to hydrate better," and she confirmed that she heard nothing about cancer treatment.  **Ex. 7** (Excerpt of D. McNealy Tr.) at 225:11-226:11.

37.    In the FACC, the Johnsons alleged that there were certain recordings of "personal conversations between [Mr. and Mrs. Johnson] about sexual intercourse" and the two of them "engaging in sexual intercourse."  FACC ¶ 70.  Mrs. Johnson was asked to identify those recordings, and in her amended interrogatory responses, she identified a June 19, 2020 recording. Canty Ex. Y, Ex. A at 15.  But during her deposition, Mrs. Johnson listened to the recording and was asked whether "this is a conversation about sex"; she responded: "I can't.  I don't know," and further testified that the recording "sounds like my grandson" and that "I can't make out the recording on this." **Ex. 9** (Excerpt of S. Johnson Tr.) at 182:14-187:9.

38.    Similarly, during Mr. Johnson's deposition, he testified that a recording he had identified as a ███████████████████████ (Canty Ex. X, Ex. A at 1 (referring to **Ex. 16**, AMZ_GARNER_AU_00153924)) was, in fact, a recording of just a "cough or sneeze." **Ex. 10** (Excerpt of R. Johnson Tr.) at 131:21-136:18.  When Mr. Johnson was asked, "you didn't hear anyone having intercourse in the recording; is that right?," he responded "No." *Id.*

39.    Plaintiffs' deposition testimony also shows the varied ways that individual Plaintiffs learned about Alexa audio recordings, "false-wakes," and human review.  Mr. Babani testified that he heard "rumors" regarding Amazon's handling of user utterances, but he used Alexa

anyway because he "didn't think too much of it." **Ex. 5** (Excerpt of Babani Tr.) at 89:4-10; 91:4-10, 93:2-5, 93:16-19.

40.     Ms. Brust testified that she "saw on the news and on Facebook that Amazon had been recording and keeping these recordings," and "third parties having access to this data." **Ex. 2** (Excerpt of Brust Tr.) at 18:19-20, 23:22-24.

41.     Ms. Garner testified that she knew about false-wakes because her ███████ ███████████████ Alexa turn on [and] she would pause what she was saying to me and say Alexa stop because Alexa was waking without intentionally being awoken." **Ex. 8** (Excerpt of Garner Tr.) at 148:1-4.

42.     Ms. Tesoriero testified about seeing a "comedy" about how "you have to pronounce the name Alexa correctly" on YouTube. **Ex. 4** (Excerpt of Tesoriero Tr.) at 40:7-22.

43.     Plaintiffs' recordings also demonstrate that many suspected false-wake recordings are either unintelligible or a just few words taken out of context. Ms. Tesoriero identified a recording of the word "oh" as not directed at Alexa, but during her deposition she testified that "oh" was actually her response to a question from Alexa. **Ex.4** (Excerpt of Tesoriero Tr.) at 110:15-112:13 (listening to **Ex. 13**, AMZ_GARNER_AU_00012829).

44.     During Mr. McNealy's deposition, he listened to a recording and testified that "I don't even know what that was. It was just a noise. It was just like a computer tone." **Ex. 6** (Excerpt of M.McNealy Tr.) at 137:21-138:4 (listening to **Ex. 12**, AMZ_GARNER_AU_00163690).

45.     Many Plaintiffs testified that they continued using Alexa after the FACC was filed. Mr. Hoyt testified that he still uses Alexa. **Ex. 3** (Excerpt of Hoyt Tr.) at 24:9-10. Ms. Brust admitted that "she has made voice commands to the Identified Alexa-enabled Device since this lawsuit was filed." **Ex. 32** at 4. Mrs. McNealy testified that she last used Alexa "the night before I left for -- to come to New York" for her deposition. **Ex. 7** (Excerpt of D. McNealy Tr.) at 22:1-8. Ms. Garner admitted that she has made voice commands to Alexa since this lawsuit was filed. **Ex. 34** at 4-5. Mr. Babani and Mr. McNealy confirmed that they have continued using Alexa since this lawsuit was filed. **Ex. 6** (Excerpt of M. McNealy Tr.) at 21:8-22:6; **Ex. 5** (Excerpt of Babani

Tr.) at 21:14-16. Ms. Tesoriero confirmed that she has continued using Alexa but that she "limit[s] the amount." **Ex.4** (Excerpt of Tesoriero Tr.) at 21:15-19.

### B.    Audio Recordings

46.    On a USB device filed with this declaration, Amazon has provided certain audio recordings from Plaintiffs' identified Amazon accounts for the Court's review.

a.    The recording labeled **Exhibit 12** is a recording from Mr. McNealy's identified Amazon account, produced as AMZ_GARNER_AU_00163690, which contains no words.

b.    The recording labeled **Exhibit 13** is a recording from Mr. Hoyt's identified Amazon account, produced as AMZ_GARNER_AU_00012829.

c.    The recording labeled **Exhibit 14** is a recording from Ms. Brust's identified Amazon account, produced as AMZ_GARNER_AU_00022561, which contains static.

d.    The recording labeled **Exhibit 15** is a recording from Ms. Brust's identified Amazon account, produced as AMZ_GARNER_AU_00016054, which contains audio from a television show, but that Ms. Brust identified as her voice in her amended interrogatory responses. *See* **Ex. 1** at 21.

e.    The recording labeled **Exhibit 16** is the recording from Mrs. Johnson's Amazon account produced, as AMZ_GARNER_AU_00153924, that Mr. Johnson identified in his amended interrogatory responses as a ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ but that in fact reflects only a cough.

f.    The recording labeled **Exhibit 17** is a recording from Ms. Tesoriero's identified account, produced as AMZ_GARNER_AU_00012910, which reflects Ms. Tesoriero saying, ▮▮▮▮▮▮▮▮▮

g.    Ms. Garner purchased an Alexa-enabled Fire TV stick on amazon.com and registered the device to her own Amazon account in November 2017. **Ex. 8** at 51:22-52:3, 55:7-11, 60:14-19; *see also* Declaration of Leila Rouhi ¶ 124(b). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

1    █████████ labeled as **Exhibit 18**, was produced as

2    AMZ_GARNER_AU_00176558. █████████ labeled **Exhibit**

3    **19**, was produced as AMZ_GARNER_AU_00176559; █████

4    █████████ labeled as **Exhibit 20**, was produced

5    as AMZ_GARNER_AU_00176560.

6    47.    In their Motion for Class Certification, Plaintiffs claim that "[o]n January 3, 2020,

7    Plaintiff Ronald Johnson's private communication in his home was intercepted, transcribed, and

8    stored by Alexa," and they cite "a recording of Plaintiff Ronald Johnson after intercourse."

9    Mot. at 6.  I have personally reviewed the recordings that correspond to the identified Amazon

10   account through which Mr. Johnson used Alexa.  **Exhibit 21** is an excerpt of the document

11   produced as AMZ_GARNER_AU_ANN_00002619, which reflects the transcripts and responses

12   for some of the recordings in the Johnsons' identified Amazon account, as well as Mr. Johnson's

13   corresponding interrogatory responses for the recordings. █████████████████████

14   █████████   **Ex. 21**.  These recordings are also included on the USB device.

15        a.    The recording labeled **Exhibit 22** is a recording dated January 3, 2020 and

16             produced as AMZ_GARNER_AU_00154201, ██████████████████

17             ████████████████████████████████████████████

18             ██████████████████████████ *See* Canty Ex. X at Ex. A,

19             4 (identifying **Ex. 22**, AMZ_GARNER_AU_00154201 as ████████

20             ██████████

21        b.    The recording labeled **Exhibit 23** is a recording dated January 3, 2020 and

22             produced as AMZ_GARNER_AU_00154200, ██████████████████

23             ████████████████████████████████████████████

24             ██████████████████████████

25        c.    The recording labeled **Exhibit 24** is a recording dated January 3, 2020 and

26             produced  as  AMZ_GARNER_AU_00154202, ██████████████████

27             ████████████████████████████████████████████

28             ██████████████████

48.    I understand that AMZ_GARNER_00073387 ████████████████
████████████████████████████████████████████████████████████
████████████████████████████ Rouhi Decl. ¶ 127. ████████████
████████████████████████████████████████████████████████████
██████████████████████ *Id.* ██████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████ are also included
on the USB device.

      a.    The recording labeled **Exhibit 25** was produced as AMZ_GARNER_AU_00159884 and has a timestamp of 03/11/2018 22:54:30 UTC. █████████████████████████
████████████████████████████████
████████████████████ Canty Ex. T at 49.

      b.    The recording labeled **Exhibit 26** was produced as AMZ_GARNER_AU_00159994 and has a timestamp of 03/18/2018 18:05:10 UTC. █████████████████████████
████████████████████████████████████ Canty Ex. T at 50.

      c.    The recording labeled **Exhibit 27** was produced as AMZ_GARNER_AU_00166345 and has a timestamp of 01/13/2021 23:34 UTC. █████████████████████████
████████████████████████ Canty Ex. U at 31.

      d.    ████████████████████████████████
████████████████████████████████

        i.    The recording labeled **Exhibit 28** was produced as AMZ_GARNER_AU_00162261 and has a timestamp of 11/03/2019 02:18:16 UTC. ██████████████
████████████████

1  ii.  The recording labeled **Exhibit 29** was produced as
2    AMZ_GARNER_AU_00166343 and has a timestamp of
3    01/13/2021 23:21 UTC. ███████████████████████

4    ██████████████

5  49.  **Exhibit 30** is an excerpt of the document produced as

6 AMZ_GARNER_AU_ANN_00000335, which reflects the transcripts and responses for some of

7 the recordings in Ms. Tesoriero's identified Amazon account, as well as Ms. Tesoriero's

8 corresponding interrogatory responses for the recordings.

9    **C.  Plaintiffs' Discovery Responses And Production**

10  50.  On May 16, 2022, Plaintiff John Dannelly, a former named Plaintiff in this matter,

11 served his Responses and Objections to Amazon's First and Second Set of Interrogatories.

12 On October 3, 2022, Mr. Dannelly voluntarily withdrew from this litigation and dismissed his

13 claims against Amazon with prejudice. Dkt. 122. Attached as **Exhibit 31** is a true and correct

14 copy of Plaintiff John Dannelly's Responses and Objections to Defendants' First and Second Set

15 of Interrogatories. (Mr. Dannelly's interrogatory responses were not designated confidential.

16 Nonetheless, in an abundance of caution, Amazon has redacted individual information from the

17 exhibit, such as any address, email address, and device serial number.)

18  51.  On February 17, 2023, Plaintiff Jodi Brust served her Responses and Objections to

19 Amazon's First Set of Requests for Admission. Attached as **Exhibit 32** is a true and correct copy

20 of Plaintiff Jodi Brust's Responses and Objections to Defendants' First Set of Requests for

21 Admission.

22  52.  On February 17, 2023, Plaintiff Diane McNealy served her Responses and

23 Objections to Amazon's First Set of Requests for Admission. Attached as **Exhibit 33** is a true and

24 correct copy of Plaintiff Diane McNealy's Responses and Objections to Defendants' First Set of

25 Requests for Admission. (Mrs. McNealy's responses to the Requests for Admission were not

26 designated confidential. Nonetheless, in an abundance of caution, Amazon has redacted individual

27 information from the exhibit, such as any email address.)

28

53. On February 17, 2023, Plaintiff Kaeli Garner served her Responses and Objections to Amazon's First Set of Requests for Admission. Attached as **Exhibit 34** is a true and correct copy of Plaintiff Kaeli Garner's Responses and Objections to Defendants' First Set of Requests for Admission. (Ms. Garner's responses to the Requests for Admission were not designated confidential. Nonetheless, in an abundance of caution, Amazon has redacted individual information from the exhibit, such as any email address.)

54. Attached as **Exhibit 35** is a true and correct copy of a screenshot of the "Manage Your Alexa Data" page in the Alexa App that Mr. Hoyt produced as AMAZON-PLTFS_0005380.

55. Attached as **Exhibit 36** is a true and correct copy of a screenshot of the "Help improve Alexa" page in the Alexa App that Mr. Hoyt produced as AMAZON-PLTFS_0005385.

56. Attached as **Exhibit 37** is a true and correct of an email that Mr. Hoyt received, titled "Keep up with Alexa – Privacy Edition," and produced as AMAZON-PLTFS_0005139.

## II.    Amazon Alexa Arbitrations

57. In 2020, a plaintiff's law firm solicited claimants on social media and partnered with the Quinn Emanuel and Keller Lenkner law firms to file individual arbitration claims against Amazon on behalf of over 70,000 alleged Alexa users who claimed they were recorded by the Alexa service without their permission. Attached as **Exhibits 38-39** are true and correct copies of social media advertisements for arbitration claims against Amazon about Alexa recording.

58. ███████████████████████████████████████
███████████████████████████████████████████████

██████████    Below I discuss specific rulings in final arbitration awards, which have been redacted to protect names of the individual claimants.

59. ███████████████████████████████████████
███████████████████████████████████████     Attached as **Exhibit 40** is a true and correct copy of ███████████████████████
███████    ███████    which was produced as AMZ_GARNER_00073483.    ███
███████████████████████████████████████████████
███████████████████████████████████████████████

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

1  ████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████

3  ██████████████████████████████

4      60.    █████████████████████████████████████████

5  ████████████████████████████████████████████████████

6  Attached as **Exhibit 41** is a true and correct copy of ██████████████

7  ████████████████████ which was produced as AMZ_GARNER_00073533.

8      a.    ██████████████████████████████████████

9          ██████████████████████████████████████

10         ██████████████████████████████████████

11         ██████████████████████████████████████

12         ██████████████████████████████████████

13         ████████████████████████████████

14     b.    ██████████████████████████████████████

15         ██████████████████████████████████████

16         ██████████████████████████████████████

17         ██████████████████████████████████████

18         ██████████████████████████████████████

19         ██████████████████████████████████████

20         ██████████████████████████████████████

21         ██████████████████████████████████████

22         ██████████████████████████████████████

23         ██████████████████████████████████████

24         ██████████████████████████████████████

25         ██████████████████████████████████████

26         ██████████████████████████████████████

27         ██████████████████████████████████████

28         ██████████████████████████████████████

1　██████████████████████████████

2　██████████████████████████████

3　██████████████████████████████

4　██████████████████████████████

5　██████████████████████████████

6　██████████████████████████████

7　██████████████████████████████

8　██████████████████████████████

9　███████████████████

10　61.　███████████████████████████

11　████████████████████████ Attached as

12　**Exhibit 42** is a true and correct copy of ██████████

13　██████ which was produced as AMZ_GARNER_00073487. ██████████

14　██████████████████████████████

15　██████████████████████████████

16　██████████████████████████████

17　██████████████████████████████

18　██████████████████████████████

19　██████████████████████████████

20　████████████

21　62.　████████████████████████

22　████████████████████████████ Attached

23　as **Exhibit 43** is a true and correct copy of ████████████

24　██████ which was produced as AMZ_GARNER_00073560. ████████

25　██████████████████████████████

26　██████████████████████████████

27　██████████████████████████████

28　██████████████████████████████



63. ███████ Attached as **Exhibit 44** is a true and correct copy of ███████ which was produced as AMZ_GARNER_00073521. ███████

64. ███████ Attached as **Exhibit 45** is a true and correct copy of ███████ which was produced as AMZ_GARNER_00073476. ███████

65. ███████ Attached as **Exhibit 46** is a true and correct copy of ███████ which was produced as AMZ_GARNER_00073490. ███████

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## III.    Media Coverage Of Alexa

66.    Since its inception, Amazon's Alexa service has been the subject of continuous, widespread news coverage and commentary, with various local, national, and international publications reporting on matters including voice recordings, human review, and Alexa's privacy-oriented features.

67.    On November 11, 2014—within a week of Amazon's announcement of the launch of its first Echo device—The Washington Post published an article entitled *How Closely is Amazon's Echo Listening?  Six Questions about the Amazon Echo and Your Privacy*.  A true and correct copy of that article is attached as **Exhibit 47**.  That article stated that Echo devices "records snippets of what you say in the privacy of your home and stores it on Amazon's servers." *Id.* at '728.  It reported that Echo devices "listen constantly" for the wake word and "stream whatever [users] say" after hearing the wake word "to the Amazon cloud" while "also go[ing] back and send[ing] a few seconds before the wake word to the cloud." *Id.* at '729.  The article further reported that "the things [that users] ask Echo [devices] are recorded and kept on the company's servers unless [users] delete them" by "go[ing] into the 'History' settings in the companion app" to "view all [their] queries and nix the ones [they] don't want[.]" *Id.* at '730.

68.    Since that time, news outlets and publications have routinely published reports and commentary related to Alexa-enabled devices, including facts about their functionality and features.  For example, in December 28, 2016, Fox News reported that "the Echo speaker is always listening for Alexa voice commands[,]" and Amazon "provides some options to manage … and review" voice recordings, including "delet[ing] all voice recordings associated with [an] Amazon account for each … Alexa-enabled product[]."  A true and correct copy of that article is attached as **Exhibit 48**.

69.    On April 10, 2019, Bloomberg published an article discussing human review of Alexa recordings, entitled "Amazon Workers Are Listening to What You Tell Alexa."  This piece

reported that "[a] global team [of employees at Amazon] reviews audio clips [captured by Alexa-enabled devices] in an effort to help the voice-activated assistant respond to commands." A true and correct copy of that Bloomberg article is attached as **Exhibit 49**. While the information contained within this article was already public, the Bloomberg piece garnered considerable public attention, which in turn, resulted in a news cycle dominated by Alexa-related coverage. Indeed, on April 11, 2019, just a day after the release of the Bloomberg article, Business Insider published an article entitled: "The media is freaking out about Alexa privacy, but here's the truth." This article reported the already-well-disclosed fact that Alexa-enabled devices "send [] recordings to Amazon's cloud to process in order to give [users] a response[,]" as well as Amazon's practice of employing human review and annotation for a miniscule set of recordings in an effort to improve Alexa-enabled devices ability to understand and respond to requests. A true and correct copy of that Business Insider article is attached as **Exhibit 50**. The Bloomberg article was picked up and republished by many local newspaper and radio stations around the country.

70.    A June 26, 2019 USA Today article, entitled "Amazon is watching, listening and tracking you. Here's how to stop it," reported that "Amazon stores recordings of every interaction you've had with Alexa," and that such recordings were "available for listening in the smartphone app, … by clicking Settings and Alexa Privacy." This piece further explained that once "[t]here, [users] can read and listen to [] past conversations with Alexa, delete all or individual recordings[,]" or "have Alexa do it, by saying 'Alexa, delete everything I said today.'" A true and correct copy of that article is attached as **Exhibit 51**.

71.    The high-profile coverage of Alexa-enabled devices following the Bloomberg article was accompanied by a series of consumer-initiated litigations alleging that Alexa-enabled devices unlawfully record consumers without their consent in violation of state wiretap laws. *See, e.g., Hall O'Neill v. Amazon.com, Inc. et al.*, No. 2:19-cv-00910-RAJ-MLP (W.D. Wash.); *Hayley Charmaine Tice v. Amazon.com, Inc. et al.,* No. 5:19-cv-01311-SVW-KK (C.D. Cal.); *Amazon.com Alexa Cases,* No. JCCP 5069 (Alameda County, CA). As discussed above, other plaintiffs' firms also filed tens of thousands of arbitration against Amazon relating to Alexa.

72.    Amazon has produced over a thousand news articles related to Alexa in connection with this action.  A summary chart containing the beginning bates number, date, source, title, and description of these items is attached as **Exhibit 52**.  Amazon can file the production versions of each of the underlying articles referenced in the exhibit upon request.

**IV.    Plaintiffs' Experts**

73.    On September 5, 2024, Amazon's counsel deposed Jonathan Hochman, one of Plaintiffs' experts.    Attached as **Exhibit 53** is a true and correct copy of an excerpt from Mr. Hochman's deposition transcript.  In his deposition, Mr. Hochman confirmed that he "ha[sn't] set forth a formula for how someone else would go about calculating an actual numerical value to" utterances.  *Id.* at 99:8-100:7.  Mr. Hochman further testified that "[m]y opinion is to state that the utterances, especially the -- what I'm focusing on, the false-wake utterances, have value," but "I haven't been asked and I haven't endeavored to -- to fix that value" and "I wasn't asked to -- to opine about how someone would go about doing that."  *Id.* at 115:18-118:22 ("I wasn't asked, first of all, to fix the value.  And I wasn't asked to opine about the relative value of a -- of one utterance to another.").

74.    On September 4, 2024, Amazon's counsel deposed David Hoffman, one of Plaintiffs' experts.    Attached as **Exhibit 54** is a true and correct copy of an excerpt from Mr. Hoffman's deposition transcript.  During his deposition, Mr. Hoffman confirmed that he has not offered any opinion on the value of recordings or a damages model.  *Id.* at 194:15-24; *see also* Canty Ex. PP, ¶ 3.

75.    On September 6, 2024, Amazon's counsel deposed Serge Egelman, one of Plaintiffs' experts.    Attached as **Exhibit 55** is a true and correct copy of an excerpt from Dr. Egelman's deposition transcript.  During his deposition, Dr. Egelman was asked, "do you provide any opinion about whether Plaintiffs were deprived of the value of – of recordings or other data?" and he responded, "I don't believe so."  *Id.* at 34:5-10.  Dr. Egelman also confirmed that he was not asked to provide an opinion about quantifying damages and "was not asked to quantify" any Amazon profits from the retention and use of recordings.  *Id.* at 25:2-5, 33:17-21, 34:12-21.

76.     In his expert report submitted in support of Plaintiffs' Motion for Class Certification, Dr. Egelman notes that Alexa users can "opt out to prevent [recordings] from being retained."    Canty Ex. XX, ¶ 36.    He concludes that "[o]nly Registrants can opt out via the companion app or website" and children and spouses of Registrants "have no way to opt out."    *Id.* In his expert report, Dr. Egelman also cites to a 2019 paper that he co-authored, entitled *Privacy Attitudes of Smart Speaker Users* ("*Privacy Attitudes*"); a true and correct copy of the paper is attached as **Exhibit 56**.    According to the *Privacy Attitudes* paper, Dr. Egelman and his co-authors surveyed 116 smart-speaker owners, with 69% of the participants using Alexa-enabled smart speakers and the rest using Google or other smart speakers, and there were "no statistical differences between the two populations on other questions we tested."    *Id.* at 254.    In contrast to his report in this litigation, Dr. Egelman's 2019 paper reported that household members other than the survey participants may have access to the companion app.    Survey participants were asked: "Who in your household has the Amazon Alexa / Google Home app installed on their mobile device and/or linked to the main Amazon/Google account?"    *Id.* at 268.    The answer choices were: "Only me," "Myself and some of the other members of the household," "Every member of the household," "Someone else in the household, but not me," and "Not sure."    *Id.*    The paper stated that many participants "mentioned that others in their household also have the Alexa or Google Home app installed."    *Id.* at 261.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7th day of October 2024.


*/s/ Y. Monica Chan*
Y. Monica Chan