THE HONORABLE ROBERT S. LASNIK

1
2
3
4
5
6
7                           UNITED STATES DISTRICT COURT
                           WESTERN DISTRICT OF WASHINGTON
8                                    AT SEATTLE

9   KAELI GARNER, *et al.*,                    Case No. 2:21-cv-00750-RSL

10                                             **AMAZON'S MOTION FOR SUMMARY**
                    Plaintiffs,                **JUDGMENT**
11
                                               NOTE ON MOTION CALENDAR:
12        v.                                   January 17, 2025

13  AMAZON.COM, INC., a Delaware               **ORAL ARGUMENT REQUESTED**
    Corporation, and AMAZON.COM SERVICES
14  LLC, a Delaware Limited Liability Company,

15                  Defendants.

16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................1

UNDISPUTED MATERIAL FACTS ......................................3

    A.   The Alexa Service ...........................................3

    B.   "False-Wakes" ..............................................4

    C.   Disclosures, Terms, And Publicity About Voice Recordings.................6

    D.   Improvements To The Alexa Service ...................9

    E.   Plaintiffs' Individual Experiences.....................9

LEGAL STANDARD ...........................................................11

ANALYSIS ..........................................................................11

I.   PLAINTIFFS HAVE NO VIABLE WCPA CLAIMS. ...............11

    A.   Amazon Did Not Act Unfairly Or Deceptively. ...............12

        1.   Alexa Was Not Designed To Secretly Record.............14

        2.   Amazon Did Not Intentionally Keep Communications That Plaintiffs Did Not Intend for Alexa. ......16

        3.   Amazon Widely Disclosed Its Recording Practices. ...............17

    B.   Plaintiffs Suffered No Injury Caused By Amazon. ...............19

II.  THE UNREGISTERED PLAINTIFFS HAVE NO VIABLE WIRETAP CLAIMS.......22

    A.   Washington Law Applies To All The Unregistered Plaintiffs' Claims.................22

    B.   Kaeli Garner And Ronald Johnson Are Registered Plaintiffs. .............23

    C.   Ms. Tesoriero, Mr. McNealy, And Mr. Johnson Are Bound By Amazon's Terms Through Agency And Equitable Estoppel. .............24

        1.   Agency Binds Plaintiffs' Spouses To Amazon's Terms.................24

        2.   Spouses Are Equitably Estopped From Avoiding Amazon's Terms. .......26

    D.   Consent Bars All The Unregistered Plaintiffs' Wiretap Claims.........................27

        1.   Recording Is An Inherent Part Of The Technology.................27

**TABLE OF CONTENTS**

**Page**

2. Amazon's Disclosures Create Implied Consent. ........................................29

3. The Unregistered Plaintiffs Understood How Alexa Works. ...................31

    a. Tesoriero .........................................................................................31

    b. Garner ..............................................................................................32

    c. Babani ..............................................................................................32

    d. Michael McNealy............................................................................33

    e. Ronald Johnson................................................................................33

    f. Watkins ............................................................................................33

E. Plaintiffs Have No Viable WPA Claims...............................................34

1. Intentional Command Recordings Do Not Violate The WPA...................34

    a. Alexa Commands Are Not Between Individuals...........................34

    b. Alexa Commands Are Not "Conversations." ................................35

2. False-Wake Recordings Do Not Violate The WPA. ..................................37

    a. There Is No "Transmission" of Communications..........................37

    b. Alexa Is Not "Designed" To Secretly Record. .............................38

    c. False-Wake Recordings Are Not "Private Conversations."................................................................................39

3. The WPA Does Not Apply To Disclosure Or Use Of Recordings. ................................................................................................42

F. False-Wake Recordings Do Not Violate the FWA................................42

1. There Is No Evidence of Any "Intentional" Interception. .........................43

2. Amazon Did Not Intercept Any "Oral Communication." .........................43

3. There Is No Evidence Of Any Unlawful Use Or Disclosure......................44

III. PLAINTIFFS HAVE NO VIABLE NON-WASHINGTON CLAIMS...........................44

IV. ALL PLAINTIFFS LACK INDIVIDUAL STANDING AND STANDING TO REPRESENT A CLASS.....................................................................................45

CONCLUSION ..................................................................................................................45

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- ii -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Adams v. Sec'y, Dep't of Corr.*,
2011 WL 202998 (M.D. Fla. Jan. 20, 2011) .......................................................................27

*All. Bank of Arizona v. Patel*,
2013 WL 2432313 (C.D. Cal. June 3, 2013) .......................................................................26

*Alpert v. Nationstar Mortg., LLC*,
2019 WL 1200541 (W.D. Wash. Mar. 14, 2019) ...........................................................12, 18

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................................................11

*Arizona v. Yellen*,
34 F.4th 841 (9th Cir. 2022) .........................................................................................19, 45

*Brotherson v. Pro. Basketball Club, L.L.C.*,
604 F. Supp. 2d 1276 (W.D. Wash. 2009) .........................................................................20

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................................................11

*Chamber of Com. of the United States v. Bonta*,
62 F.4th 473 (9th Cir. 2023) ..............................................................................................25

*Commonwealth v. Byrd*,
661 Pa. 85 (Pa. 2020) .........................................................................................................27

*Commonwealth v. Diego*,
119 A.3d 370 (Pa. Super. 2015) .........................................................................................28

*Commonwealth v. Maccini*,
2007 WL 1203560 (Mass. Super. Apr. 23, 2007) ..............................................................30

*Commonwealth v. Proetto*,
771 A.2d 823 (Pa. Super. 2001) .........................................................................................28

*Comer v. Micor, Inc.*,
436 F.3d 1098 (9th Cir. 2006) ............................................................................................26

*Cousineau v. Microsoft Corp.*,
992 F. Supp. 2d 1116 (W.D. Wash. 2012) ..............................................................34, 35, 36

*Davis v. Fed. Election Comm'n*,
554 U.S. 724 (2008) ............................................................................................................19

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- iii -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON  98101

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Davis v. HSBC Bank Nevada, N.A.*,
   691 F.3d 1152 (9th Cir. 2012) ........................................................................13

*Davis v. State ex rel. Dep't of Licensing*,
   137 Wn.2d 957 (1999) ....................................................................................38

*Del Vecchio v. Amazon.com, Inc.*,
   2012 WL 1997697 (W.D. Wash. June 1, 2012)..............................................20

*Dunn v. United States*,
   442 U.S. 100 (1979).........................................................................................34

*Flanagan v. Flanagan*,
   27 Cal. 4th 766 (Cal. 2002).............................................................................44

*Gray v. Amazon.com, Inc.*,
   653 F. Supp. 3d 847 (W.D. Wash. 2023 ...........................................13, 17, 19

*Greenberg v. Amazon.com, Inc.*,
   553 P.3d 626 (Wash. 2024)........................................................................12, 13

*Haywood v. Amazon.com, Inc.*,
   2023 WL 4585362 (W.D. Wash. July 18, 2023) ........................................11, 13

*HB Dev., LLC v. W. Pac. Mut. Ins.*,
   86 F. Supp. 3d 1164 (E.D. Wash. 2015) ........................................................14

*Hoang v. Amazon.com, Inc.*,
   2012 WL 1088165 (W.D. Wash. Mar. 30, 2012)......................................36, 42

*Houserman v. Comtech Telecomm. Corp.*,
   2021 WL 366006 (W.D. Wash. Feb. 3, 2021) ................................................11

*In re Amazon Service Fee Litig.*,
   2024 WL 3460939 (W.D. Wash. July 18, 2024) ..............................13, 20, 35

*In re Google Assistant Privacy Litig.*,
   457 F. Supp. 3d 797 (N.D. Cal. 2020) ...........................................................27

*In re Google Inc. Gmail Litig.*,
   2014 WL 1102660 (N.D. Cal. Mar. 18, 2014)................................................27

*In re Meta Pixel Tax Filing Cases*,
   2024 WL 1251350 (N.D. Cal. Mar. 25, 2024)................................................35

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- iv -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON  98101

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Pharmatrak, Inc.*,
   329 F.3d 9 (1st Cir. 2003) .........................................................................................43

*Kadoranian by Peach v. Bellingham Police Dep't*,
   119 Wn.2d 178 (1992) ...............................................................................................41

*Kearney v. Kearney*,
   95 Wn. App. 405 (1999) .............................................................................................42

*Keenan v. Allan*,
   91 F.3d 1275 (9th Cir. 1996) .....................................................................................11

*Keithly v. Intelius Inc.*,
   764 F. Supp. 2d 1257 (W.D. Wash. 2011).................................................................14

*Keyes v. Bollinger*,
   31 Wn. App. 286 (1982) .............................................................................................19

*King v. Riveland*,
   125 Wn.2d 500 (1994) ...............................................................................................24

*Konop v. Hawaiian Airlines, Inc.*,
   302 F.3d 868 (9th Cir. 2002) .....................................................................................43

*Krakauer v. Recreational Equip., Inc.*,
   2024 WL 1494489 (W.D. Wash. Mar. 29, 2024) .....................................................20

*Leingang v. Pierce Cnty. Med. Bureau, Inc.*,
   131 Wn.2d 133 (1997) ...............................................................................................12

*Leocal v. Ashcroft*,
   543 U.S. 1 (2004)........................................................................................................34

*LVRC Holdings LLC v. Brekka*,
   581 F.3d 1127 (9th Cir. 2009) ...................................................................................34

*Marquez v. Amazon.com, Inc.*,
   69 F.4th 1262 (11th Cir. 2023) ............................................................................13, 14

*Martinez v. Newsom*,
   46 F.4th 965 (9th Cir. 2022) ......................................................................................45

*Mundi v. Union Sec. Life Ins.*,
   555 F.3d 1042 (9th Cir. 2009) ...................................................................................26

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- v -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Nguyen v. Barnes & Noble Inc.*,
   763 F.3d 1171 (9th Cir. 2014) ........................................................26

*Nicosia v. Amazon.com, Inc.*
   384 F. Supp. 3d 254 (E.D.N.Y. 2019) ...........................................26

*Noel v. Hall*,
   568 F.3d 743 (9th Cir. 2009) ..........................................................44

*Panag v. Farmers Ins. of Wash.*,
   166 Wn.2d 27 (2009) ......................................................................11

*People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W.*
   *Maryland, Inc.*,
   2018 WL 6324806 (D. Md. Dec. 3, 2018) ......................................27

*Percival v. Poon*,
   2021 WL 962701 (W.D. Wash. Mar. 15, 2021) ..............................43

*Revitalization Partners, LLC v. Equinix, Inc.*,
   2017 WL 823291 (W.D. Wash. Mar. 2, 2017) ................................24

*Revitch v. New Moosejaw, LLC*,
   2019 WL 5485330 (N.D. Cal. Oct. 23, 2019) ...........................28, 44

*Smale v. Cellco P'ship*,
   547 F. Supp. 2d 1181 (W.D. Wash. 2008) .................................13, 14

*State v. Clark*,
   129 Wn.2d 211 (1996) ...............................................................40, 41

*State v. David Smith*,
   85 Wn.2d 840 (1975) ......................................................................39

*State v. Diaz-Barrientos*,
   14 Wn. App. 2d 1002 (2020) .....................................................35, 38

*State v. Glant*,
   13 Wn. App. 2d 356 (2020) .............................................................28

*State v. Kamara*,
   28 Wn. App. 2d 903 (2023) .............................................................39

*State v. Lott*,
   879 A.2d 1167 (N.H. 2005) ..................................................27, 28, 29

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- vi -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*State v. Moscone*,
  13 A.3d 137 (N.H. 2011) ...................................................................28

*State v. Racus*,
  7 Wn. App. 2d 287 (2019) ................................................................27

*State v. Smith*,
  196 Wn. App. 224 (2016) ................................................................37

*State v. Smith* (*John Smith*),
  189 Wn.2d 655 (2017) ...........................................................27, 34, 39

*State v. Townsend*,
  147 Wn.2d 666 (2002) ............................................................. *passim*

*Street v. Amazon.com Servs., LLC*,
  2022 WL 3683811 (W.D. Wash. Aug. 25, 2022) ...............................19

*Tice v. Amazon.com, Inc.*,
  845 F. App'x 535 (9th Cir. 2021) .....................................................26

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ........................................................................45

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ........................................................................45

*United States v. Van Poyck*,
  77 F.3d 285 (9th Cir. 1996) .............................................................27

*United States v. Christensen*,
  828 F.3d 763 (9th Cir. 2015) ...........................................................43

*United States v. McIntyre*,
  582 F.2d 1221 (9th Cir. 1978) .........................................................43

*Wetzel v. CertainTeed Corp*,
  2019 WL 3976204 (W.D. Wash. Mar. 25, 2019) ..............................45

STATUTES AND RULES

18 Pa. Cons. Stat. § 5703(1) .............................................................44

18 Pa. Cons. Stat. § 5704(4) .............................................................27

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- vii -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON  98101

# TABLE OF AUTHORITIES

**Page(s)**

STATUTES AND RULES

18 U.S.C. § 2510(2) ............................................................................................43

18 U.S.C. § 2511 ...............................................................................27, 43, 44

Cal. Pen. Code § 631(a) .....................................................................................27

Fed. R. Civ. P. 23 ..............................................................................................45

Fed. R. Civ. P. 56(a) .........................................................................................11

Fla. Stat. § 934.03 ........................................................................................27, 44

Md. Code Ann., Cts. & Jud. Proc. § 10-402(c)(3) .........................................27

Md. Code Ann., Cts. & Jud. Proc. § 10-402(a)(1) .........................................44

N.H. Rev. Stat. § 570-A:2(I) .......................................................................27, 44

RCW § 9.73.030(1) ...................................................................................... *passim*

RCW § 9.73.080 .................................................................................................34

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- viii -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

# INTRODUCTION

Plaintiffs are frequent users of Amazon's popular Alexa service. They all live in homes with Alexa-enabled devices, which they routinely use to access information, entertainment, and countless online services with simple voice commands. In their First Amended Class Complaint, Dkt. 59 ("FACC"), Plaintiffs alleged that the Alexa service "surreptitiously" intercepted, eavesdropped on, recorded, disclosed, and used their private communications, all without their knowledge or consent.

The Court's May 6, 2022, dismissal order substantially narrowed this case. Dkt. 91 ("MTDO"). The Court grouped Plaintiffs into those who "live in a household with an Alexa device they registered themselves" (the "Registered Plaintiffs") and those who "live in a household with an Alexa device that was registered by someone else" (the "Unregistered Plaintiffs"). MTDO at 1-2. The Court ruled that the Registered Plaintiffs received notice of, and expressly consented to, Alexa recordings, including from accidental activations, which barred their wiretap claims. As a result, the Registered Plaintiffs now assert only Washington Consumer Protection Act ("WCPA") claims, while the Unregistered Plaintiffs assert claims under both the WCPA and state and federal wiretap laws, on the premise that they had no notice of Alexa recordings.

At the pleading stage, the Court was required to accept as true Plaintiffs' allegations that Amazon intentionally designed Alexa to record even when no one said the "wake-word" (so called "false-wakes"), that Amazon employees listened to Plaintiffs' most intimate conversations, and that Amazon "monetized" Alexa recordings. Years of extensive discovery have revealed that these allegations have no factual or evidentiary basis, and Amazon is entitled to judgment as a matter of law on all of Plaintiffs' claims.

First, Plaintiffs cannot establish that Amazon engaged in any "unfair or deceptive" practice, or that Amazon's conduct caused injury to Plaintiffs' "business or property" under the WCPA. Courts routinely dismiss WCPA claims where a company's terms and public disclosures authorize and notify consumers of the challenged practice. Amazon widely disclosed not only the fact of Alexa recordings, but the phenomenon of false-wakes and the practice of human review to improve the Alexa service. And there is no evidence that Amazon ever "monetized" voice recordings, or

that Plaintiffs lost any value associated with their Alexa recordings.  Perhaps most importantly, discovery revealed that *Plaintiffs themselves were never harmed by false-wakes or human review*.  Plaintiffs' Alexa recordings in fact contain *none* of the private, salacious, or personal details they claimed in their complaint, and *none* of their false-wake recordings were ever subject to human review.  As such, Plaintiffs suffered no concrete or cognizable injury, and their claims fail on that basis alone.

The Unregistered Plaintiffs' state and federal wiretap claims fare no better.  As a threshold matter, two of the purportedly Unregistered Plaintiffs (Ms. Garner and Mr. Johnson) are actually *registered*, because they set up Alexa-enabled devices and agreed to Amazon's terms.  Three other of the purportedly Unregistered Plaintiffs (Ms. Tesoriero, Mr. McNealy, and Mr. Johnson) are bound by the Alexa terms, through agency and estoppel theories, because their spouses agreed on their behalf.  Under the MTDO, all five of these purported Unregistered Plaintiffs consented to Alexa Recordings and cannot assert wiretapping claims.

On the merits, none of the Unregistered Plaintiffs can establish the required elements of wiretapping under the Washington Privacy Act (WPA), which controls here.  First, even without express consent to recording, the Unregistered Plaintiffs' *implied* consent bars their wiretap claims, because they either knew or reasonably should have known how Alexa worked.  From Alexa's inception, Amazon itself, the news, and posts on social media have extensively disclosed the fact of Alexa recordings, including from false-wakes.  And Plaintiffs' own testimony reveals their widespread understanding about Alexa's recording functionality.  Given Plaintiffs' actual and constructive knowledge, their decision to keep Alexa-enabled devices active in their homes, and to routinely use those devices, creates implied consent.  Second, Alexa recordings—which are typically just short commands intentionally directed to Amazon, or mere blips of sound caused by false-wakes—do not constitute intercepted "transmissions" and do not reflect any "private conversations," as the WPA requires.

Plaintiffs' Federal Wiretap Act ("FWA") claims—which the Court limited to false-wakes—also fail as a matter of law.  Plaintiffs have *no evidence* that Amazon designed Alexa to record without detecting a wake-word, so false-wakes, by definition, are not "intentional" conduct,

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 2 -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

which the FWA requires. Nor did Amazon intercept any "oral communications," which requires an objectively reasonable expectation that the communication is not potentially subject to interception. Plaintiffs had no such expectation, because they knew that their Alexa-enabled devices were listening for the wake-word, and that if it was detected (even by mistake), Alexa would record their voices.

Based on the undisputed facts (set forth below), Plaintiffs have no viable legal claims and suffered no concrete harm. The Court should grant summary judgment in Amazon's favor.

## UNDISPUTED MATERIAL FACTS

### A.    The Alexa Service

Amazon's Alexa is a cloud-based voice assistant that allows users to access online services by voice instead of a keyboard, mouse, or touchscreen. Fresko Decl. ¶¶1-5. To use most Alexa-enabled devices, users say a wake-word (usually "Alexa") or press a "push-to-talk" button. *Id*. ¶¶4, 20. Users can also type inputs through the Alexa App. *Id*. ¶13.

While Alexa's voice interface is innovative, its basic functionality is the same as other online services: the user inputs a command, the command is transmitted across the internet, and computers receive, process, and execute it. FACC ¶5; Fresko Decl. ¶¶6, 16-41. Alexa inputs may be *spoken*, but like typed commands, those spoken commands must be recorded and processed by computers. *Id*.

Echo smart-speakers are typical Alexa-enabled devices containing a speaker, microphone, light-ring, and a few buttons (volume buttons, a "push-to-talk" button to activate Alexa without the wake-word, and a microphone on/off button). Fresko Decl. ¶¶10-11. When a user turns off the microphone, the light-ring turns red and the microphone is physically disabled. Rouhi Decl. ¶8-Ex-E (video about microphone button). As one Plaintiff put it, an Echo device "[d]oesn't do anything" when the light is red. Nercessian Decl. ¶17-Ex-60 (45:12-23, 49:9-15, 53:15-54:1).

When the microphone is on, Echo devices wait for the wake-word to activate, and conspicuously notify users once Alexa is activated. When a device detects the wake-word (including from any false-wake), the light-ring flashes blue to alert the user. Rouhi Decl. ¶5-Ex-D. At the user's option, Echo devices also will produce an audible tone when activated. Rouhi

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 3 -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

Decl. ¶5.  Several Plaintiffs configured their devices that way.  Nercessian Decl. ¶18-Ex-62, ¶101-Ex-99 (66:24-67:1).  If the device is playing music or other audio when it detects the wake-word, the volume lowers, further alerting people that the device activated.  Rouhi Decl. ¶5.

Once an Alexa device is activated, it streams audio to the cloud, where more powerful computers process a user's command or request and return a response.  Fresko Decl. ¶5.  That core functionality was not only disclosed by Amazon, but also widely reported in the press since Alexa launched.  *See, e.g.*, Chan-Ex-47 (*Washington Post* article, dated November 11, 2014).  The audio stream continues until the Alexa service in the cloud turns it off.  Fresko Decl. ¶23.

Amazon securely stores recordings of Alexa interactions unless users delete them or change their settings to prevent them from being saved.  Since Alexa's launch in 2014, the ability of Alexa users to review and delete all Alexa recordings has been widely publicized and well-known.  *See* Rouhi-Ex-47.  Amazon provides a Voice History feature on the Alexa app and amazon.com that households can use to review any audio transmitted to Alexa.  Rouhi Decl. ¶¶15-18-Exs-F-H; *see also* FACC ¶63 (Plaintiffs "accessed their recordings, or the recordings of the registered user that they live with, through an Alexa App").  Voice History gives users transparency about how Alexa works, allowing them to see any audio streamed to the cloud from a device.  Rouhi Decl. ¶¶15-16; Fresko Decl. ¶9.  Users can review recording transcripts, listen to recordings, and delete recordings individually or all at once.  *Id.*  Customers can adjust their settings to auto-delete recordings (*e.g.*, every three months) or not store them at all.  Rouhi Decl. ¶¶17-18.  Users also can delete recordings with voice commands.  *Id.; see also, e.g.*, Rouhi-Ex-T18 (FAQ4: "Can I review and delete my voice recordings?").

## B.    "False-Wakes"

So-called "false-wakes" are Alexa activations that occur if the device mistakenly identifies a sound as the wake-word.  Fresko Decl. ¶¶7-9, 24.  This can happen if someone says something that matches the acoustic pattern of the wake-word (e.g., "a Lexus"), or when there is a "media wake," i.e.,  when a TV or radio says "Alexa."  *Id.* When false-wakes happen, Alexa-enabled devices operate in the same manner that they do whenever they are activated: they alert users with a flashing blue light, optional tone, and reduced volume if other audio is playing.  *Id.* And, as with

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 4 -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

any other audio input to Alexa, household members can review suspected false-wakes in their Voice History. Rouhi Decl. ¶16. The false-wake phenomenon has been widely known since Alexa's launch. *See, e.g.*, Chan-Ex-47 (*Washington Post* article recommending using the microphone button to "avoid triggering Echo if, for instance, you are having a dinner guest over with the same name as your wake word").

In other words, false-wakes are no secret. A user who experiences one will know, because the device will signal that it has been activated, and the user can stop talking or tell the service to "stop." Fresko Decl. ¶24; *see also* Nercessian Decl. ¶105-Ex-99 (70:25-71:22) (Babani, discussing "cancel" command after mistaken activation); Chan-Ex-8 (148:1-4) (Garner, discussing "Alexa stop" command). Amazon explains this in the Frequently Asked Questions ("FAQs") for Alexa. *See, e.g.*, Rouhi-Ex-T19 (FAQ5: "What about 'false wakes'?").

Amazon adopts many measures to reduce false-wakes and to limit how much audio is recorded due to mistaken activations. In addition to on-device wake-word detection, Amazon applies a second detection process in the cloud called "cloud-side verification" ("CSV"). Fresko Decl. ¶¶8, 25-29. When CSV detects a potential false-wake, it cuts off the audio stream, deletes the transcript, and keeps only a truncated portion of the audio, just enough to identify what activated the device while avoiding capturing unintended communications. *Id.* As a result, none of Plaintiffs' alleged false-wake recordings, which are often short blips of sound, contain "private conversations." Alexa's Voice History feature labels potential false wakes as "not intended for Alexa," which allows users to provide feedback about suspected false-wakes. Rouhi Decl. ¶16. And if there is someone named Alexa (or a similar sounding name) in the household, users can also change the wake-word to something less likely to accidentally activate Alexa, like "Echo," "Computer," "Ziggy," or "Amazon." Rouhi Decl. ¶7. *See, e.g.*, Nercessian Decl. ¶102-Ex-99 (53:17-54:23) (wake-word changed to "Computer" because household members "found frustration in the device waking up when constantly referring" to close friend named "Alexa").

Plaintiffs argue that Amazon intentionally stores audio when Amazon knows that the audio was "not intended for Alexa," pointing to the label in the Voice History feature. But the Alexa service cannot know if a *potential* false-wake was, in fact, intended for Alexa. Rouhi Decl. ¶16;

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 5 -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

Fresko Decl. ¶¶20, 28.  Indeed, the *only* way to know whether a suspected false-wake recording contains the wake-word is to have a human listen to the recording.  Rouhi Decl. ¶¶22-23.  And, as the undisputed evidence shows, many so-called "false-wakes" involve situations where a person *did* in fact say the wake-word but the service simply could not confirm it.  Fresko Decl. ¶8; *see also*, *e.g.*, Chan-Ex-7 (163:3-164:13); Nercessian Decl. ¶24-Ex-59 and Ex-65 (148:3-150:13, AMZ_GARNER_AU_00013572), ¶26-Ex-67 (AMZ_GARNER_AU_00012992), ¶41-Ex-74 (AMZ_GARNER_AU_00158394), ¶43-Ex-76 (AMZ_GARNER_AU_00158307), ¶44-Ex-77 (AMZ_GARNER_AU_00158015), ¶58-Exs-85-86 (AMZ_GARNER_AU_00157011, AMZ_GARNER_AU_00156828), ¶59-Exs-87 (AMZ_GARNER_AU_00155347), ¶76-Ex-90 and Ex-94 (225:16-229:23, AMZ_GARNER_AU_00021786), ¶77-Ex-95 (AMZ_GARNER_AU_00021888), ¶102-Ex-99 and Ex-101 (79:1-11, AMZ_GARNER_AU_00165560), ¶103-Ex-103 (AMZ_GARNER_AU_00165626), ¶116-Ex-106 and Ex-108 (146:20-149:24, AMZ_GARNER_AU_00165116), ¶116-Ex-109 (AMZ_GARNER_AU_00165116).  Moreover, several recordings that Plaintiffs claimed were "false-wakes" in their complaint turned out to be directed at Alexa.  Nercessian Decl. ¶25-Ex-60 and Ex-66 (118:16-122:4, AMZ_GARNER_AU_00013643), ¶57-Ex-82 and Ex-84 (122:11-127:9, AMZ_GARNER_AU_00155972), ¶75-Ex-90 and Ex-93 (237:21-239:9, AMZ_GARNER_AU_00021824); *see also* Chan Decl. ¶33-Ex-6 (140:5-143:13) ("Now that I heard my sisters say, 'Hey, Alexa,' that would be directed at Alexa now, wouldn't it?"), ¶34-Ex-9 (152:4-23) ("I just heard 'Alexa'.  I must not have heard it earlier.").

## C.    Disclosures, Terms, And Publicity About Voice Recordings

As the Court found, Amazon repeatedly "announced" "[t]hrough its registration process" that the Alexa service "would record whenever activated."  MTDO at 16.  The Court noted that Amazon's FAQs, Alexa Terms of Use, and Privacy Notice were "irrelevant" at the dismissal stage because the versions Amazon submitted were current rather than historical.  *Id*. at 13 n.6.  But the Court also noted that, "[i]f Amazon could show that the FAQs, Terms of Use, and Privacy Notice it submitted for consideration were from (or were materially unchanged from) the relevant time period, there are a number of other representations that impact the analysis regarding the scope of

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 6 -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

1  a registered user's consent." *Id*. at 14 n.8.  Amazon has now made that record.  In support of this

2  motion, Amazon has submitted historical versions of its Conditions of Use ("COUs"), FAQs,

3  Alexa Terms of Use, and Privacy Notice for the entirety of the relevant time period, i.e., from

4  January 2017 (when the first Plaintiff registered an Alexa-enabled device) forward.  Rouhi-Exs-

5  L1-U13 (terms and disclosures), AA-HH (device registrations, account records).  The important

6  and relevant disclosures about Alexa's functionality were materially unchanged throughout that

7  period.  *Id*.

8       Amazon has always clearly and conspicuously disclosed the fact that Alexa records and

9  that Amazon uses Alexa recordings to improve the service, including through human review.  *See*

10  Rouhi-Exs-M1-T26.  Amazon announces to users that they must agree to Amazon's terms

11  governing Alexa "[t]hroughout the setup process …."  MTDO at 13.  The first time a user registers

12  an Alexa-enabled device, Amazon presents the user with a short, easy-to-read "Welcome Screen"

13  informing them that "Amazon processes and retains audio, interactions, and other data in the cloud

14  to provide and improve our services," and that to use Alexa, they must agree to Amazon's terms.

15  Fresko Decl. ¶¶63-65-Ex-NN; *see also* FACC ¶100.  While some language on the Welcome Screen

16  has changed over time, all versions have included substantially similar language disclosing the fact

17  of Alexa recordings and requiring agreement to Amazon's terms as a condition of use.  Fresko

18  Decl. ¶65.

19       The Welcome Screen includes a link to "Alexa and Alexa Device FAQs" with more

20  information about the Alexa service and privacy settings.  Fresko Decl. ¶64; Rouhi-Exs-T1-T26

21  (compiled FAQs).  When setting up an Echo smart-speaker device, Amazon again informs users

22  that "[b]y proceeding, you agree to Amazon's Conditions of Use and all the terms found here"—

23  which include the hyperlinked Privacy Notice and Alexa Terms, among other agreements.  Fresko

24  Decl. ¶¶66-68-Ex-OO; *see also* FACC ¶100.  Amazon presents users with similar disclosures when

25  they register Echo Show devices with screens, Fresko Decl. ¶¶69-75-Ex-PP, or Fire TV Sticks, *id.*

26  ¶¶76-80-Ex-QQ, or when they activate Alexa on Sonos or other third-party Alexa-enabled devices.

27  *Id.* ¶¶81-84-Ex-RR.  The publicly available Alexa Terms inform users that:

28

AMAPZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 7 -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

> ***Alexa records and sends audio to the cloud when you interact with Alexa.***
> ***Amazon processes and retains your Alexa Interactions***, such as your voice inputs,
> music playlists, and your Alexa to-do and shopping lists, ***in the cloud to provide,***
> ***personalize, and improve our services***.  Learn more about Alexa, including how to
> delete voice recordings associated with your account and manage our use of those
> voice recordings.

Rouhi-Exs-M5-M15 § 1.3 (emphases added); *see also* Rouhi-Exs-M1-M4 § 1.3.  Thus, the Alexa

Terms immediately put users on notice that Amazon will use recordings of Alexa interactions to

improve the Alexa service, and also inform users that, "[b]y using Alexa" they agree to the Terms.

Rouhi-Exs-M1-15, Preamble.

The Privacy Notice, in turn, discloses that "[w]hen you use our voice … services, we use

your voice input … and other personal information to respond to your requests, provide the

requested service to you, and improve our services.…"  Rouhi-Exs-N5-N6 ("For What Purposes

Does Amazon Use Your Personal Information?" and "Examples of Information Collected"

sections); *see also* Rouhi-Ex-N1-N4 ("What Personal Information About Customers Does

Amazon.com Gather?") ("We use the information that you provide for such purposes as

responding to your requests, customizing future shopping for you, improving our stores, and

communicating with you.").  The Privacy Notice is also explicit that Amazon may "employ other

companies and individuals to perform functions on our behalf," including for "analyzing data,"

and that Amazon must give those service providers "access to personal information needed to

perform their functions, but [they] may not use it for other purposes."  Rouhi-Exs-N1-N6.  In

addition, Amazon maintains Alexa FAQs with answers for all manner of inquiries that users may

have about Alexa, including recording practices and settings, use of human review to improve the

service, and users' ability to review and delete recordings.  *See* Rouhi-Exs-T1-T26.  Amazon also

introduced the "Privacy Hub" to consolidate all Alexa privacy information into one convenient

resource.  Rouhi Decl. ¶73-Ex-O.

Alexa, and Amazon's recording practices, have been the subject of countless stories from

mainstream national publications (e.g., *Time*, *NPR, The Washington Post, The Wall Street*

*Journal)*, and countless local newspaper, radio, and television outlets have similarly reported on

Alexa's creation and retention of voice recordings.  Chan Decl. ¶¶66-72-Exs-47-52.  In short, the

1  fact that the Alexa service records users' interactions, and that Amazon uses those recordings to
2  improve the service, has been widely publicized, disclosed, and known for years.

3      **D.**    **Improvements To The Alexa Service**

4      At several points during this lawsuit, Plaintiffs have suggested that Amazon sells voice
5  recordings to third parties. It categorically does not. Rouhi Decl. ¶21. There is no evidence of
6  Amazon selling or otherwise "monetizing" Alexa recordings.

7      Instead, consistent with Amazon's Alexa Terms, Privacy Notice, and other disclosures,
8  Amazon uses voice recordings to improve Alexa, so that it performs as intended across a limitless
9  array of environments, acoustic scenarios, accents, and dialects. Rouhi Decl. ¶¶22-24. ███████

10 █████████████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████ *Id.* Across *all*

12 recordings from Plaintiffs' households, ███████████████████████████████████

13 ████ Rouhi Decl. ¶¶125-127-Ex-II. ██████████████████████████████████████

14 ████████████████████████████████████ Chan Decl. ¶48-Exs-25-29. Customers can

15 opt out of human review. *Id.* ¶25. ██████████████████████████ *Id.*

16     **E.**    **Plaintiffs' Individual Experiences**

17     After extensive discovery, the undisputed facts show that all Plaintiffs knew how Alexa
18 works. For example, Hoyt testified that he understood that Alexa works like a "search engine"
19 operating over the Internet, Nercessian Decl. ¶14-Ex-59 (28:13-21, 58:17-25), ████████████

20 █████████████████████████████████████████████████████████████████████████

21 █████████████████████████████████████████████████████████████████████████

22 █████████████████████████████████████████████████████████████████████████

23 ██████████████████████████████████████████████████ *id.* ¶15-Exs-60-61 (139:25-

24 141:24, AMZ_GARNER_AU_00013943); Chan-Ex-30. Similarly, Babani admitted that he
25 understood that his Alexa commands were recorded, and that it is "fair" for Amazon to review
26 recordings for quality assurance purposes and improvement. Nercessian Decl. ¶¶105-107-Ex-99
27 (130:14-22, 153:14-18, 154:5-12) ("For the scope of performing its function it has -- it has to save
28 something. So I don't object to the fact that it would save something."); *see also id.* ¶49-Ex-72

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 9 -

**FENWICK & WEST LLP**
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

(123:1-16) (Mrs. McNealy, admitting she understood the fact of recording);[1] ¶¶91-92-Ex-96 (108:24-109:3) (Garner, admitting that it "would make sense" that Alexa had to record her inputs in some form to respond to her requests).  And Brust saw news stories and social media posts reporting that Amazon makes and retains Alexa recordings and uses human review to improve the service.  Chan-Ex-2 (18:19-20, 23:22-24).  Despite this knowledge, none of the Plaintiffs changed their use of Alexa, reflecting that they were clearly unconcerned about any privacy implications.

None of Plaintiffs testified that they read or even inquired about the Alexa privacy policies and myriad disclosures about Alexa, which were all public and widely available.  Nercessian Decl. ¶11-Ex-59 (55:13-59:9, 94:4-96:23) and Ex-60 (207:23-208:6, 216:19-217:1), ¶47-Ex-71 (69:11-25, 70:1-8, 74:25-75:6) and Ex-72 (71:15-25, 94:7-16, 101:3-7), ¶66-Ex-81 (74:13-19, 97:22-98:13) and Ex-82 (59:6-8, 61:14-20, 76:5-7, 76:19-21, 78:20-79:17), ¶79-Ex-90 (95:17-97:20, 123:10-20, 179:4-182:7), ¶87-Ex-96 (61:1-25), ¶104-Ex-99 (84:15-22), ¶114-Ex-106 (75:18-76:5); *see also id.* ¶12-Ex-60 (51:6, 106:5, 106:19, 107:2, 108:16, 109:8, 113:2-3, 134:21) (Ms. Tesoriero, testifying eight times that she "didn't read the manual," even though it was available).

Finally, Plaintiffs all were aware of Alexa privacy settings and features that could address any purported concerns, but chose not to use them.  *See, e.g.*, Nercessian Decl. ¶17-Ex-59 (70:21-72:2) and Ex-60 (45:12-23, 49:9-15, 53:15-54:1) (Plaintiffs Hoyt and Tesoriero, admitting they understood microphone-off function), ¶113-Ex-106 (72:20-22, 73:9-10, 73:17-74:3) (Watkins, admitting that she knew about but did not use the microphone-off button); *see also* Chan-Exs-35-36 (Hoyt-Tesoriero privacy settings).  Even after filing suit, Plaintiffs *continued* enjoying the benefits of the Alexa service.  Chan-Ex-3 (24:9-10), Ex-4 (21:15-19), Ex-5 (21:2-22:7), Ex-6, (21:8-22:6), Ex-7 (22:1-8); Nercessian Decl. ¶10-Ex-59 (67:5-8) and Ex-60 (21:15-19), ¶50-Ex-71 (89:15-24) and Ex-72 (248:8-20), ¶81-Ex-90 (46:16-48:21), ¶93-Ex-96 (178:16-179:7), ¶119-Ex-106 (172:20-173:3); *see also* Chan-Exs-32-34 (Plaintiffs Jodi Brust, Kaeli Garner, and Diane McNealy's Responses to RFA Nos. 3-6); Nercessian-Exs-57-58, Ex-69, Ex-83, Ex-98, Ex-104

---

[1] At 3:30pm today, Plaintiffs' counsel informed Amazon that Mrs. McNealy passed away.  Given the timing, Amazon was unable to make changes to its papers to address this development.

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 10 -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

1  (Plaintiffs Jeffrey Hoyt, Lorlie Tesoriero, Michael McNealy, Ronald Johnson, Ricky Babani, and

2  Caron Watkins's Responses to RFA Nos. 3-6).

### LEGAL STANDARD

4      A motion for summary judgment must be granted "if the movant shows that there is no

5  genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

6  Fed. R. Civ. P. 56(a). Facts are only material if they affect the outcome of the action. *Anderson*

7  *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A defendant can prevail on summary judgment

8  by establishing the absence of evidence sufficient to support the plaintiff's claims. *Celotex Corp.*

9  *v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the plaintiff to present evidence

10  that creates a triable issue of material fact. *Houserman v. Comtech Telecomm. Corp.*, 2021 WL

11  366006, *2 (W.D. Wash. Feb. 3, 2021). The Court need not "scour the record in search of a

12  genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). There are no

13  genuine issues here and Amazon is entitled to summary judgment.

### ANALYSIS

15  **I.    PLAINTIFFS HAVE NO VIABLE WCPA CLAIMS.**

16      Under the WCPA, a plaintiff must establish (1) an unfair or deceptive act or practice,

17  (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's

18  business or property, and (5) causation. *E.g.*, *Panag v. Farmers Ins. of Wash.*, 166 Wn.2d 27, 37

19  (2009). A "finding that any element is missing is fatal to the claim." *Haywood v. Amazon.com,*

20  *Inc.*, 2023 WL 4585362, *8 (W.D. Wash. July 18, 2023).

21      The Court allowed Plaintiffs' WCPA claim to proceed past the pleading stage based on

22  three alleged "misrepresentations and omissions": (1) that Amazon intentionally designed Alexa-

23  enabled devices "to intercept and record conversations even before a wake-word is uttered" and

24  made false "representations regarding the rarity of 'false-wakes'"; (2) that Amazon "retains (and

25  sometimes discloses) false wake recordings" even when it "knows that a particular communication

26  was recorded in the absence of a wake-word"; and (3) that, before November 2020, Amazon

27  allegedly "failed to accurately describe what it does with voice interactions," including that it

28  "permanently stores audio recordings made by Alexa devices and transcripts of those

communications, transmits the communications internally and to third parties, and reveals the communications to human reviewers (sometimes with identifying information still attached)." MTDO at 20-21. As discussed below, extensive discovery has established that all of these allegations are false; there is no evidence that Amazon acted unfairly or deceptively.

But even if Plaintiffs could establish an unfair or deceptive act, *they have not been harmed*. The Court allowed Plaintiffs to proceed past the pleading stage based on two potential theories of injury: (1) "that they paid more for their Alexa devices than they would have" had they known how Alexa actually worked (a "price-premium" approach); and (2) that Amazon "monetized plaintiffs' personal data for its own commercial benefit without payment ...." MTDO at 21-22. Now that discovery is complete, it is clear that neither of these theories is viable. Plaintiffs abandoned any price-premium approach in their class certification motion. *See generally* Dkt. 255. And there is no evidence that Amazon sold or otherwise "monetized" their voice recordings. More fundamentally, while Plaintiffs claim harm from false-wakes and human review, no Plaintiff was negatively impacted by either phenomenon. As addressed further below, Plaintiffs have not identified a single false-wake recording that captured anything remotely private, sensitive, or troubling. █████████████████████████████████████████████

████████████████████████████████

### A.    Amazon Did Not Act Unfairly Or Deceptively.

Where (as here) the material facts are undisputed, whether a particular action constitutes "unfair or deceptive" conduct is a question of law. *Greenberg v. Amazon.com, Inc.*, 553 P.3d 626, 649 (Wash. 2024); *see, e.g., Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 131 Wn.2d 133, 150 (1997) (collecting cases).

A practice is "unfair" under the WCPA if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and is not outweighed by countervailing benefits" to consumers or to competition generally. *Alpert v. Nationstar Mortg., LLC*, 2019 WL 1200541, *6 (W.D. Wash. Mar. 14, 2019) (quotation omitted) (dismissing WCPA claim on summary judgment where defendant disclosed force-placed insurance requirement, which plaintiff could have avoided by choosing other insurance); *accord Greenberg*, 553 P.3d

at 641. "[E]xercising a right that a contract permits and is fully disclosed to the parties in advance is not an unfair or deceptive act or practice." *Haywood*, 2023 WL 4585362 at *7 (collecting cases).[2]

Courts have repeatedly dismissed WCPA claims against Amazon because its terms and public disclosures authorize, and notify consumers of, the challenged practices. For example, in *Gray v. Amazon.com, Inc.*, 653 F. Supp. 3d 847, 858 (W.D. Wash. 2023), *aff'd*, 2024 WL 2206454 (9th Cir. May 16, 2024), plaintiffs challenged Amazon's alleged "use of Alexa-captured voice data for advertising purposes." The court found that, even if that allegation were true, it was not "unfair" because Amazon's terms "do not conceal … but instead contemplate that very practice." *Id.* In *Marquez v. Amazon.com, Inc.*, 69 F.4th 1262, 1275 (11th Cir. 2023), the Eleventh Circuit affirmed dismissal of a WCPA claim challenging Amazon's suspension of "Rapid Delivery" as an Amazon Prime benefit. The court found that "Amazon's discretionary authority to suspend" Prime benefits "was made exceedingly clear," and that the governing Prime Terms "were easily accessible and straightforward." 69 F.4th at 1274-75. Similarly, in *In re Amazon Service Fee Litig.*, 2024 WL 3460939 (W.D. Wash. July 18, 2024), Judge Lin (twice) dismissed a WCPA claim based on Amazon's removal of free Whole Foods grocery delivery as a Prime benefit, because the Prime Terms "expressly authorize the addition or removal of Prime benefits" and that was "disclosed to Plaintiff and to all Prime subscribers prior to their enrollment." *Id.* at *9. Thus, "any surprise or harm from the modification of [Prime] benefits was 'reasonably avoidable'" by plaintiffs, who "could have read the T&C and chosen not to subscribe if they were unfavorable" (regardless of whether they actually read those terms). *Id.* (discussing *Gray*, 653 F. Supp. 3d at 858); *see also Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168-69 (9th Cir. 2012) (no "unfair" practice under California UCL where credit card company disclosed annual fee).

An act is "deceptive" under the WCPA "if there is a representation, omission or practice that is likely to mislead a reasonable consumer." *Gray*, 653 F. Supp. 3d at 858 (quotations and citations omitted). To determine deceptiveness, courts examine whether the challenged "act has

---

[2] There is no per se WCPA violation at issue in this case because the WPA does not declare violations of the statute to be per se unfair or deceptive acts. *Greenberg*, 553 P.3d at 638.

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 13 -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

1   the capacity to materially deceive a substantial portion of the public." *Smale v. Cellco P'ship*, 547
2   F. Supp. 2d 1181, 1188 (W.D. Wash. 2008).  As a matter of law, a practice is not deceptive when
3   a company provides reasonable notice of that practice to the public.  *See Marquez*, 69 F.4th at
4   1275; *HB Dev., LLC v. W. Pac. Mut. Ins.*, 86 F. Supp. 3d 1164, 1187 (E.D. Wash. 2015) (granting
5   summary judgment on WCPA claims because the pertinent disclosures were clear).

6       When evaluating a company's disclosures, "[p]erfection is not the standard."  *Marquez*,
7   69 F.4th at 1275 (quoting *Keithly v. Intelius Inc.*, 764 F. Supp. 2d 1257, 1269 (W.D. Wash. 2011),
8   *on reconsideration*, 2011 WL 2790471 (W.D. Wash. May 17, 2011)).  For example, in *Smale*,
9   plaintiffs asserted a WCPA claim against Verizon for allegedly failing to disclose an "Effect of
10  City Tax" fee.  547 F. Supp. 2d at 1183.  The court held that Verizon's conduct was not deceptive
11  (or unfair) because its customer agreement unambiguously disclosed that Verizon generally
12  "reserves the right to assess additional fees related to its governmental costs."  *Id.* at 1185-88.
13  Even though Verizon "d[id] not expressly disclose an Effect of City Tax charge," the court
14  concluded that "any reasonable consumer reading the Agreement would realize that Verizon
15  reserved the right to assess surcharges (however named) that are 'related to' its governmental
16  costs."  *Id.* at 1186.

17      The following subsections address each of the allegations the Court cited in its dismissal
18  order as surviving bases for Plaintiffs' WCPA claims.  None of those allegations are supported by
19  the evidence.

**1.    Alexa Was Not Designed To Secretly Record.**

21      As an initial matter, there is *no* evidence that Alexa can "intercept and record conversations
22  even before a wake-word is uttered."  MTDO at 20.  Plaintiffs made that allegation with no good-
23  faith basis or factual support.  Alexa-enabled devices monitor only for an acoustic pattern that
24  matches the wake-word, and they do not activate until that pattern is detected.  They then transmit
25  a split-second of audio before the wake-word, a fact Amazon has disclosed since Alexa's launch.
26  Fresko Decl. ¶23.  But there is *no* evidence that Alexa *ever* captured any Plaintiff's "conversation"
27  or other communication in that way, and certainly not that Alexa was *designed* to function in that
28  manner.

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL
- 14 -
FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

To the contrary, the undisputed evidence shows that Amazon designed Alexa specifically *not* to record any communications that are not directed at the service. *See* Fresko Decl. ¶¶19-29; *see also* Nercessian Decl. ¶¶121-125-Exs-110-113 ███████████████████ ██████████████████████████████████████████ Amazon built many safeguards into Alexa-enabled devices and the Alexa service to prevent accidental activations: a clear and conspicuous "mute" button that electrically disconnects the microphone and prevents any recording; the ability to change the wake-word for convenience or preference; visual indicators that signal when the device is activated (blue) or muted (red); optional tones that signal when the device is activated; reduction in the volume of any other audio playing on the device when it is activated; an additional, more powerful layer of wake-word detection in the cloud that terminates the audio stream, and truncates the recording, whenever it suspects a false-wake; and a Voice History feature for Alexa households to see any audio streamed to Alexa (including recordings labeled "Audio Was Not Intended For Alexa"), with settings for manual or automatic deletion of recordings. *See* Rouhi Decl. ¶¶4-19-Exs-D-H; Fresko Decl. ¶¶19-29. And Alexa users can choose not to retain recordings at all, ███████████████████ Rouhi Decl. ¶18.

These features all undermine any reasonable suggestion that Amazon designed Alexa to transmit or record private conversations or communications. Nor is there any genuine dispute that false-wakes are exceedingly rare, ███████████████████████ Canty-Ex-E (Vitaladevuni Depo. at 160:17-162:1). Moreover, many Alexa activations identified as false-wakes—i.e., as "Audio was not intended for Alexa"—are not in fact "false." As Plaintiffs' own depositions clearly established, many so-called "false-wakes" *actually contain the wake-word*. *See, e.g.*, Nercessian Decl. ¶116-Ex-106 (146:20-149:24). Discovery also contradicted Plaintiffs' allegations of purported "surreptitious recordings" in their complaint. For instance, Tesoriero admitted that the recording she identified in the FACC as a "conversation between Mr. Hoyt and Ms. Tesoriero"—which allegedly "was not intended for Amazon" because "no wake-word was used"—did in fact include the wake-word, not once but *twice*. Nercessian Decl. ¶25-Ex-60 and Ex-66 (117:11-122:4, AMZ_GARNER_AU_00013643). Indeed, Tesoriero herself admitted that "[t]he command 'Alexa' has to be clear in order for it to respond." *Id.* ¶19-Ex-60 (117:6-7).

### 2.    Amazon Did Not Intentionally Keep Communications That Plaintiffs Did Not Intend for Alexa.

The record also refutes any contention that Amazon intentionally retained any of Plaintiff's private communications that it *knew* resulted from false-wakes.  Alexa's automated wake-word detection algorithms are based on probabilistic models that rely on "best guess" determinations that are not perfect.  Fresko Decl.  ¶¶7-8, 28.  The label "Audio was not intended for Alexa" is merely a label based on that algorithmic guess, and it is conservative and often wrong.  Indeed, in depositions, Plaintiffs themselves listened to recordings that had been labeled by Amazon as audio "not intended for Alexa" and acknowledged that those recordings were either intentional commands or clearly contained the wake-word.  *See, e.g.*, Nercessian Decl. ¶24-Ex-59 (148:3-150:13),  ¶76-Ex-90  (225:16-229:23), ¶102-Ex-99  (79:1-11),  ¶117-Ex-106  (146:20-149:24); Chan-Ex-7 (163:3-164:13).  In other words, Plaintiffs' Alexa-enabled devices were functioning exactly as they expected.

Amazon cannot know whether a recording actually contains a wake-word without reviewing the recording, and only a tiny fraction ███ of Alexa recordings undergo anonymized human review as part of Amazon's machine learning processes.  Rouhi Decl.  ¶¶22-23.  None of Plaintiffs' recordings marked as "not intended for Alexa" were reviewed (except by counsel in this litigation).  Which is all to say that Amazon does not systematically or intentionally retain recordings that it *knows* were made accidentally, and it did not do so with *any* of Plaintiffs' recordings.

More to the point, Plaintiffs' theories ignore—or, worse, seek to weaponize—Amazon's commitment to provide Alexa users with complete visibility into their Alexa use and access to their inputs, intentional or not.  Retaining recordings and making them available to users is a *feature* of Alexa, not a bug or defect.  The vast majority of users *want* that feature and *want* to see their Alexa history (as they would their Internet search history), as evidenced by the fact that ████████████████████████████████████████ Rouhi Decl. ¶18.  If a user listens to a recording, determines that it is a true false-wake, and does not want to retain that audio,

the user can simply delete the recording.  The ability to determine which wakes are truly "false," and whether the user should keep a copy, resides entirely with the user.

### 3.    Amazon Widely Disclosed Its Recording Practices.

Finally, it simply is not true that, before November 2020, Amazon failed to adequately disclose its practices for storing and using Alexa recordings.  To the contrary, the record shows that Amazon widely disclosed how it makes and uses Alexa recordings—including the possibility of false-wakes and human review—and specifically advised Plaintiffs' households of these practices upon registration of their Alexa-enabled devices.  Fresko Decl. ¶¶52-84-Exs-MM-SS; Rouhi-Exs-M1-T26 (collected Amazon terms and disclosures about Alexa since its launch); *see also, e.g.*, *Gray*, 653 F. Supp. 3d at 858.  Since before Alexa launched, Amazon has always disclosed in its Privacy Notice that it retains and uses customers' data, and might rely on humans, including sometimes third-party contractors, to "analyze data," in order to improve and personalize its services.  *See* Rouhi-Exs-N1-N6 (collected versions of Privacy Notice, with effective dates as early as 03/03/2014) ("Does Amazon.com Share the Information It Receives?" / "Does Amazon Share Your Personal Information?").  Amazon has always disclosed in the Alexa Terms that it retains Alexa users' *voice inputs* to improve and personalize the service.  *See* Rouhi-Ex-M1 (Alexa Terms, effective 06/25/2015).  And Amazon has always told users in the Alexa FAQs that they can review and delete their recordings and transcripts in the Alexa app, and how to "reasonably avoid" being recorded accidentally (e.g., by changing the wake-word or muting the microphone on their device).  Rouhi-Ex-T1-T26 (collected Alexa FAQs, captured 11/09/2014 through 03/01/2022).

With respect to human review of Alexa recordings specifically, in 2019 Amazon added even more detailed disclosures to the Alexa FAQs:

> Alexa is designed to get smarter every day.  For example, we use your requests to Alexa to train our speech recognition and natural language understanding systems using machine learning.  Training Alexa with real world requests from a diverse range of customers is necessary for Alexa to respond properly to the variation in our customers' speech patterns, dialects, accents, and vocabulary and the acoustic environments where customers use Alexa.  This training relies in part on supervised machine learning, an industry-standard practice where humans review an extremely small sample of requests to help Alexa understand the correct interpretation of a request and provide the appropriate response in the future.  For example, a human

reviewing a customer's request for the weather in Austin can identify that Alexa misinterpreted it as a request for the weather in Boston. Our supervised learning process includes multiple safeguards to protect customer privacy.

Rouhi-Ex-T18. The media has also extensively reported on the fact that some Alexa recordings undergo human review since at least 2019. Chan Decl. ¶¶69-72-Exs-49-52. This has never been a secret, and there is *no* evidence that any of Amazon's practices with respect to machine learning and human review are inconsistent with its public disclosures.

At the dismissal stage, the Court was compelled to credit Plaintiffs' allegation that Amazon "reveals the [Alexa] communications to human reviewers (sometimes with identifying information still attached)." MTDO at 21. That mischaracterizes the facts. In reality, ██████████

████████████████████████████████████████

██████ Rouhi Decl. ¶¶23-24. Throughout that process, Amazon implements strict measures to protect user privacy, including randomly selecting recordings for annotation, anonymizing those recordings to disconnect them from their accounts and remove user-identifying information, and making the recordings available only through secure computers to prevent dissemination or misuse. *Id.* at ¶125. Amazon "limit[s] the information available to individuals who are assigned transcription and annotation tasks" and "use[s] multi-factor authentication to restrict access, service encryption, and audits of our control environment to protect it." Fresko-Ex-LL at AMZ_GARNER_00048012-13. "Only those who have an approved need to access certain data to accomplish their job are given access to that data—access is granted via specific, audited permissions and access to customer data requires review and approval by the responsible managers." *Id.* In all events, human review had *no* harmful impact on *Plaintiffs*. ██████████

████████████████████████████████████████

████████████████████████████████████ *See* Chan Decl. ¶48-Exs-25-29; Rouhi Decl. ¶¶125-127-Ex-II.

Any alleged injury also was "reasonably avoidable by [Plaintiffs] themselves." *Alpert*, 2019 WL 1200541 at *6. The record shows that Amazon told Plaintiffs "what [they] were doing, why they were doing it, and how Plaintiff[s] could stop what was being done." *Id.* at *7. The WCPA does not require more. Plaintiffs could easily have changed their Alexa settings to disable

the storage of voice recordings (whether intentional or not), but none did. *See Gray*, 653 F. Supp. 3d at 858-59 ("In light of Amazon's disclosures, consumers would have 'reason to anticipate' their injury and 'the means to avoid it'—i.e., by reviewing the Alexa Terms and declining to purchase and use an Alexa-enabled device."). In sum, Plaintiffs knew that the Alexa service recorded when activated and knew that recordings could sometimes occur by accident. They also knew they could review their recordings to see if any false-wakes had ever occurred, knew they could delete any such recordings, and knew they could configure the Alexa service not to store recordings at all – but did not take any of those steps. By continuing to use Alexa with this knowledge, Plaintiffs consented to its functionality. Thus, on the first element alone, Plaintiffs' WCPA claims fail.

### B.      Plaintiffs Suffered No Injury Caused By Amazon.

A WCPA "plaintiff must suffer injury to his 'business or property;'" any other purported harm is not compensable. *Keyes v. Bollinger*, 31 Wn. App. 286, 295 (1982). Mere embarrassment or inconvenience, or amorphous notions of "privacy" invasions, are "too vague and de minimis to constitute the kind of injury for which the law provides redress." *E.g.*, *Street v. Amazon.com Servs., LLC*, 2022 WL 3683811, *5 (W.D. Wash. Aug. 25, 2022) (dismissing WCPA claim with prejudice). Indeed, to establish even basic Article III standing, "a claimant must present an injury that is concrete, particularized, and actual or imminent." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008). "A concrete injury is one that actually exists, meaning that it is real, and not abstract." *Arizona v. Yellen*, 34 F.4th 841, 848 (9th Cir. 2022) (quotations omitted). Plaintiffs have suffered literally no harm, concrete or otherwise.

In its dismissal order, the Court expressly allowed Plaintiffs to proceed (past the pleading stage) based on two potential theories of harm: (1) a price-premium theory that Plaintiffs overpaid for Alexa-enabled devices; and (2) a theory that Amazon somehow "monetized plaintiffs' personal data for its own commercial benefit." MTDO at 22. Neither theory has evidentiary support.

In their class certification motion, where Plaintiffs described their class-wide damages theory, Plaintiffs and their putative experts abandoned the price-premium theory altogether. *See generally* Dkt. 255. The reasons for that strategic choice are evident: several Plaintiffs (i.e., Tesoriero, Watkins, Babani, and Ronald Johnson) never purchased an Alexa-enabled device, and

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 19 -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

therefore obviously lack standing to pursue a price-premium theory. Nercessian Decl. ¶8-Ex-60 (18:1-19:21), ¶61-Ex-82 (51:15-52:25, 54:17-18), ¶100-Ex-99 (31:24-32:14), ¶111-Ex-106 (56:15-17, 57:21-58:3, 59:4-5). Those Plaintiffs who did purchase Alexa-enabled devices got exactly what they paid for, i.e., unrestricted access to the myriad benefits of Alexa. *See, e.g., Brotherson v. Pro. Basketball Club, L.L.C.*, 604 F. Supp. 2d 1276, 1296 (W.D. Wash. 2009) (no WCPA injury because "plaintiffs took advantage of the benefits of their 2008 season tickets to the greatest extent they could"); *Krakauer v. Recreational Equip., Inc.*, 2024 WL 1494489, *9 (W.D. Wash. Mar. 29, 2024) (plaintiff "received what he bargained for in exchange for the purchase price: a functional raincoat"). No Plaintiff denies that he or she took full advantage of Alexa, and most continue to do so actively to this day.

With respect to Plaintiffs' "monetization" theory, Plaintiffs have no evidence that Amazon "monetizes" Alexa recordings "for its own benefit," because it unequivocally does not. Amazon does not sell Alexa voice recordings to third parties or place any monetary value on individual recordings. Rouhi Decl. ¶¶21, 117-23. Recordings are valuable only in the aggregate to help train the Alexa model, which *benefits* Alexa users by improving Alexa's accuracy and giving them a better product over time than they originally paid for. *Id.* ¶¶21-25. In any event, whether particular data might have value to *Amazon* is irrelevant. "It is not enough to allege only that the information has value to Defendant; the term 'loss' requires that *Plaintiffs suffer a detriment*." *Del Vecchio v. Amazon.com, Inc.*, 2012 WL 1997697, *4 (W.D. Wash. June 1, 2012).

Plaintiffs all admit that they have not lost money or suffered any financial detriment because of Alexa. Plaintiffs have never sold, or even considered selling, their voice recordings. Nercessian Decl. ¶30-Ex-59 (175:2-178:19) and Ex-60 (219:13-221:23), ¶51-Ex-71 (225:16-22, 228:8-23) and Ex-72 (241:18-242:7), ¶70-Ex-81 (203:3-204:4) and Ex-82 (185:20-25, 186:13-20), ¶82-Ex-90 (208:15-213:13, 222:17-24), ¶96-Ex-96 (216:16-218:11), ¶106-Ex-99 (156:10-13), ¶120-Ex-106 (179:14-25, 180:17-181:1, 188:9-189:2). Nor is there evidence of any market where Plaintiffs conceivably could sell their Alexa voice recordings. Plaintiffs' experts say nothing at all on that point. And even if there were some market for recordings, *Amazon's* expert, Lorin Hitt, explained that Amazon's internal use of those recordings would not diminish their value (if any)

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 20 -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

to Plaintiffs; in other words, both uses could coexist. *See* Dkt. 300, Declaration of Lorin Hitt, ¶¶56-59. Plaintiffs have always had *unfettered access* to their Alexa recordings through the Voice History feature (and still do); if those recordings had value, Plaintiffs were free to capitalize on them as they saw fit.

More fundamentally, Plaintiffs themselves were not harmed. As Plaintiffs' theories have evolved (or eroded) over the course of this case, it is clear that their two primary complaints are about false-wakes and human review. *But neither phenomenon negatively impacted Plaintiffs.* The undisputed evidence shows that false-wakes are very rare. Canty-Ex-E (Vitaladevuni Depo. at 160:17-162:1) ████████████ And no Plaintiff identified a *single* true false-wake recording that contained anything remotely private, sensitive, or concerning. The closest they came was an initial assertion by Mr. Johnson that ████████████████████ ████████ Canty-Ex-X, Ex-A at 1 (annotating AMZ_GARNER_AU_00153924). But in his deposition, Johnson admitted that the recording at issue contains no words at all, just a cough, which he could not confirm occurred "after intercourse." Chan Decl. ¶47-Ex-10 (131:1-132:23, 133:17-134:1) and Ex-16. (Even if it had, there is no private information revealed by a cough.) In a similar vein, the FACC alleged that, on August 20, 2020, Amazon recorded a private conversation "not intended for Alexa," in which Mrs. McNealy purportedly discussed her cancer treatment and whether she "was drinking enough water." FACC ¶68. But when she listened to that recording at her deposition, Mrs. McNealy admitted that there was no reference to cancer treatment. Chan-Ex-7 (225:11-226:11).

Similarly, Watkins alleged that Alexa "surreptitiously recorded a personal marital disagreement[,]" FACC ¶73, but when she listened to the recording during her deposition, she admitted that she only heard herself saying "all right, all right" and could not make out anything that her husband said. Nercessian Decl. ¶115-Ex-106 and Ex-107 (166:18-169:25, AMZ_GARNER_AU_00165230) ("today, I don't know what he's saying."). And while Brust initially marked nearly every one of her roughly ████ recordings as "private-confidential," she could not identify a *single* piece of sensitive or private information that was recorded by the Alexa service. Nercessian Decl. ¶82-Ex-90 (208:24-213:8).

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 21 -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

1      None of this is surprising, given that Alexa recordings are only seconds long, and even

2  shorter in the case of a suspected false-wake. Plaintiffs' own experiences consistently

3  demonstrated that these short snippets of audio contain no sensitive or private information

4  whatsoever, a fact readily apparent to anyone who reviews any purported false-wake recordings.

5  Amazon has submitted a sampling of Plaintiffs' recordings (Chan-Exs-12-29; Nercessian-Ex-61,

6  Exs-64-67, Ex-70, Exs-73-77, Exs-79-80, Exs-84-89, Exs-91-95, Ex-97, Exs-100-101, Ex-103,

7  Ex-105, Exs-107-108), so that the Court may listen and judge for itself.

8      Human review had even less of an impact on Plaintiffs. Across *all* Plaintiffs and *all*

9  recordings from their households, ████████████████████████████████████

10  ████████████  Rouhi Decl. ¶¶125-127-Ex-II. ████████████████████

11  ████████████████████████████████████████████████

12  ████████████████████████  Chan Decl. ¶48-Exs-25-29. Thus, even if human review

13  posed some theoretical privacy risk (which the evidence does not remotely support), that risk never

14  materialized for Plaintiffs.

15      Because Plaintiffs cannot show any injury to their "business or property," their WCPA

16  claims fail on this element as well.

## II.    THE UNREGISTERED PLAINTIFFS HAVE NO VIABLE WIRETAP CLAIMS.

18      Only the Unregistered Plaintiffs assert wiretap claims. Four of the Plaintiffs who purport

19  to be Unregistered are in fact Registered. The remaining Unregistered Plaintiffs' wiretap claims

20  all fail as a matter of law under Washington law.

### A.    Washington Law Applies To All The Unregistered Plaintiffs' Claims.

22      Washington law applies to all of Plaintiffs' claims. In response to Amazon's motion to

23  dismiss, Plaintiffs conceded as much, arguing that "Washington law likely governs the wiretap

24  claims … under Washington's 'most significant relationship' test" ("MSR test"), which applies in

25  the absence of a choice-of-law provision. MTDO at 8; 9-10 ("In fact, plaintiffs affirmatively argue

26  that Washington has the most significant relationship to the dispute and to the parties."). While it

27  declined to "conduct a choice-of-law analysis with regards to the wiretap claims of unregistered

28  users" (because Amazon did not raise that issue), *id.* at 11 n.5, the Court found unequivocally "that

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 22 -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

1   Washington law applies to the wiretap claims asserted in this case." *Id.* at 9.  Thus, Washington
2   law governs and precludes the Unregistered Plaintiffs' claims under other states' laws.

3   **B.     Kaeli Garner And Ronald Johnson Are Registered Plaintiffs.**

4   As the Court previously ruled, there is a critical difference between Registered and
5   Unregistered Alexa users: Registered users consent to being recorded and, as such, cannot assert
6   wiretap claims.  MTDO at 17, 23.  Plaintiffs Kaeli Garner and Ronald Johnson claim to be
7   Unregistered Alexa users.  FACC ¶¶17, 34, 60, 70.  But the undisputed evidence demonstrates that
8   they are, in fact, Registered.

9   Garner asserts claims based on her use of a roommate's Alexa-enabled device beginning
10  in March 2021.  FACC ¶60.  But in November 2017, Garner bought an Alexa-enabled Fire TV
11  stick on amazon.com, which she registered through her own Amazon account.  Rouhi Decl.
12  ¶124(b)-Ex-CC; Chan Decl. ¶15-Ex-8 (53:8-55:11, 57:10-59:9); Nercessian Decl. ¶85-Ex-96
13  (57:10-59:9, 81:14-83:6).  Thus, Garner agreed to the COUs, Privacy Notice, and Alexa Terms—
14  and thereby consented to recording—both when she purchased the Fire TV stick and when she
15  registered it.  Fresko Decl.  ¶¶58-59, 76-80, Ex-MM, QQ.  She is a Registered Alexa user.

16  Mr. Johnson asserts claims based on use of his wife's Alexa-enabled devices.  FACC ¶70.
17  Notably, Plaintiffs' initial complaint said something else; it stated that Mr. Johnson "lives in a
18  household with an Alexa device registered by himself," while his wife "lives in a household with
19  an Alexa Device registered by someone else."  Dkt. 22, ¶¶29-30.  Consistent with those prior
20  allegations, discovery revealed that Mr. Johnson helped set up an Echo Dot, including plugging it
21  in and connecting smart lightbulbs to it.  Nercessian Decl. ¶64-Ex-81 (67:2-5) and Ex-82 (57:23-
22  59:2, 69:1-9, 70:16-71:1); *see also* Nercessian-Ex-83 (R. Johnson Response to RFA No. 35),
23  Nercessian-Ex-78 (R. Johnson Response to Interrogatory No. 3).  Mr. Johnson also had a personal
24  Amazon account (separate from his wife's), had the Alexa app installed on his smartphone, and
25  "believe[s]" that he could see his household devices through the app.  Nercessian Decl. ¶62-Ex-82
26  (25:9-10, 27:1-11, 28:1-7, 28:11-16, 152:19-21).  Mr. Johnson also created an Alexa voice profile,
27  *id.* ¶65-Ex-82 (77:14-78:9), which is a multi-step process that *requires* the user to accept Amazon's

28

1    terms.  Fresko Decl. ¶¶85-86-Ex-SS.  In short, Mr. Johnson too is a Registered Alexa user who

2    consented to the Alexa Terms.

3        Consistent with the MTDO, the Court should grant summary judgment in Amazon's favor

4    on Garner's and Mr. Johnson's federal and state wiretap claims.  As Registered Alexa users, they

5    consented to being recorded.

### C.    Ms. Tesoriero, Mr. McNealy, And Mr. Johnson Are Bound By Amazon's Terms Through Agency And Equitable Estoppel.

8        The Court's ruling that Registered Alexa users consented to Alexa recordings—including

9    those caused by false-wakes—was based on the Alexa Terms and Amazon's public disclosures

10   about the service.  MTDO at 12-17 & ns. 6-8.  Plaintiffs Ms. Tesoriero, Mr. McNealy, and

11   Mr. Johnson—who purport to be Unregistered Alexa users—all have *spouses* who registered

12   Alexa-enabled devices for their household's use.  As a result, under basic agency and estoppel

13   principles, Plaintiffs Tesoriero, McNealy, and Johnson also are bound by Amazon's terms and

14   subject to the consent those terms require.

### 1.    Agency Binds Plaintiffs' Spouses To Amazon's Terms.

16       Under Washington law, an agent can bind a principal when the agent acts with either actual

17   or apparent authority.  *King v. Riveland,* 125 Wn.2d 500, 507 (1994) (en banc).  "Actual authority

18   exists where 'at the time of taking action that has legal consequences for the principal, the agent

19   reasonably believes, in accordance with the principal's manifestations to the agent, that the

20   principal wishes the agent so to act.'"  *Revitalization Partners, LLC v. Equinix, Inc.*, 2017 WL

21   823291, *4 (W.D. Wash. Mar. 2, 2017) (granting summary judgment on agency) (quoting

22   Restatement (Third) of Agency § 2.01 (2006)).  "Implied authority is actual authority,

23   circumstantially proved …."  *King*, 125 Wn.2d at 507.

24       For Ms. Tesoriero, Mr. McNealy, and Mr. Johnson, the undisputed evidence demonstrates

25   that their spouses acted as their agents and with actual authority in registering household Alexa-

26   enabled devices.  Mr. McNealy, who admits that he is not adept with technology, has his "wife

27   set[] everything up" for him, including the household's computer and SmartTV, as well as his

28   email, iPhone, and Facebook account.  Chan Decl. ¶13-Ex-6 (24:6-8, 24:20-21, 25:18-23, 26:23-

27:5, 27:20-29:20); Nercessian Decl. ¶36-Ex-71 (38:16-17, 47:11-48:1, 77:15-21). The McNealys purchased their first Alexa-enabled device together, Chan Decl. ¶13-Ex-6 (71:13-72:6), and Mrs. McNealy registered two of the household's devices in Mr. McNealy's name. Nercessian Decl. ¶39-Ex-71 (58:11-60:25). She has Mr. McNealy's permission to "use [his] name and do anything she wants" on his behalf with electronic devices and accounts, and he does not "expect her" to ask him first. Chan Decl. ¶13-Ex-6 (77:22-78:7). In fact, Mr. McNealy even directed Mrs. McNealy to program their Echo Plus to connect to different lights, explaining: "If I decided I wanted [a light] in the computer room [] then I would buy a bulb and have her program it." Nercessian Decl. ¶38-Ex-71 (91:10-25).

The same applies for the Hoyt-Tesoriero and Johnson households. Hoyt is responsible for installing and registering the household's devices; as Tesoriero explained, "I'm not very techie, that's why it's his job, he does that stuff." Nercessian Decl. ¶9-Ex-60 (36:23-24); *see also id.* (137:3-6) (testifying that she did not personally review the Alexa instructions because "I have my husband"). For their part, the Johnsons jointly manage their household's technology: it just depends on who "wants to do it." Nercessian Decl. ¶60-Ex-82 (29:6-17). Mr. Johnson plugged in and started the Echo Dot device that his wife registered. Nercessian Decl. ¶64-Ex-82 (57:23-59:2, 69:1-9, 70:16-18); *see also* Nercessian-Ex-83 (R. Johnson Response to RFA No. 35), Nercessian-Ex-78 (R. Johnson Response to Interrogatory No. 3). Mr. Johnson also admitted that his wife set up the Echo Dot in their bedroom *for him*. Nercessian Decl. ¶63-Ex-82 (30:25-31:20).

The Registered Plaintiffs also expressly represented that they have authority to act for their spouses. In the first paragraph, the Alexa Terms state: "By using Alexa, you agree to the terms of this Agreement on behalf of yourself *and all other persons who use Alexa under your account*. If you do not accept the terms of this Agreement, then you may not use Alexa." Rouhi-Ex-M13-M15 (emphasis added). It is irrelevant whether Plaintiffs chose to read, or recall seeing, those terms and disclosures; they are nevertheless bound by them. *See, e.g.*, *Chamber of Com. of the United States v. Bonta*, 62 F.4th 473, 488 (9th Cir. 2023) (collecting cases) ("It has long been established that parties to a contract are generally deemed to have consented to all the terms of a contract they sign, even if they have not read it."). The Court already found that Amazon

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 25 -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

1    adequately advised the Registered Plaintiffs of Alexa's recording practices.  MTDO at 12-17.

2    Those notices therefore are effective against Ms. Tesoriero, Mr. McNealy, and Mr. Johnson as

3    principals of their spouses.  *See Nicosia v. Amazon.com, Inc.* 384 F. Supp. 3d 254, 268 (E.D.N.Y.

4    2019) (consumer was bound by agreements that friend entered when creating Amazon account on

5    her behalf).

6               **2.    Spouses Are Equitably Estopped From Avoiding Amazon's Terms.**

7           Many courts "have held that a third-party user of an account is bound by the terms

8    governing the account."  *Nicosia*, 384 F. Supp. 3d at 272 (collecting cases).  "Equitable estoppel

9    typically applies to third parties who benefit from an agreement made between two primary

10   parties."  *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014).  It precludes

11   someone from "claiming the benefits of a contract while simultaneously attempting to avoid the

12   burdens that contract imposes."  *Mundi v. Union Sec. Life Ins.,* 555 F.3d 1042, 1045–46 (9th Cir.

13   2009) (citing *Comer v. Micor, Inc.,* 436 F.3d 1098, 1101 (9th Cir. 2006)).  In other words, this

14   doctrine "prohibits third-party plaintiffs from having it both ways."  *E.g., All. Bank of Arizona v.*

15   *Patel*, 2013 WL 2432313, *3 (C.D. Cal. June 3, 2013) (citing *Mundi*, 555 F.3d at 1045).

16          Ms. Tesoriero, Mr. McNealy, and Mr. Johnson undeniably enjoyed and benefitted from the

17   use of their household Alexa-enabled devices and authorized their spouses to register those devices

18   on their behalf.  For example, Mr. McNealy acknowledged that he and his wife bought an Alexa-

19   enabled device because it would make life "easier."  Chan-Ex-6 (71:3-12).  Mr. Johnson agreed,

20   testifying that "everyone" in the house used the devices and that he used the Echo Dot in his

21   bedroom *daily* to operate the lights.  Nercessian Decl. ¶69-Ex-82 (40:6-20).  Ms. Tesoriero

22   similarly enjoyed the benefits of the Alexa service, and continued to do so long after filing suit.

23   Nercessian Decl. ¶27-Ex-60 (21:15-19).  Because Tesoriero, McNealy, and Johnson all enjoy the

24   benefits of the Alexa service, they may not "have it both ways" and disavow their spouses' consent

25   to recording.  MTDO at 12-17.  *See also Tice v. Amazon.com, Inc.*, 845 F. App'x 535, 536 (9th

26   Cir. 2021) (plaintiff was bound by spouse's agreement to Alexa Terms); *Nicosia,* 384 F. Supp. 3d

27   at 275 (because "plaintiff knowingly accepted the benefit of [his wife's] contractual relationship

28

with Amazon" by using her account, he was equitably estopped from disclaiming "the arbitration clause that govern[ed] that relationship").

### D.    Consent Bars All The Unregistered Plaintiffs' Wiretap Claims.

As the Court ruled, consent defeats any wiretap claim. MTDO at 12, 17. A recording is illegal under the wiretap laws *only* if it is made without the knowledge or consent of all parties. *See* RCW § 9.73.030(1)(a).[3] Importantly, consent to recording can be either express or *implied*. *See State v. Smith* (*John Smith*), 189 Wn.2d 655, 665 (2017) (defendant impliedly consented to recording by taking "risk" that his call might trigger voicemail; discussing *State v. Townsend*, 147 Wn.2d 666 (2002) (en banc)).[4]

In considering whether the Unregistered Plaintiffs impliedly consented to being recorded by the Alexa service, it is critical to remember that they are not houseguests or mere passersby. Every Unregistered Plaintiff lives in a household with a registered Alexa user who set up Alexa-enabled devices for the household's common use. Every Unregistered Plaintiff regularly uses Alexa-enabled devices to access and enjoy the Alexa service. And, as set forth below, every Unregistered Plaintiff knew or should have known that they would be recorded.

### 1.    Recording Is An Inherent Part Of The Technology.

For wiretap purposes, implied consent can be established where recording is an "inherent" part of the technology at issue. *Townsend*, 147 Wn.2d at 676. Courts have applied this principle to hold that users of digital communications—which by their very nature must be captured by the machines to which they are directed—impliedly consent to recording by the recipient. In *State v.*

---

[3] Consent defeats claims under the other states' wiretap laws and the FWA, as well. Cal. Pen. Code §§ 631(a), 632(a); Fla. Stat. § 934.03(2)(a).3(d); Md. Code Ann., Cts. & Jud. Proc. § 10-402(c)(3); N.H. Rev. Stat. § 570-A:2(I); 18 Pa. Cons. Stat. § 5704(4); 18 U.S.C. § 2511(2)(d). In fact, "under California law, the plaintiff bringing a CIPA claim has the burden to prove that the defendant lacked consent to record" as an affirmative element of the claim. *In re Google Assistant Privacy Litig.*, 457 F. Supp. 4d 797, 828 (N.D. Cal. 2020) (quotation omitted).

[4] All the wiretap laws that Plaintiffs invoke recognize implied consent. *In re Google Inc. Gmail Litig.*, 2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) (FWA, CIPA, Maryland, and Florida laws) (consent may be "inferred from surrounding circumstances"; denying class certification because consent inquiry was too individualized); *Adams v. Sec'y, Dep't of Corr.*, 2011 WL 202998, *11 (M.D. Fla. Jan. 20, 2011) (Florida); *People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Maryland, Inc.*, 2018 WL 6324806, *2 (D. Md. Dec. 3, 2018) (Maryland); *State v. Lott*, 879 A.2d 1167, 1171 (N.H. 2005) (New Hampshire); *Commonwealth v. Byrd*, 661 Pa. 85, 98 (Pa. 2020) (Pennsylvania); *United States v. Van Poyck*, 77 F.3d 285, 292 (9th Cir. 1996) (FWA).

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 27 -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

*Racus*, 7 Wn. App. 2d 287 (2019), the court held that a criminal defendant impliedly consented to the recording of emails and text messages he exchanged with a detective because he "had to understand that computers are message recording devices and that his text messages [and e-mails] with 'Kristl' would be preserved and recorded on a computer." *Id.* at 300; *accord State v. Glant*, 13 Wn. App. 2d 356, 364-66 (2020) ("Glant had to understand that computers and phones are message recording devices and that his e-mails and text messages with Hannah would be preserved."). Implied consent exists in these circumstances because "[a]ny reasonably intelligent person, savvy enough to be using the Internet … would be aware of the fact that messages are received in a recorded format, by … the very act of sending a communication over the Internet …." *Commonwealth v. Diego*, 119 A.3d 370, 376 (Pa. Super. 2015) (quoting *Commonwealth v. Proetto*, 771 A.2d 823, 829 (Pa. Super. 2001), *aff'd*, 575 Pa. 511 (Pa. 2003)); *accord State v. Lott,* 879 A.2d 1167, 1170-71 (N.H. 2005) (concluding a user impliedly consents to recordings where such recordings are an "inherent function" of an internet communication, or when communicating with a computer that is known to be capable "of being used as a recording device"); *State v. Moscone*, 13 A.3d 137, 145 (N.H. 2011) (same for "instant messaging technology"). *See also, e.g.*, *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, *3 (N.D. Cal. Oct. 23, 2019) (no wiretapping when a computer records a communication directed to it).

The Alexa service is no different. Alexa instructions and questions are merely commands to a computer. It is inherent—and obvious to the reasonable person—that a command to an online computer service must be recorded in memory to be processed. *Townsend*, 147 Wn.2d at 676. The fact that those commands are delivered by voice (rather than typed or swiped) is incidental; in fact, the same commands can be typed through the Alexa app. It makes no sense that typing "Alexa, set a five-minute timer" is legal and totally innocuous, but speaking the same phrase creates legal liability. And it should not be overlooked that Alexa's innovative voice-interface impacts not just convenience but accessibility, because some people are unable to type or write.

In its dismissal order, "[d]rawing all reasonable inferences in favor of plaintiffs," the Court distinguished *Townsend* based on Plaintiffs' allegation that "Alexa could process interactions locally on the device." MTDO at 17-18. The undisputed evidence shows that allegation to be

- 28 -

false.  Amazon developed Alexa to leverage the power of the cloud and provide all Alexa users with access to the latest technology and features, without customers having to upgrade their hardware.  Fresko Decl. ¶¶45-50.  Thus, a consumer can buy a $22 Echo Dot and have access to all of Alexa, including every improvement to the service over time, because the service exists in the cloud.  And many of the resources Alexa users draw on (weather, news, music) exist only online; not even the most powerful personal computers can perform locally all the features Alexa delivers.  Since late 2020, certain Alexa-enabled devices have allowed for more processing functionality on the device itself.  Fresko Decl. ¶51.  But even with those devices, most of what the Alexa service is able to deliver must occur in the cloud, with the benefit of much more powerful cloud-computing resources.  *See* Fresko Decl. ¶¶35-50.  Plaintiffs have no evidence to the contrary.

More to the point, for wiretapping purposes, whether the recording occurs on the device or in the cloud is a distinction without a difference.  It is inherent and commonsense that a computer command must be recorded to be processed.  A voice command must be captured, turned into written words (a transcript), and translated and processed by a computer to return a response.  In its dismissal order, the Court noted that "Amazon may ultimately be able to show that recording of the oral communication is essential to the functioning of the product …."  MTDO at 18 n.9.  Amazon has done so.  Fresko Decl. ¶6. ██████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

### 2.    Amazon's Disclosures Create Implied Consent.

Implied consent applies (among other circumstances) "when another party has announced in an effective manner that the conversation would be recorded" or "when the party knows that the messages will be recorded."  *Townsend*, 147 Wn.2d at 675 (internal citations omitted); *see also, e.g.*, *Lott*, 879 A.2d at 1170 (approving *Townsend*, and holding that defendant "implicitly consented to the recording" of instant messages under the New Hampshire wiretap statute as a

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 29 -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

1   matter of law); *accord Commonwealth v. Maccini*, 2007 WL 1203560, at *3 (Mass. Super. Apr.

2   23, 2007) (applying *Townsend* to reach same holding under Massachusetts's similar all-party-

3   consent wiretap statute).   In *Townsend*, defendant used an Internet chat service whose public

4   privacy policy "advised users such as Townsend that if they did not wish to be subjected to the

5   risks of recording, they should not use the software."   147 Wn.2d at 678.   Even though "no

6   evidence was presented at trial establishing that Townsend had acquainted himself with the ICQ

7   privacy policy," the Washington Supreme Court found that the policy put him on notice of the

8   "possibility" of recording and he impliedly "took a risk that his messages might be recorded." *Id.*

9        As the Court already observed, Amazon's disclosures—all of which are publicly available

10  and easily accessible on Amazon's website—advised Plaintiffs and everyone else, in many places

11  and many ways, about Alexa's recording practices.   MTDO at 12-17.   Amazon provided those

12  extensive disclosures not only in terms and policies, like the Alexa Terms and Privacy Notice, but

13  also in user-friendly FAQs covering "topics such as 'How are my voice recordings used?' and

14  'How do my voice recordings and text transcripts improve Alexa?'" *Id.* at 14-15 n.8. ████

15  ████████████████████████████████████ Bogusz Decl. ¶¶7-8.   In them, Amazon

16  discusses the fact that Alexa records and processes recordings in the cloud, the possibility of false-

17  wakes, and how users can access or delete their recordings or change their privacy settings.   *See,*

18  *e.g.*, Rouhi-Ex-M3 (2/2/2016 Alexa Terms) at §1.3 ("Alexa processes and retains your voice input

19  and other information, such as your music playlists and your Alexa to-do and shopping lists, in the

20  cloud to respond to your requests and improve our services. Learn more about these voice services

21  including how to delete voice recordings associated with your account"); Rouhi-Ex-T9 (FAQs,

22  captured 12/13/2016) at Q2 ("Alexa uses your voice recordings and other information, including

23  from third-party services, to answer your questions, fulfill your requests, and improve your

24  experience and our services"); Fresko-Ex-LL (2019 "Alexa Confidentiality and Data Handling

25  Overview" white paper) at AMZ_GARNER_00048012 ("Amazon uses your requests to Alexa to

26  train our speech recognition and natural language understanding systems using machine

27  learning …. This training relies in part on supervised machine learning, an industry-standard

28  practice where humans review an extremely small sample of requests to help Alexa understand the

1   correct interpretation of a request…"); Chan-Ex-37 (AMAZON-PLTFS_0005139) ███████

2   ████████████████████████████████████████████████████████████████████████████

3   ██████████████████████████████████████████ Alexa-enabled devices also come

4   with manuals explaining how those devices, and the Alexa service generally, work. *See*, *e.g.,*

5   Nercessian Decl. ¶12-Ex-60 (51:6, 106:5, 106:19, 107:2, 108:16, 109:8, 113:2-3, 134:21)

6   (Tesoriero admitting repeatedly that she never read the manual even though it was available).

7        None of these materials are difficult to understand, and all are readily available to anyone

8   through a simple Google search. If that were not enough, since Alexa launched in 2014, the media

9   also has widely reported on Amazon's recording practices and the fact of false-wakes. Chan Decl.

10  ¶¶66-72; Chan-Exs-47-52. That extensive media coverage separately put the Unregistered

11  Plaintiffs on notice of the "possibility" of being recorded when using Alexa, which created implied

12  consent when they continued to use the service. *Townsend*, 147 Wn.2d at 678.

13       **3.    The Unregistered Plaintiffs Understood How Alexa Works.**

14       Given the extensive public information about Alexa's recording functionality, and a

15  commonsense understanding of how computers and the Internet function, it is unsurprising that all

16  the (purportedly) Unregistered Plaintiffs were on notice, and had some knowledge, of Alexa's

17  functionality. They therefore lacked any reasonable expectation of non-recording when they

18  used Alexa.[5]

19            **a.    Tesoriero**

20       Tesoriero testified that she understood that the Alexa service would record her whenever

21  her household Echo Dot detected the wake-word. Chan-Ex-4 (40:7-22); Nercessian Decl. ¶17-Ex-

22  60 (51:7-53:1, 117:6-7, 176:2-177:18). Tesoriero even specifically asked the service, "████████

23  ████████████████████████ and Alexa responded:

24   ███████████████████████████████████████████████████████

25   ███████████████████████████████████████████████████████
     ███████████████████████████████████████████████████████

26

27  ────────────────────
    [5] Even if non-Washington law applied here, that lack of reasonable expectations also would defeat Plaintiffs' claims
28  under the other states' wiretap laws.

1　██████████████████████████████████

2　██████████████████████

3　Nercessian Decl. ¶15-Exs-60-61 (139:25-141:24, AMZ_GARNER_AU_00013943); Chan-Ex-30.

4　In 2018, Tesoriero also created a voice profile, which required her to direct a series of voice

5　prompts to the Alexa service so it could learn her voice and "understand [her] accent," and she

6　configured the service to address her as "Lorlie your highness." Nercessian Decl. ¶20-Ex-60

7　(112:23-113:7, 123:1-127:11). When asked how Alexa possibly could perform those functions

8　and others, like sending voice messages to her husband, *without* recording her voice, Tesoriero

9　(predictably) had no answer. Nercessian Decl. ¶16-Ex-60 (161:11-15, 164:13-165:1). ██████

10　███████████████████████████████████████████

11　███████████████████████████ *See* Rouhi-Ex-AA.

**b.    Garner**

13　　　As explained in Section II.B above, Garner is a registered Alexa user and therefore

14　expressly consented to recording, like the other Registered Plaintiffs. *See* MTDO at 12-17. Garner

15　also testified that she "knew Alexa didn't work unless it was connected to the internet" and

16　understood that it would record her voice inputs as an inherent part of the service. *See* Nercessian

17　Decl. ¶92-Ex-96 (108:17-109:3) ("That would make sense."). And she continued using Alexa

18　after filing this lawsuit. Chan-Ex-34 (Responses to RFA Nos. 3-6).

**c.    Babani**

20　　　In his deposition, Babani testified that "before I was in the house that owned the device"

21　and before ever using Alexa, he understood Alexa's recording functionality and had heard about

22　human review. Chan-Ex-5 (88:20-89:10, 91:4-10, 92:23-93:5, 93:16-19); Nercessian Decl. ¶105-

23　Ex-99 (130:14-22). In fact, Babani *assumed* there would be "someone reviewing the commands

24　to make sure the device is going well." Chan-Ex-2 (93:16-19, 94:2-11). And he admitted that he

25　was "okay with [Amazon] using recordings internally for quality purposes and improvement on

26　the device itself." Nercessian Decl. ¶107-Ex-99 (153:14-154:12). Babani also testified he was

27　aware of the possibility of false-wakes even before his involvement in this lawsuit. Chan-Ex-5

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 32 -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

(86:1-6).  And he too continued using Alexa after filing suit.  Chan-Ex-5 (21:14-16); Nercessian-Ex-98 (Babani Responses to RFA Nos. 3-6).

### d.    Michael McNealy

As explained in Section II.C above, under agency and estoppel principles, Mr. McNealy is bound by Amazon's terms through his spouse, and thereby consented to recording.  Those same facts also independently establish his implied consent to recording, because Amazon advised Mrs. McNealy of Alexa's recording functionality.  The McNealys also continued to routinely use Alexa after this litigation began.  Chan-Ex-33 (Diane McNealy Responses to RFA Nos. 3-6); Nercessian-Ex-69 (Michael McNealy Responses to RFA Nos. 3-6).  Indeed, the McNealys allow their grandson to use Alexa, which belies any suggestion that they have genuine privacy concerns about the service.  Nercessian Decl. ¶50-Ex-71 (191:5-193:9).

### e.    Ronald Johnson

Like Garner, Johnson is a registered user who, per the Court's rulings, expressly consented to recordings.  *See* MTDO at 12-17.  He understood that his household Alexa-enabled devices were connected to the Internet and that they had to record voice commands in some form in order to respond to them.  Chan-Ex-10 (122:2-8); Nercessian Decl. ¶66-Ex-82 (82:4-83:25), ¶68-Ex-82 and Ex-89 (121:23-122:8, AMZ_GARNER_AU_00155962).  Johnson also expressly consented to recording when he asked Alexa to remember his voice by creating a voice profile.  *Id*. ¶65-Ex-82 (77:14-78:9).

### f.    Watkins

Watkins also knew that the Alexa service would record her voice after it detected the wake-word.  She testified that, for the Alexa service to respond, it had to "retain and process" her commands.  Nercessian Decl. ¶113-Ex-106 (99:24-100:3, 100:20-25).  She acknowledged that her voice "[h]ad to be captured and processed in order [for Alexa] to respond, yes." *Id*.  By analogy, she testified that she used her iPhone to send voice notes, and understood that, to send a message, her voice had to be recorded, just like with Alexa.  Nercessian Decl. ¶116-Ex-106 (38:2-39:14).  Despite that knowledge, Watkins also continued using Alexa even after this lawsuit was filed.

1    Nercessian Decl. ¶119-Ex-106 (172:20-173:3); Nercessian-Ex-104 (Watkins Responses to RFA

2    Nos. 3-6).

3         In summary, *every* Unregistered Plaintiff consented—either expressly or impliedly

4    (through notice, their own professed knowledge, or continued use)—to being recorded when they

5    interacted with the Alexa service.  Per the Court's prior rulings, Plaintiffs' consent defeats all of

6    their wiretap claims in this case and ends the inquiry.

7         **E.       Plaintiffs Have No Viable WPA Claims.**

8         It is a violation of the WPA to intercept or record any "private communication … between

9    two or more individuals" or any "private conversation." RCW § 9.73.030(1).  The statute includes

10   no definitions, so its terms retain their plain meanings. *John Smith*, 189 Wn.2d at 662.  The WPA's

11   plain language forecloses liability here; even if there were some ambiguity, because the statute is

12   criminal in nature (RCW § 9.73.080), the "rule of lenity" would still require the Court to resolve

13   that ambiguity in Amazon's favor.  *E.g.*, *Leocal v. Ashcroft*, 543 U.S. 1, 12 n.8 (2004); *accord*

14   *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1134 (9th Cir. 2009).  The lenity rule is "not merely

15   a convenient maxim of statutory construction" but "is rooted in fundamental principles of due

16   process which mandate that no individual be forced to speculate, at peril of indictment, whether

17   his conduct is prohibited." *Dunn v. United States*, 442 U.S. 100, 112 (1979).

18        Neither the text of the WPA, nor any of the case law interpreting it, supports its application

19   to recordings of audio inputs to an automated computer service like Alexa.  *See, e.g.*, *Cousineau*

20   *v. Microsoft Corp.*, 992 F. Supp. 2d 1116, 1129 (W.D. Wash. 2012) (no WPA violation based on

21   Microsoft collecting data inputs directed at Microsoft computers).  For that core reason, Amazon

22   uniformly prevailed in individual arbitrations challenging the Alexa service under the WPA.

23   Chan-Exs-40-46; Nercessian Decl. ¶¶121-127-Exs-109-114.

24        **1.       Intentional Command Recordings Do Not Violate The WPA.**

25        **a.       Alexa Commands Are Not Between Individuals.**

26        To violate WPA Section 1(a), a recorded communication must be "between two or more

27   *individuals*." *Cousineau*, 992 F. Supp. 2d at 1129   ("[T]he WPA requires a communication

28   between at least two individuals").  The Alexa service is not an "individual"—it is an automated

1  computer service operated by Amazon, a corporation.  Neither the Alexa service nor Amazon

2  meets any rational definition of "individual," much less a narrowly construed one.  In fact, the

3  WPA expressly distinguishes between individuals and other legal persons (*e.g.*, "corporations").

4  *See* RCW § 9.73.030(1).  "This suggests that 'individual,' as used in the statute, has a meaning

5  distinct from a corporation or other business entity."  *In re Meta Pixel Tax Filing Cases*, 2024 WL

6  1251350, *8 (N.D. Cal. Mar. 25, 2024) (WPA "does not apply to communications between an

7  individual and a business entity's automated system").  The Legislature would not have separately

8  identified partnerships, corporations, or state agencies in the statute if those organizations were

9  already encompassed within the definition of "individuals."  *State v. Diaz-Barrientos*, 14 Wn. App.

10  2d 1002, *3 (2020) ("Expansion of [WPA's statutory privacy] protections must come from the

11  legislature.").

12      In *Cousineau*, the plaintiff accused Microsoft of violating the WPA by collecting

13  geolocation data from her Microsoft smartphone.  992 F. Supp. 2d at 1119.  Judge Coughenour

14  posited as follows: "[I]f Microsoft intercepted Cousineau's communication, as she argues, with

15  whom was Cousineau communicating?  Without an individual on the other end of her

16  communication (other than Microsoft), the transmission of Cousineau's data cannot be considered

17  a communication under the WPA."  *Id*. at 1129.  That logic applies with equal force here.

18  Intentional commands or requests to Alexa are communications to *Amazon* the corporation and, as

19  such, cannot violate the WPA as a matter of law.  Thus, as a threshold matter, all of the

20  Unregistered Plaintiffs' intentional commands and requests to Alexa drop out under Section 1(a).

21          **b.    Alexa Commands Are Not "Conversations."**

22      WPA Section 1(b) separately makes it unlawful to intercept or record any "private

23  conversation."  RCW § 9.73.030(1)(b).  Alexa commands plainly are not "conversations."  "While

24  the Washington Supreme Court has not specifically defined the term 'private conversation,'

25  it indicated that the term should be construed within its 'ordinary connotation of oral exchange,

26  discourse, or discussion.'"  *Cousineau*, 992 F. Supp. 2d at 1129 (internal citations omitted).

27  Conversations occur between *people*.  *See, e.g.,* CAMBRIDGE DICTIONARY, https://dictionary.

28  cambridge.org (conversation is a "talk *between two or more people* in which thoughts, feelings,

and ideas are expressed, questions are asked and answered, or news and information is exchanged") (emphasis added); OXFORD LANGUAGES DICTIONARY, https://oed.com ("a talk, especially an informal one, *between two or more people*, in which news and ideas are exchanged") (emphasis added).

When a person asks the Alexa computer service to take an action (*e.g.*, "turn off the lights") or to answer a question (*e.g.,* "what's the temperature outside"), that is not a "conversation," any more than a Google search is a "conversation" with Google.  No court has ever held that commands or queries to computers—whether they are delivered via typing, clicking, tapping, or voice—are "conversations" under Washington law.  That is unsurprising, because construing "conversation" to include commands to an online computer service would "stray too far from the term's ordinary meaning."  *See, e.g.*, *Cousineau*, 992 F. Supp. 2d at 1129; *Hoang v. Amazon.com, Inc.*, 2012 WL 1088165, *5 (W.D. Wash. Mar. 30, 2012) (Amazon recording personal information the plaintiff voluntarily input during subscription sign-up process was not interception of a private conversation or communication).  In the individual Alexa-related arbitrations against Amazon, ███████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████ *See*, *e.g.*, Nercessian Decl. ¶122-Ex-109 at AMZ_GARNER_00073457.

In its dismissal order, the Court referred to a "conversation with Alexa" and noted that "the conversation is (or at least appears to be to the user) oral and is more analogous to a telephone call."  MTDO at 18 n.9.  Respectfully, that is wrong.  No Alexa user could have an objectively reasonable belief that she or he is engaging in anything akin to a telephone call, which is a live communication with a sentient being.  Voice-enabled technologies were novel at the 1962 World's Fair (*see* IBM's "Shoebox"), but now are totally unremarkable and well-understood.  No reasonable user of such technology believes that Siri, Google Assistant, Alexa, ChatGPT, or the myriad other interactive computer programs and voice assistants—no matter how realistic, sophisticated, and "human" they have become—are conscious or capable of thinking, feeling, or

- 36 -

truly "interacting." Alexa commands are merely computer commands, which could just as readily be typed as spoken. It is unrealistic to anthropomorphize a computer and suggest that anyone is having a "private conversation" with the Alexa service.

Plaintiffs understand this reality and concede they did not have conversations with Alexa. As Mrs. Johnson put it at her deposition, "A conversation is when two *people* talk." Nercessian Decl. ¶68-Ex-81 (126:16-19) (emphasis added); *see also*, *e.g., id.* ¶29-Ex-59 (130:6-131:18) (admitting that commands directed at a computer, like "Alexa what is the weather," are not "conversations"), ¶118-Ex-106 (115:22-116:10) ("As Caron, a person, I don't – have never thought about me having a conversation with a – you know, a non-living thing. I don't – so, yeah – no, I would not constitute it as a conversation"); Chan-Ex-6 (139:10-140:15) (testifying that an Alexa command is not a conversation, that a conversation requires two people, and that a recording of only a person's voice is not a conversation).

### 2. False-Wake Recordings Do Not Violate The WPA.

Given that the WPA clearly does not apply to *intentional* commands by a human to a computer, the Unregistered Plaintiffs likely will focus instead on false-wake recordings to support their WPA claims. Although discovery has not borne this out, Plaintiffs' theory is that a false-wake activation by the Alexa service might accidentally record a private conversation or communication between two people near an Alexa-enabled device. But even if that had occurred, it would not violate the WPA, for several reasons.

#### a. There Is No "Transmission" of Communications.

WPA Section 1(a) applies only to recordings or interceptions of a "private communication *transmitted* by telephone, telegraph, radio, or other device between two or more individuals …." RCW § 9.73.030(1)(a) (emphasis added). This provision is aimed at traditional wiretapping, *i.e.,* "tapping into" some other communication medium and "intercepting" people's communications exchanged through that medium. *See, e.g., State v. Smith*, 196 Wn. App. 224, 231 (2016), *rev'd in part on other grounds*, 189 Wn.2d 655 (2017) ("The unchallenged findings … show that the voice mail feature recorded John and Sheryl communicating in person. They were not attempting to communicate through any device that would make the voice mail recording subject to RCW

9.73.030(1)(a).").  If Alexa activated accidentally and happened to record two people speaking near an Alexa-enabled device, that live oral communication would not be one "transmitted by telephone, telegraph, radio, or other device between two or more individuals."    RCW § 9.73.030(1)(a).  It would simply be two people talking in person directly to each other.  Thus, Section 1(a) cannot apply to false-wake recordings.

### b.    Alexa Is Not "Designed" To Secretly Record.

The WPA does not apply to recordings made by just any device; it only applies to devices that are *designed* to secretly record.  RCW § 9.73.030(1).  Section 1(a) applies to recordings made of private transmitted communications "by any device electronic or otherwise *designed* to record and/or transmit said communication[s]."  *Id*., § (1)(a) (emphasis added).  Similarly, Section 1(b) applies to recordings made of private conversations "by any device electronic or otherwise *designed* to record or transmit such conversation[s]."  *Id*., § (1)(b) (emphasis added).  By its plain terms, the WPA cannot apply to *every* device with the capacity to record.  If it did, the phrase "designed to record or transmit such conversation" would be superfluous, which violates fundamental rules of statutory construction.  *See Diaz-Barrientos*, 2020 WL 4462657, *3  (noting that the WPA should be construed to "avoid rendering any word or provision meaningless"); *Davis v. State ex rel. Dep't of Licensing*, 137 Wn.2d 957, 963(1999) ("Statutes must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous.").  Such an interpretation would also impose liability for every recording device of any kind, including, for example, an answering machine that automatically records a communication in response to an inadvertent "pocket dial."  That cannot possibly be the intention of the statute.  Instead, the statute expressly applies only to devices "designed" to record private communications.  The Alexa service is indisputably not such a device.

As discussed in Section I.A.1 above, the Alexa service was specifically designed *not* to capture private communications.  There is no dispute that false-wakes are *accidents*: they are antithetical to how the Alexa service is intended to function, Amazon takes extensive measures to prevent them, and Amazon truncates suspected false-wake recordings and notifies users (through their Voice History) whenever such recordings occur.  Fresko Decl. ¶¶19-29.  That is not, by any

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 38 -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

legal or commonsense measure, a device "designed to record" private communications or conversations. *See, e.g.*, Nercessian Decl. ¶¶122-125-Exs-109-112 (arbitrator decisions holding that Amazon designed Alexa specifically *not* to record private conversations). This fact alone independently defeats Plaintiffs' WPA claims.

<strong>c.     False-Wake Recordings Are Not "Private Conversations."</strong>

Section 1(b) applies only if a "private conversation" is recorded. False-wake recordings are not "private conversations" under Washington law.

Under the WPA, short verbal exchanges are not "conversations." For instance, in *State v. David Smith*, 85 Wn.2d 840, 844-47 (1975), the Washington Supreme Court sitting en banc held that there was no violation for recording the following exchange: "What's the deal?"—"You know what the deal is. I'll tell you one thing baby, you have had it"—"If you wanted me, why didn't you come to see me?"—"I'll tell you why." *See also John Smith*, 189 Wn.2d at 658 ("brief oral exchange" between husband and wife not a "conversation": "Get away"—"No way. I will kill you"—"I know"). In fact, a Washington court recently found that a *nine-minute-long* portion of a recording, which captured several verbal exchanges between a man and woman, as well as music, noises, TV, laughter, and unintelligible discussion, was not a "conversation." *State v. Kamara*, 28 Wn. App. 2d 903, 910 (2023), *review denied*, 2 Wn.3d 1031 (2024).

False-wake recordings are almost uniformly just seconds-long blips of sound, a few words out of context, or unintelligible noise. At the Court's direction, Plaintiffs annotated *all* Alexa recordings that they claim were accidental and private. Not *one* reflects an "oral exchange, discourse, or discussion" between people as Washington law defines that concept. *David Smith*, 85 Wn.2d at 847; *see also* Chan-Ex-42 (Arbitrator Hendricks decision) (holding that "short audio fragments of only a few seconds duration, with only a few spoken words" were not conversations); *accord* Chan-Ex-44 (Arbitrator Gordon decision). In fact, Plaintiffs initially characterized recordings as private conversations and were later forced to recant these claims. For example, Ms. Brust identified a recording as containing "a conversation" but later testified that "I heard only static." Chan Decl. ¶35; Chan-Ex-2. Similarly, Mr. Babani testified that a recording he had marked as a private conversation contained only sounds from a television. Chan-Ex-5 (87:20-23)

("Q: Okay. You identify that as a recording of a private conversation. But having heard it again, do you believe that that is a private conversation? A: No. That appears to be a TV."); *see also* Chan Decl. ¶19-Ex-2 (154:11-156:4) (Ms. Brust, mistakenly identifying snippet from Cougar Town TV show as containing her voice). Mr. Johnson admitted that recordings of supposed conversations that happened "after intercourse" contained no conversation at all, but instead only a cough. Chan Decl. ¶47-Ex-10 (131:1-132:23, 133:17-134:1) and Ex-16. Mrs. McNealy—who claimed that Alexa recorded a conversation about her cancer treatment—admitted at her deposition that the snippet of recorded audio said nothing about cancer. Chan-Ex-7 (225:18-226:11); *see also* Chan-Ex-6, 140:16-143:12 (Mr. McNealy, testifying about a recording he had identified as a confidential conversation not directed at Alexa: "Now that I heard my sisters say, 'Hey, Alexa,' that would be directed at Alexa now, wouldn't it?"). Ms. Garner testified that recordings she originally characterized as "conversations" occurred within a six-minute span during which she and her friends were playing the "Song Quiz" skill, a game where participants take turns guessing the name of songs played by Alexa. Nercessian Decl. ¶94-Ex-96 (166:17-174:25). And, in many instances, ███████████████████████████████████████████████████████████ ██████████████████████ *See, e.g.*, Nercessian Decl. ¶33-Ex-70, ¶53-Exs-79-80, ¶72-Exs-91-92, ¶99-Ex-100, ¶109-Ex-105. In short, nothing in the record establishes that Amazon *ever* recorded *any* of Plaintiffs' "conversations."

Nor are false-wake recordings "private."[6] Courts define "private" the ordinary way: "belonging to one's self … secret … intended only for the persons involved ([in] a conversation) … holding a confidential relationship to something … a secret message: a private communication … secretly: not open or in public." *E.g.*, *State v. Clark*, 129 Wn.2d 211, 224 (1996) (citations omitted). The analysis is necessarily *objective*, because every recorded plaintiff "will contend that his or her conversation was intended to be private." *Clark*, 129 Wn.2d at 225.

---

[6] In its dismissal order, *accepting Plaintiffs' allegations as true*, the Court stated that "Defendants do not dispute that the communications picked up by the Alexa devices were 'private' …." MTDO at 12. Amazon very much disputes that assertion, and discovery has shown it to be false. Alexa recordings are *not* private, as a practical or legal matter. Intentional commands are not even arguably private, at least not vis-à-vis Amazon as the intended recipient. And, as discussed below, false-wake recordings are not private either.

And where (as here) the facts are undisputed, whether a communication is "private" is a question of law. *Kadorian by Peach v. Bellingham Police Dep't*, 119 Wn.2d 178, 190 (1992) (phone call was not "private" as a matter of law). To make that determination, courts consider (1) the duration and subject matter of the communication; (2) the location of the communication and the presence, or potential presence, of a third party; and (3) the recorded (non-consenting) party's role and relationship to the recording (consenting) party. *Clark*, 129 Wn.2d at 225-26. While "any single factor is not conclusive," *id.* at 227, all three favor Amazon.

**Duration and Subject Matter.** The Washington Supreme Court has held that even recordings of several minutes are too short to be "private." *Clark*, 129 Wn.2d at 225; *Kadorian*, 119 Wn.2d at 191 ("very brief" but intelligible exchange too "inconsequential" and "abbreviated" to be private). If intelligible exchanges lasting minutes are not "private," then neither are seconds-long false-wake recordings of isolated words and unintelligible sounds. *See, e.g.,* Chan Decl. ¶¶35, 43-44; Chan-Ex-2, Ex-4, Ex-6, Ex-12, Ex-13, Ex-15; Nercessian-Ex-70, Exs-79-80, Exs-91-92, Ex-100, Ex-105.

**Location and Presence of Third Parties**. Plaintiffs used internet-connected, microphone-enabled devices in their homes, knowing that, when activated, those devices would send audio to Amazon, a "third party," for processing. Unlike true wiretaps or "bugs," Echo devices light up to signal when they are activated, provide audible signals of that activation (*e.g.,* an optional tone, reduction of the device volume), and often provide audible responses. Rouhi Decl. ¶¶4-14-Exs-D-E; Fresko Decl. ¶¶38-41. Alexa even responds to questions specifically about recording. *See, e.g.*, Nercessian Decl. ¶15-Ex-60 and Ex-61 (139:25-141:24, AMZ_GARNER_AU_00013943); Chan-Ex-30 (response to "Alexa are you listening to anything?"). Under all these circumstances (or any of them), Plaintiffs had no reasonable, objective expectation that Alexa was not processing audio whenever activated, intentionally or otherwise. Stated differently, Plaintiffs were clearly on notice of the "possibility" of Alexa recording and "took a risk that [their] messages might be recorded." *Townsend*, 147 Wn.2d at 678.

**Role and Relationship to Amazon**. All the Unregistered Plaintiffs routinely directed intentional commands and requests to the Alexa service and expected that it would respond.

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 41 -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

Again, these Plaintiffs knew, or at least reasonably should have known, that in order to function, Alexa would record when activated, and they also reasonably understood that—unless they turned the microphone off—the devices would activate whenever the wake-word was spoken nearby. By the very nature of the relationship between the Unregistered Plaintiffs and Amazon, they could not have had an objectively reasonable expectation that their audio inputs to Alexa, including potential false-wakes, would not be recorded in some form to be processed.

In sum, even if false-wake recordings could be characterized as "conversations," they are not "private" under the WPA. That is true both because of their length and content—which is too "inconsequential" to create privacy concerns—and because the Unregistered Plaintiffs could not reasonably have believed that Alexa activations, even accidental, are "private." Their WPA claims fail on these bases, as well.

### 3. The WPA Does Not Apply To Disclosure Or Use Of Recordings.

Throughout this case, Plaintiffs' real complaint has *not* been that false-wake recordings sometimes *occur*, but that Amazon retains those recordings and that some are subject to human review. *See, e.g.*, FACC ¶149. But, as the Court already ruled, that is irrelevant under the WPA. "Whether Amazon adequately disclosed how long it stores the recordings and what it does with them after they are made is not relevant to the Washington wiretap claim: the law focuses on whether the recordings were unlawfully made and does not address or prohibit post-recording activities." MTDO at 16-17; *accord Kearney v. Kearney*, 95 Wn. App. 405, 412 (1999) (WPA "prohibits only recording or intercepting private phone conversations without the consent of the other party; it does not prohibit disseminating such conversations to others"); *Hoang*, 2012 WL 1088165 at *5 (no violation of WPA "regardless of what [defendants] did with [plaintiff's] information."). Thus, the Unregistered Plaintiffs' claims that are predicated on what Amazon *does* with Alexa recordings also fail.

### F. False-Wake Recordings Do Not Violate the FWA.

In its dismissal order, the Court limited the Unregistered Plaintiffs' FWA claims to purported interceptions of "the contents of oral communications in the absence of a wake-word." MTDO at 23-24. The FWA prohibits intentionally intercepting a wire, oral, or electronic

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 42 -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

communication. 18 U.S.C. § 2511(1)(a)); *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 876 (9th Cir. 2002). Plaintiffs' FWA claims fail for three reasons.

### 1.    There Is No Evidence of Any "Intentional" Interception.

There can be no FWA liability without an "intentional" interception. 18 U.S.C. § 2511(1)(a). "An act is not intentional if it is the product of inadvertence or mistake." *In re Pharmatrak, Inc.*, 329 F.3d 9, 23 (1st Cir. 2003). Thus, "the operative question under § 2511 is whether the defendant acted consciously and deliberately with the goal of intercepting [protected] communications." *United States v. Christensen*, 828 F.3d 763, 791 (9th Cir. 2015) (approving *In re Pharmatrak*; collecting cases).

By definition, false-wakes are *accidental* activations and therefore are not actionable. Voice assistants are a novel and evolving technology, and sometimes they make mistakes (as Amazon widely discloses). Fresko Decl. ¶¶7-8. That is not "intentional" conduct. The undisputed evidence shows that Amazon devotes substantial resources to reducing false-wakes and limiting any recording that accidentally occurs. Fresko Decl. ¶¶19-29. Moreover, any inference that Amazon "intends" to *unlawfully* intercept confidential communications is undermined by the fact that Amazon's conduct has been found lawful across over two dozen final arbitration awards, based on the same basic allegations Plaintiffs assert here. *See, e.g.*, Chan-Exs-40-46; Nercessian Decl. ¶¶121-127-Exs-110-115 (compiled arbitration orders).

### 2.    Amazon Did Not Intercept Any "Oral Communications."

The FWA covers only oral communications "uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2). Thus, a plaintiff must not only have a subjective expectation that their communications will not be intercepted, that expectation must also be objectively reasonable. *Percival v. Poon*, 2021 WL 962701, *5 (W.D. Wash. Mar. 15, 2021) (citing *United States v. McIntyre*, 582 F.2d 1221, 1223 (9th Cir. 1978)). Plaintiffs had no objectively reasonable expectation of not being recorded, because they knew that their Alexa-enabled devices, when turned on, were listening for the wake-word and that, if it was detected, Alexa would capture their voices. *See, e.g.*, Chan-Ex-4 (40:7-22).

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 43 -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

### 3. There Is No Evidence Of Any Unlawful Use Or Disclosure.

Sections 2511(1)(c) and (d) of the FWA protect only "against the dissemination of private communications that have been unlawfully intercepted." *Noel v. Hall*, 568 F.3d 743, 751 (9th Cir. 2009) (dismissing claims for use and disclosure absent an unlawful interception). Because the undisputed evidence establishes no predicate violation of Section 2511(1)(a), Plaintiffs' claims under Sections 2511(1)(c) and (d) necessarily fail too.

## III. PLAINTIFFS HAVE NO VIABLE NON-WASHINGTON CLAIMS.

Several of the (purportedly) Unregistered Plaintiffs assert claims under the wiretap laws of states other than Washington. But, as addressed above, under standard choice-of-law principles, and as the Court effectively already ruled, Washington law applies to *all* claims by *all* Plaintiffs. Thus, the Court need not consider the non-Washington claims.

Even if non-Washington wiretap laws applied, it would not change the result. While some of those laws contain different statutory language, they are consistent with the WPA, and many are in fact modeled on the FWA. *See* Fla. Stat. § 934.03(1)(a) (making it unlawful to "[i]ntentionally intercept[], endeavor[] to intercept, or procure[] any other person to intercept or endeavor to intercept any wire , oral, or electronic communication"); Md. Code Ann., Cts. & Jud. Proc. § 10-402(a)(1) (same); 18 Pa. Cons. Stat. § 5703(1) (same); N.H. Rev. Stat. § 570-A:2.I(a) (similar but limited to interceptions of "telecommunication[s] or oral communication[s]" only); *cf.* 18 U.S.C. § 2511(1)(a) (FWA). As discussed in Section II.D above, all the asserted non-Washington wiretap laws recognize *implied* consent. All but the CIPA also require some act of "interception" or "tapping" of protected communications. All require intentional, willful, or reckless conduct. And none of the laws permit a claim for use or disclosure of recordings without a predicate recording violation. *See also Flanagan v. Flanagan*, 27 Cal. 4th 766, 775 (Cal. 2002) (no cause of action under CIPA Section 632 for post-recording or post-eavesdropping use or disclosure at all). In addition, no state wiretap law applies when a plaintiff lacks a *reasonable* expectation that an "oral communication" will not be recorded or intercepted. And many states recognize that recording of online communications by computers that receive them is not wiretapping. *See, e.g.*, *Revitch*, 2019 WL 5485330 at *3.

AMAZON'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. 2:21-CV-00750-RSL

- 44 -

FENWICK & WEST LLP
401 UNION STREET, 5TH FLOOR
SEATTLE, WASHINGTON 98101

All of that is absent here: there is no conceivable "interception" of Alexa commands directed at Amazon; no reasonable expectation of non-recording of Alexa audio inputs, including from the widely-known phenomenon of false-wakes; no evidence of any willfulness or otherwise culpable intent to intercept or record private communications; and no unlawful use or disclosure of Alexa audio inputs.  Space limitations on this motion preclude Amazon from fully addressing the merits of the other state laws.  But if the Court determines that any of Plaintiffs' non-Washington claims survive, Amazon respectfully requests an opportunity to submit supplemental briefing addressing why those claims also fail on the merits as a matter of law.

## IV.    ALL PLAINTIFFS LACK INDIVIDUAL STANDING AND STANDING TO REPRESENT A CLASS.

"Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C. J., concurring).  Plaintiffs must maintain standing at all stages of the litigation.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  Accordingly, a "named plaintiff who has not been harmed by a defendant is generally an inadequate and atypical class representative for purposes of Federal Rule of Civil Procedure 23." *Martinez v. Newsom*, 46 F.4th 965, 970 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1782 (2023); *accord Wetzel v. CertainTeed Corp*, 2019 WL 3976204, *14 (W.D. Wash. Mar. 25, 2019) ("A plaintiff who lacks standing to bring a claim in his own right cannot qualify as a class representative for a class of persons able to raise that claim.") (citation omitted).

As set forth above, Plaintiffs have no viable claims of their own and suffered no concrete harm.  *Yellen*, 34 F.4th at 848.  As such, they cannot act as class representatives and this case must be dismissed in its entirety.

## CONCLUSION

For the foregoing reasons, Amazon respectfully requests that the Court grant summary judgment in Amazon's favor on all of Plaintiffs' claims for relief and dismiss this action.

\\

\\

\\

1    Dated:  October 30, 2024          FENWICK & WEST LLP

2

3                                       By: */s/ Brian D. Buckley*
                                           Brian D. Buckley, WSBA No. 26423
4

5                                           Y. Monica Chan, WSBA No. 58900
                                            401 Union Street, 5th Floor
6                                           Seattle, WA  98101
                                            Telephone:  206.389.4510
7                                           Facsimile:  206.389.4511
                                            Email:      bbuckley@fenwick.com
8
                                            Jedediah Wakefield (admitted *pro hac vice*)
9                                           Tyler G. Newby (admitted *pro hac vice*)
                                            Armen N. Nercessian (admitted *pro hac vice*)
10                                          Garner F. Kropp (admitted *pro hac vice*)
                                            555 California Street, 12th Floor
11                                          San Francisco, CA  94104
                                            Telephone:  415.875.2300
12                                          Facsimile:  415.281.1350
                                            Email:      jwakefield@fenwick.com
13                                                      tnewby@fenwick.com
                                                        anercessian@fenwick.com
14                                                      gkropp@fenwick.com

15                                          Melissa Lawton (admitted *pro hac vice*)
                                            Janie Yoo Miller (admitted *pro hac vice*)
16                                          Esther Galan (admitted *pro hac vice*)
                                            730 Arizona Street, 1st Floor
17                                          Santa Monica, CA  90401
                                            Telephone:  310.434.5400
18                                          Email:      mlawton@fenwick.com
                                                        jmiller@fenwick.com
19                                                      egalan@fenwick.com

20                                          *Counsel for Defendants*
                                            AMAZON.COM, INC. and AMAZON.COM
21                                          SERVICES LLC

22

23

24

25

26

27

28

1

## LCR 7 WORD-COUNT CERTIFICATION

2          As required by Western District of Washington Local Civil Rules, and the Court's July 31,

3   2024 Order, Dkt. 272, I certify that this memorandum contains 16,584 words.

4          Dated:  October 30, 2024

5                                        FENWICK & WEST LLP

6

7                                        By: /s/ Brian D. Buckley
                                            Brian D. Buckley, WSBA No. 26423

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28