UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KAELI GARNER, *et al.*,

    Plaintiffs,

  v.

AMAZON.COM, INC., *et al.*,

    Defendants.

CASE NO. 2:21-cv-00750-RSL

ORDER GRANTING IN PART DEFENDANTS' *DAUBERT* MOTION REGARDING TESTIMONY OF SERGE EGELMAN

This matter comes before the Court on "Amazon's Motion to Exclude Testimony of Serge Egelman." Dkt. # 322. Defendants seek to exclude Dr. Egelman's testimony regarding (a) whether voice recordings are personally identifiable information, (b) the frequency and content of false wake recordings, (c) the reliability of voice recordings, (d) consumer expectations and views regarding the retention and use of voice recordings, (e) whether users consented to Alexa's terms and conditions, (f) the content of Amazon's documents, and (g) Dr. Egelman's interpretation of Amazon's documents.[1]

Federal Rule of Evidence 702 provides that expert testimony is admissible if:

---

[1] This matter can be decided on the papers submitted. Amazon's request for oral argument is DENIED.

ORDER GRANTING IN PART DEFENDANTS' DAUBERT
MOTION REGARDING TESTIMONY OF SERGE
EGELMAN - 1

(1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the relevant principles and methods to the facts of the case.

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014). As construed in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, Rule 702 tasks a district judge with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579, 597 (1993). Where an expert offers non-scientific testimony, "reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind" the testimony. *Porter v. Martinez*, 64 F.4th 1112, 1127 (9th Cir. 2023) (quoting *Daubert*, 509 U.S. at 594, and *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F. 3d 998, 1017 (9th Cir. 2004)). The analysis "should be applied with a 'liberal thrust' favoring admission." *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting *Daubert*, 509 U.S. at 588).

Ultimately, the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology. The court is a gatekeeper, not a fact finder. Accordingly, the district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury. If the proposed testimony meets the thresholds of relevance and reliability, its proponent is entitled to have the jury decide upon its credibility, rather than the judge. Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury. This Court has previously noted that shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.

ORDER GRANTING IN PART DEFENDANTS' DAUBERT
MOTION REGARDING TESTIMONY OF SERGE
EGELMAN - 2

*Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (internal quotation marks, citations, and alterations omitted). "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013).

**A. Voice Recordings as Personally Identifiable Information**

Dr. Egelman opines that voice recordings are personally identifiable information. Dkt. 324 at ¶¶ 47-51. He explains why voices are unique and how voice recordings can be matched, and he provides examples in research, statutes, and within Amazon of voice recordings being treated as personally identifiable information. Amazon does not take issue with that opinion, *per se*, but rather argues that plaintiffs have improperly relied "on that generalized statement to suggest that Amazon could identify all people whose voices were recorded in Alexa interactions." The portion of plaintiffs' motion for class certification to which Amazon apparently objects relies on evidence other than Dr. Egelman's report, however. Dkt. 257 at 18 ("Moreover, Amazon has a voice profile for Non-Registrants tied to the IP address and other identifying data associated with the account. *See* Ex. CC at 303:12-24; Ex. WW at '7633.''). Even if, as Amazon asserts, plaintiffs stretched Dr. Egelman's general statement to support a broader argument, counsels' advocacy does not make unreliable or unhelpful Dr. Egelman's opinion regarding the personally identifiable nature of voice recordings.

ORDER GRANTING IN PART DEFENDANTS' DAUBERT
MOTION REGARDING TESTIMONY OF SERGE
EGELMAN - 3

**B. Frequency and Content of False Wakes**

Dr. Egelman, citing an internal Amazon document, opines that Alexa devices experience between 0.21 and 0.43 false wakes per week and that "each and every Alexa device will inappropriately intercept and transmit contemporaneously-captured audio streams *at least* once per month." Dkt. 324 at ¶ 18 (emphasis in original). Amazon takes issue with this opinion, asserting that the document on which Dr. Egelman relies reflects the *average* rate of false wakes per week and cannot logically be used to say anything about the number of false wakes a particular device might experience. Plaintiffs, on the other hand, assert that the document discusses *actual* false wake measurements. A review of AMZ_GARNER_00052921 at '2921 does not resolve the matter: the top end of the false wake range appears to be measured on a device/week basis (*i.e.*, actual rates) while the bottom end of the range is clearly stated as an average. Dkt. 379-2 at 3. Even if all of the numbers in the range are based on averages, Dr. Egelman maintains that the complex statistical models generating these numbers, the way the technology works, and the millions of data points lead to the conclusion that all of the devices are impacted by false wakes. Dkt. 379-1 at 5-7. While this conclusion is not the only one that could be drawn from the underlying data, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), as amended (Apr. 27, 2010).

ORDER GRANTING IN PART DEFENDANTS' DAUBERT
MOTION REGARDING TESTIMONY OF SERGE
EGELMAN - 4

## C. Consumer Awareness of Alexa's Recording Practices

In a section of his report entitled "The Public is Likely Unaware Audio was Collected," Dr. Egelman makes a number of statements regarding how Alexa and its opt-out features work and cites research studies showing that "almost half" of Alexa users did not know their recordings were being permanently stored or that they could review them and that "most participants" did not feel like they had consented to Amazon's storage and use of their data. Dkt. 324 at ¶¶ 36-37. Amazon combines the title, the technological descriptions, and the studies to ascribe to Dr. Egelman opinions he has not espoused. Dkt. 322 at 5-6 (attributing to Dr. Egelman Amazon's descriptions of the product and the statement of an anonymous study participant); Dkt. 379 at 7 (attributing to Dr. Egelman the opinion that customers "are uniformly unaware" of how Alexa works). To the extent Dr. Egelman is opining that the public is likely unaware of Alexa's recording, collection, storage, and review features, the opinion is based on sufficient data and facts, including relevant studies and his two decades of experience/expertise in researching consumer privacy preferences and expectations. The fact that Amazon can identify additional sources of facts and data that were not considered goes to the weight of the evidence, not its admissibility.

## D. Consumer Views of Alexa's Recording Practices

Dr. Egelman opines that, based on his prior research regarding consumer privacy and security decision making, consumer privacy preferences, privacy and security expectations, and the ways online services and other software attempt to satisfy those

ORDER GRANTING IN PART DEFENDANTS' DAUBERT
MOTION REGARDING TESTIMONY OF SERGE
EGELMAN - 5

expectations, consumers would find Alexa's recording, collection, storage, and review features objectionable. In particular, Dr. Egelman relies on studies regarding consumers' reactions to recording within their homes, the personally identifiable nature of voice recordings, consumer reactions to sharing recordings with humans (as opposed to machine processing), and the strenuous objections of "bystanders" (those who are not users of the device but nevertheless have their data captured), as well as Amazon's own internal acknowledgment that using consumer voice recordings raises privacy concerns for Alexa users. Amazon argues that this opinion is baseless because the technologies that were studied (smartphones, wearable devices, *etc*.) differ from voice assistants like Alexa and the consumers participating in the study do not map squarely with any of the classes proposed by plaintiffs. It further asserts that Dr. Egelman misinterprets or misstates the findings of three of the studies on which he relies.

Dr. Egelman has sufficient knowledge, experience, and data to opine regarding how consumers would view various recording practices and uses of their voice data. Some of the surveys on which Dr. Egelman relies relate to voice assistants like Alexa, and even studies that were not specific to voice assistant technologies shed light on how consumers view the collection and use of their data. The survey results that Amazon believes contradict Dr. Egelman's opinions are, on the whole, supportive. The Malkin, et al. (2018) study, for example, amply supports the conclusion that, while between 25-50% of study participants recognized that data collected by internet-enabled devices could be shared and repurposed, a large majority strongly felt that data sharing was unacceptable and would, if

ORDER GRANTING IN PART DEFENDANTS' DAUBERT
MOTION REGARDING TESTIMONY OF SERGE
EGELMAN - 6

given an opportunity, disable any data-sharing features. Dkt. 325-3 at 103-05. Again, while Dr. Egelman's conclusions regarding consumer views are not unassailable, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

**E. Consent**

Dr. Egelman opines that the collector of personal data has an obligation "to ensure customers are informed and consent to the collection of the data and how it may be used (*e.g.*, that it may be shared with human employees/contractors who will listen to it) – which Amazon failed to do here" and that non-registrants did not have the opportunity to consent. Dkt. 324 at 14-15. Amazon argues that any opinion regarding whether users expressly or impliedly consented to Alexa recordings must be excluded as an improper legal conclusion, is without basis, and is contrary to the Court's prior rulings.

Amazon's underlying assertion that consent is a legal issue to be decided by the Court is unsupported. While a Court may resolve the issue of consent if there is no genuine dispute regarding a material fact, there are myriad cases and contexts in which consent is deemed a fact issue. *See, e.g.*, *Harrison v. Eddy Potash, Inc.*, 248 F.3d 1014, 1023 (10th Cir. 2001) (consent to sexual advances); *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981) (consent to search); *Godinez-Torres v. United States*, No. 14-cv-01097-CBA-PK, 2016 WL 11670284, at *10 (E.D.N.Y. Mar. 31, 2016) (consent to surgery); *Anderson v. City of Columbus, Georgia*, 374 F. Supp. 2d 1240, 1250 (M.D. Ga. 2005) (consent to recording). Nevertheless, Dr. Egelman will not be permitted to opine regarding

ORDER GRANTING IN PART DEFENDANTS' DAUBERT
MOTION REGARDING TESTIMONY OF SERGE
EGELMAN - 7

the consent (or lack of consent) of consumers as a whole or of individual consumers. Dr. Egelman's expertise is in consumer expectations and preferences. He may, as discussed above, opine regarding what consumers expect with regards to the collection and use of their data, what their preferences would be, and what Amazon could have or should have done to ensure that those expectations and preferences were satisfied. But neither plaintiffs nor Dr. Egelman establish any basis for an opinion regarding whether a particular individual consumer or consumers as a group consented to the collection of audio recordings or the storage, review, and subsequent use of the same.

**F. Contents of Amazon Documents**

Amazon seeks to exclude Dr. Egelman's statements regarding how Alexa works and what Amazon does with the resulting voice recordings on the ground that the statements merely regurgitate the content of Amazon's documents without analyzing or synthesizing the information into admissible expert opinions. An explanation of the product and its capabilities is necessary background for Dr. Egelman's opinions. For example, knowing that the technology generates unintended recordings and what Amazon does with those recordings helps establish the relevance of the research on which Dr. Egelman relies to opine on consumer expectations and preferences. While Dr. Egelman will be instructed at trial to differentiate between facts he has assumed based on Amazon's

documents[2] and the opinions he has drawn from those facts, he is not precluded from discussing Amazon's documents in this context.

**G. Interpretation of Amazon's Documents**

Amazon seeks to exclude what it describes as Dr. Egelman's incorrect interpretations and misleading characterizations of Amazon's documents. In paragraph 16, for example, Dr. Egelman apparently interpreted an on-going discussion regarding whether the "comms team" stored "data in any place other than Datamart" (Dep. Tr. At 197) as an admission that "Amazon is not sure of all the places where employees and/or contractors store voice data" (Dkt. 324 at ¶ 16).

The Court takes this matter under advisement. Dr. Egelman's expertise lies in evaluating consumer expectations, consumer preferences, and the ways in which products meet those expectations/preferences. To the extent Dr. Egelman relies on an Amazon document to support an opinion that falls within his expertise, his understanding of the document is admissible even if faulty. But there is no reason to believe that Dr. Egelman has any special knowledge or experience that would allow him to interpret or explain the meaning of internal Amazon documents that have nothing to do with the opinions offered. The admissibility of the challenged portions of the report will be determined based on the context in which the testimony is elicited at trial.

---

[2] The underlying facts regarding how Alexa works and what Amazon does with the resulting data must, of course, be established through the presentation of admissible evidence. To the extent Dr. Egelman's assumed facts are incorrect, that can be shown on cross-examination.

ORDER GRANTING IN PART DEFENDANTS' DAUBERT
MOTION REGARDING TESTIMONY OF SERGE
EGELMAN - 9

For all of the forgoing reasons, defendants' *Daubert* motion regarding Dr. Egelman's opinions is GRANTED in part. Dr. Egelman will not be permitted to opine regarding whether a particular consumer or group of consumers consented to Amazon's collection of audio recordings or their storage, review, and subsequent use. Amazon's objection to Dr. Egelman's interpretations of its internal documents is taken under advisement. The motion to exclude is DENIED in all other respects.

Dated this 30th day of March, 2026.

Robert S. Lasnik
United States District Judge

ORDER GRANTING IN PART DEFENDANTS' DAUBERT
MOTION REGARDING TESTIMONY OF SERGE
EGELMAN - 10